**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** | § § § § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § § | |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** | § § § | |
| *Defendant.* | § | **Cause No. 4:25-cv-00319-P** |
| and | § | |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** | § § § | |
| | § | |
| *Counter-Plaintiff,* | § | |
| v. | § § | |
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** | § § § § | |
| *Counter- Defendant.* | § | |

---

**LEGACY MEDICAL CONSULTANTS' BRIEF IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ................................................................................. 1

II.     SUMMARY JUDGMENT EVIDENCE ............................................... 2

III.    STATEMENT OF MATERIAL FACT ................................................. 3

    A.    THE PARTIES AND AGREEMENTS .................................... 3

    B.    PERFORMANCE ...................................................................... 5

    C.    OUTSTANDING BALANCE AND BREACH .......................... 6

    D.    MEDICARE REIMBURSEMENT PROCESS ......................... 8

        1.    Dr. Leeberg, as the Treating Provider, Bore Sole Responsibility for All Medical Necessity Determinations and Billing. ................................... 8

    E.    INSTRUCTIONS FOR USE (IFU) DO NOT SUPPLANT PROVIDER RESPONSIBILITIES ........................................... 11

    F.    DEFENDANT'S DENIALS WERE DUE TO HER OWN DOCUMENTATION AND BILLING DEFICIENCIES .................................... 13

    G.    Leeberg Cannot Establish Apparent Authority for Apex/Logwood ................... 15

IV.     PROCEDURAL HISTORY ................................................................. 16

V.      LEGAL STANDARD .......................................................................... 17

VI.     ARGUMENT ....................................................................................... 18

    A.    Leeberg CANNOT Establish ACTUAL OR APPARENT HAD AUTHORITY to MODIFY the Integrated Agreements. ....................................... 18

    B.    SUMMARY JUDGMENT SHOULD BE GRANTED ON LEGACY'S BREACH OF CONTRACT CLAIM ................................................ 24

        1.    Existence of valid contracts and Legacy performed. ............................... 25

        2.    Leeberg Breached the Agreements. ....................................................... 26

        3.    Damages sustained by Legacy as a result of the breach. ......................... 31

    C.    LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS ............................................ 31

VII.    CONCLUSION .................................................................................... 48

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*5AIF Sycamore 2, LLC v. Beit Nes, LLC*,
No. 1:19-cv-0431-RP, 2022 WL 2903122 (W.D. Tex. Jan. 6, 2022)......................................42

*AHBP LLC v. Lynd Co.*,
649 F. Supp.3d 371 (W.D. Tex. 2023).............................................................................41, 42

*AKB Hendrick, LP v. Musgrave Enters, Inc.*,
380 S.W.3d 221 (Tex. App.—Dallas 2012, no pet.)...............................................................46

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*,
124 S.W.3d 154 (Tex. 2003)......................................................................................................25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................................17

*Armendariz v. Hudgens, et al.*,
618 S.W.3d 750 (Tex.App.—El Paso, 2020)..............................................................19, 20, 22

*Bandera Drilling Co., Inc. v. Sledge Drilling Corp.*,
293 S.W.3d 867 (Tex. App.—Eastland 2009, no pet.)...............................................7, 25, 30

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019)......................................................................................7, 25, 29

*Breeden v. Weinberger*,
377 F.Supp. 734 (M.D. La. 1974)........................................................................................8, 40

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................................................17

*Cleary v. American Airlines, Inc.*,
No. 4:21-cv-00184-O, 2022 WL 5320126.......................................................................42, 43

*Coburn Supply Co. v. Kohler Co.*,
342 F.3d 372 (5th Cir. 2003) ...................................................................................................28

*Coffey v. Fort Wayne Pools, Inc.*,
24 F.Supp.2d 671 (N.D. Tex. 1998) ................................................................................22, 23

*Community Health Sys. Pro. Servs. Corp. v. Hansen*,
525 S.W.3d 671 (Tex. 2017).....................................................................................................19

*DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*,
   112 S.W.3d 854 (Tex. App. –Houston 2003) ........................................................44

*East Hill Marine, Inc. v. Rinker Boat Co., Inc.*,
   229 S.W.3d 813 (Tex.App.-Fort Worth 2007, pet. denied) ....................................27

*First Am. Title Ins. Co. v. Cont'l Cas. Co.*,
   709 F.3d 1170 (5th Cir. 2013) ................................................................... *passim*

*Fluorine on Call Ltd. v. Fluorogas Ltd.*,
   380 F.3d 849 (5th Cir. 2004) ................................................................................42

*Fontenot v. Upjohn Company*,
   780 F.2d 1190 (5th Cir. 1986) ..............................................................................17

*Gaines v. Kelly*,
   235 S.W.3d 179 (Tex. 2007) .................................................................................22

*Givens v. Dougherty*,
   671 S.W.2d 877 (Tex. 1984) .................................................................................28

*Glenn Thurman, Inc. v. Moore Const., Inc.*,
   942 S.W.2d 768 (Tex.App.—Tyler 1997, no pet.) ................................................28

*Great Western Sugar Co. v. Lone Star Donut Co.*,
   567 F.Supp. 340 (N.D. Tex. 1983) ........................................................................28

*Grissom v. Watson*,
   704 S.W.2d 325 (Tex. 1986)..................................................................................19

*Hammonds v. Calhoun Distributing Co., Inc.*,
   584 S.W.2d 473 (Tex. App.—Texarkana 1979, writ ref'd n.r.e.)...........................28

*Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*,
   377 Fed.App'x. 422 (5th Cir. 2010) ......................................................................43

*House v. Chrysler Corp.*,
   No. 01-93-00854-CV, 1994 WL 320423 (Tex. App. –Houston [1st Dist.] July
   7, 1994) ................................................................................................................22

*Humble Nat. Bank v. DCV, Inc.*,
   933 S.W.2d 224 (Tex. App.–Houston [14th Dist.] 1996) .......................................24

*Impact Finishing, Inc. v. Wild Card, Inc.*,
   713 F. Supp. 3d 322 (N.D. Tex. 2024) ..................................................................26

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*,
    995 F. Supp.2d 587 (N.D. Tex. 2014.) ........................................................25, 37, 39

*IRA Res., Inc. v. Griego*,
    221 S.W.3d 592 (Tex. 2007)...............................................................................19

*James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*,
    198 S.W.3d 434 (Tex.App.-Dallas 2006, no pet.) ..............................................31

*Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*,
    136 F. Supp. 3d 792 (S.D. Tex. 2015) ................................................................27

*JPMorgan Chase Bank, N.A. v. Orca Assets*,
    546 S.W.3d 648 (Tex. 2018)..........................................................................43, 44

*Kachina Pipeline Co. v. Lillis*,
    471 S.W.3d 445 (Tex. 2015)...............................................................................25

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.*,
    242 S.W.3d 1 (Tex. 2007)...................................................................................47

*LG Ins. Mgmt. Servs., L.P. v. Leick*,
    378 S.W.3d 632 (Tex. App.– Dallas 2012, pet. denied)......................................25

*Lifshutz v. Lifshutz*,
    199 S.W.3d 9 (Tex. App. –San Antonio [4th Dist.] 2006) ..................................24

*Malacara v. Garber*,
    353 F.3d 393 (5th Cir. 2003) ..............................................................................18

*Miller v. CitiMortgage, LLC*,
    970 F.Supp.2d 568 (N.D. Tex. 2013) .............................................................47, 48

*Minsa Corp. v. SFTC, LLC*,
    540 S.W.3d 155 (Tex.App.—Amarillo 2017) ................................................33, 34

*Mullins v. TestAmerica, Inc.*,
    564 F.3d 386 (5th Cir. 2009) ..............................................................................25

*Nat'l Advert. Co. v. Brown*,
    894 S.W.2d 785 (Tex. App.– Tyler [12th Dist.] 1994)........................................23

*Nat'l Prop. Holdings, L.P. v. Westergren*,
    453 S.W.3d 419,425 (Tex. 2015)........................................................................46

*Nat'l Prop. Holdings, L.P. v. Westergren*,
    453 S.W.3d 419 (Tex. 2015)..............................................................42, 43, 44, 47

*Omni USA, Inc. v. Parker-Hannifin Corp.*,
964 F. Supp. 2d 805 (S.D. Tex. 2013) ............................................................8, 27

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*,
574 S.W.3d 882 (Tex. 2019) ...........................................................................25

*US ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) ...........................................................................37

*Protect Envtl. Servs., Inc. v. Norco Corp.*,
403 S.W.3d 532 (Tex.App.—El Paso, 2013, pet. denied) .............................19, 22

*Rainer Southlake DST v. Woodbury Strategic Partners Fund, LP*,
No. 02-16-00263-CV, 2017 WL 6047725 (Tex. App. Dec. 7, 2017)....................34

*Roxo Energy Co., LLC v. Baxsto*,
LLC, 713 S.W.3d 404 (Tex. 2025) ..................................................................44

*Sanders Oil & Gas GP, LLC, et al. v. Ridgeway Elec.*,
479 S.W.3d 293 (Tex.App.—El Paso, 2015, no pet.)...........................................20

*Shafipour v.Richson Dev. Corp.*,
No. 11-13-00212-CV, 2015 WL 3454219 (Tex. App. – Eastland 2015, no
pet.) .............................................................................................................47

*Suarez v. Jordan*,
35 S.W.3d 268 (Tex. App.—Houston [14th Dist.] 2000).....................................24

*Union Pacific R.R. v. Novus Int'l, Inc.*,
113 S.W.3d 418 (Tex. App. –Houston [1st Dist.] 2003, pet. denied)....................25

*Wal-Mart Stores, Inc. v. Guerra*,
No. 04-08-00146, 2009 WL 1900411 (Tex. App.—San Antonio 2009) (Tex.
App. –San Antonio [4th Dist.] 2009)...............................................................24

*Walcott v. Sebelius, et al.*,
653 F.3d 757 (5th Cir. 2011) ...........................................................................45

**Statutes**

42 U.S.C.
§ 1395 et. seq. ...............................................................................................8
§ 1395y(a)(1)(A)......................................................................................8, 45

Social Security Act ...............................................................................................8

Tex. Bus. & Com.Code Ann. §§ 2.101–2.725 .........................................................27

Tex. Bus. & Com. Code Ann.
  § 2.201, A......................................................................................................28
  § 2.204(a).....................................................................................................26
  § 2.601(a)..................................................................................................8, 27

Tex. Bus. & Com. Code
  § 2.201......................................................................................................7, 27
  § 2.202.........................................................................................................29
  §§ 2.202, 2.209(b).........................................................................................31
  § 2.209(b).................................................................................................*passim*
  §§ 2.601........................................................................................................33
  § 2.607(1).....................................................................................................31
  § 2.709(a)(1)............................................................................................27, 31
  §§ 2.709(a)(1), 2.710....................................................................................31

Tex. Fin. Code § 304.003..................................................................................31

UCC.........................................................................................................*passim*

UCC article 2............................................................................................27, 29

Uniform Commercial Code..................................................................................7

**Other Authorities**

42 C.F.R.
  § 424.32.......................................................................................................40
  § 424.32(a)(i)(b)..........................................................................................10

Fed. R. Civ. P.
  56(a)............................................................................................................17
  56(c)............................................................................................................17
  56(c)(1)–(3)..................................................................................................18

## I.    INTRODUCTION

This case presents a straightforward accounts receivable dispute that warrants summary judgment, arising from Defendant's sustained nonpayment of undisputed invoices under unambiguous written, integrated agreements. The undisputed record shows that Plaintiff, Legacy Medical Consultants, LP ("Legacy" or "Plaintiff") and Defendant Cristi Leeberg d/b/a Practitioners in Motion, PLLC ("Leeberg" or "Defendant") entered into multiple Texas governed, integrated purchase agreements (the "Agreements") pursuant to which Legacy would supply specified human cell and tissue products and Leeberg would pay the contract price within the agreed payment windows. Texas law applies under the Agreements' governing-law clauses, and the Court may enforce the contracts as written. Legacy fully performed by delivering the contracted-for products and issuing any applicable credits, as reflected in contemporaneous invoices and communications. Leeberg, by contrast, ordered, received, and used those products, yet has failed to pay the outstanding, liquidated principal balance of $7,335,930.32.

In short, no genuine dispute of material fact exists: the executed Agreements, Legacy's performance in and shipments made from Texas, the invoicing and payment terms (requiring payment within 45–60 days regardless of insurance reimbursement), the volume and value of shipments (approximately $14.8 million across roughly 770 orders), and the resulting unpaid balance are established by the pleadings, sworn declarations, and exhibits, and they entitle Legacy to judgment as a matter of law.

Further, Leeberg's counterclaims do not create any triable issue of fact or law. Attempting to recast a payment dispute as fraud, Leeberg relies on vague, extracontractual assurances and unincorporated instructions-for-use language that contradict the Agreements' express payment terms and their integration provisions. Those theories are incompatible with Medicare's regulatory

1

framework, which places medical-necessity determinations and reimbursement risk solely on the billing provider. The insurance claim denials Leeberg cites arise from her medical-necessity and documentation deficiencies, over which Legacy has no control. Leeberg does not identify any facts demonstrating that the independent distributor who purportedly made extracontractual statements had actual or apparent authority to bind Legacy. Most importantly, her conclusory counterclaims are barred by the express terms of the Agreements she signed, the parol evidence rule, and the absence of justifiable reliance as a matter of law.

Because Legacy performed and Leeberg did not—and because Leeberg's counterclaims fail as a matter of law—the Court should grant summary judgment for Legacy's breach of contract claims and against all counterclaims, and dismiss the counterclaims with prejudice.

## II.    SUMMARY JUDGMENT EVIDENCE

In support of this Motion, Plaintiff attaches the evidence outlined below, which is contained within the Appendix and which Plaintiff incorporates by reference as if fully set forth herein:

### Summary Judgment Evidence

**Exhibit 1:** Deposition of Cristi Leeberg
**Exhibit 2**: Agreements
 **Exhibit 2-A**: July 25, 2022 Fulfillment/Rebate Agreement
 **Exhibit 2-B**: April 1, 2023 Purchase Agreement for Zenith Membrane ("Zenith Agreement")
 **Exhibit 2-C**: September 27, 2023 Purchase Agreement for InnovaMatrix AC ("InnovaMatrix Agreement")
 **Exhibit 2-D**: September 27, 2023 Purchase Agreement for PalinGen ("PalinGen Agreement")
 **Exhibit 2-E**: November 7, 2023 Purchase Agreement for Impax Membrane ("Impax Agreement")
**Exhibit 3**: Expert Report of Charlotte L. Kohler
**Exhibit 4**: Legacy Insurance Verification Request Form
**Exhibit 5**: Deposition of Kimberly R. Bini
**Exhibit 6**: Defendants' Balance Statement
**Exhibit 7:** Medicare Program Integrity Manual
**Exhibit 8**: CMS 1500 Form
**Exhibit 9**: Medicare Denial Letters

**Exhibit 10**: LCD, *"Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities"*
**Exhibit 11**: Agency Commission Agreement
**Exhibit 12**: Defendants' Responses and Objections to Plaintiff's Request for Admission
**Exhibit 13**: Gateway Foot and Ankle Center, PLC
**Exhibit 14**: Declaration of Megan A. Altobelli in Support of Plaintiff's Motion for Summary Judgment
**Exhibit 15**: Declaration of Kimberly R. Bini in Support of Plaintiff's Motion for Summary Judgment
**Exhibit 16**: Declaration of Charlotte L. Kohler in Support of Plaintiff's Motion for Summary Judgment

## III.    STATEMENT OF MATERIAL FACT

### A.    THE PARTIES AND AGREEMENTS

Legacy markets proprietary regenerative biomaterial products, including amniotic tissue grafts used for wound covers by providing tissue in the form of scaffolding. Leeberg has more than three decades of experience as a medical professional: she began working as a practical nurse in 1995 and earned bachelor's and master's degrees as a nurse practitioner in 2011. (Ex. 1, at App. 0002, at 17:1-6). Based on her experience as a medical provider, Leeberg has served as an expert witness in several legal proceedings. (Ex 1. at App. 0006, at 53:16). Leeberg owns and operates Practitioners in Motion, PLLC, making all financial and managerial decisions for her practice. (Ex. 1. at App. 0005, at 34:9-12).

Legacy and Leeberg commenced their contractual relationship on July 25, 2022, by executing a written agreement, under which Legacy agreed to sell—and Leeberg agreed to purchase—specified human cell and tissue products. (Ex. 2-A at App. 0081-84.) Between July 25, 2022, and November 7, 2023, Leeberg personally executed five Agreements with Legacy (Exs. 2-A-E at App. 0081-0100.) (collectively, the "Agreements"), identified her signature, and disclaimed any allegation of forgery or inducement. (Ex. 1 at App., at 0035-36, 123:1-124:11). The Agreements covered a range of products, including the Zenith™ Amniotic Allograft ("Zenith"),

InnovaMatrix, PalinGen, and Impax™ Amniotic Allograft ("Impax"). (Exs. 2-A-E at App. 0081-0100.) Apex Medical, owned by Rick Logwood, served as an independent distributor of Legacy's products and was identified on Leeberg's onboarding materials as such; Apex/Logwood was not a Legacy employee or agent. Rather, the governing distributor agreement limited Apex/Logwood to marketing activities and expressly disclaims any authority to bind or obligate Legacy.

Each Agreement requires payment within 45 or 60 days of shipment without reference to third-party reimbursement and includes an integration and no-oral-modification clause requiring any changes to be made by a signed writing. (Exs. 2-A-E at App. 0081-0100, at ¶ 6) ("Customer agrees to pay Legacy Medical Consultants the balance due amount stated in each Invoice"); (Exs. 2-A-E at App. 0081-0100, at ¶ 7) ("This agreement may be amended or modified **_only_** by a written agreement signed by both parties.") (emphasis added). Leeberg confirmed the Agreements require payment within the specified timeframe (Ex. 1 at App. 0034, 0037, at 122:10-14; 127:20-23), are fully integrated (Ex. 1 at App. 0032-33, at 120:21-121:4), and were never modified in writing (*id.* at 121:5-8; 129:1-5). Further, the Agreements specify that Leeberg, as the medical provider, is solely responsible for medical necessity determinations. (Exs. 2-A-E at App. 0081-0100, at ¶ 4) ("Customer will treat the patient as medically necessary. Customer and Legacy Medical Consultants acknowledge that use of any Product is at the sole discretion of the treating provider, pursuant to his or her professional medical judgement."). As an experienced medical provider, Leeberg admitted it was her "responsibility to determine what is medically necessary" (Ex. 1 at App. 0063, at 204:13-17), and that she understood the Medicare Local Coverage Determinations ("LCD") requirements for the products (Ex. 1 at App. 0067-0068, at 212:1-213:22).[1] The

---

[1] LCDs are Medicare Administrative Contractor ("MAC")-issued coverage policies that guide payment decisions within a MAC's jurisdiction; they are not statutes or regulations, do not guarantee payment, and may vary by region and over time. (Ex. 3 at App. 0110-11, Kohler Report ¶¶ 29-33).

Agreements do not obligate Legacy to guarantee reimbursement, provide billing advice, or assume any responsibility for insurance denials. (Exs. 2-A-E at App. 0081-0100).

Legacy's Insurance Verification Request ("IVR") is a pre-order benefits-check tool that collects payer information and verifies the existence of the patient's insurance. (Ex. 4 at App. 00133). Legacy's IVR expressly disclaims that the form represents any kind of guarantee of reimbursement for the product. (Ex. 4 at App. 0133). The IVR is dependent on information supplied by the provider and does not bind the payer or guarantee coverage and it expressly disclaims any promise of reimbursement. *Id.* Final payment decisions are made by Medicare/contractors under applicable LCD and documentation standards, not by the IVR output. (Ex. 3 at App. 107-08, Kohler Report ¶¶ 18-21, 29); (Ex. 1 at App. 0070, at 217:19-21). Although the Agreements required Leeberg to use Legacy's IVR, she admittedly disregarded this process and instead used the process and form from her third-party distributor, Apex Medical. (Exs. 2-A-E at App. 0081-100, at ¶ 4); (Ex. 1 at App. 0028, at 110:15-19; 286:3-10.); (Exs. 2-A-E, ¶ 2.) Leeberg admitted she understood the IVR was not a guarantee of payment and that reimbursement depends on LCD criteria and her own documentation. (Ex. 1 at App. 0070, at 217:22-25.) She nevertheless chose to use the Apex's process instead of Legacy's IVR. (Ex. 1 at App. 0028, at 110:15-19) Leeberg confirmed that: the Agreements she signed are integrated, she never sought or executed any amendment, and there was no written modification of any agreement. (Ex. 1 at App. 0038-39, at 128:25-129:1-5.)

### B.    PERFORMANCE

Leeberg placed product orders with Legacy, received the products from Legacy, and used them in treating patients, admitting she "liked the products" and that they worked for her patients. (Ex. 1 at App. 0029-30, at 113:20-25; 114:1). Under the Agreements, Leeberg was obligated to

pay within 45 or 60 days of shipment irrespective of insurance reimbursement. (Ex. 1 at App. 0029-30, at 127:20-23.) Despite this, Leeberg acknowledged she paid only when Medicare reimbursed her and that any occasional extensions were never in writing. Legacy fulfilled and shipped a substantial volume of product for nearly two years: from July 25, 2022, to May 17, 2024, Leeberg placed 770 orders totaling approximately $14.815 million (ECF No. 24, Ex. 1, at ¶ 13.) In connection with these transactions, Leeberg remitted approximately $7.276 million to Legacy and returned approximately $157,981 in products to Legacy's Fort Worth headquarters. (*Id.*) Leeberg ordered Legacy products by sending the order request to either Legacy or Apex Medical ("Apex"), the distributor which Rick Logwood ("Logwood") owned and operated. (Ex. 5 at App. 0135, Bini Tr. 101:8-23; Ex. 1 at App. 0007, at 58:24-25.) Despite agreeing to use Legacy's IVR, Leeberg used Apex's IVR and routed forms through Apex/Logwood. (Ex. 1 at App. 0022, at 97:17-18, 137:4-6.) If an unused product was returned, Legacy issued a credit memo and by early 2024, the credit memos totaled $113,137.65. (Ex. 5 at App. 0136, at 117:16-19.) Leeberg does not dispute product acceptance, receiving invoices with the shipments, the accuracy of the invoices or disputing any of the amounts owed. (Ex. 1 at App. 0029, 0055-56, at 113:5-18; 171:8-172:15.)

### C.    OUTSTANDING BALANCE AND BREACH

Despite Legacy's performance, Leeberg failed to pay invoices for products she ordered, received, and did not return, leaving a delinquent balance of $7,335,930.32, as shown by Legacy's accounts-receivable ledger and invoice summaries.[2] (Ex. 6 at App. 0138-169); (ECF No. 6, Ex F, at ¶ 6). Leeberg has admitted she did not pay all invoices within the 45–60 day terms, paid only when Medicare reimbursed her, and never obtained a written modification of the Agreements'

---

[2] The only outstanding invoices at issue are for those Zenith™ and Impax™ amniotic allograft products, and therefore, Leeberg's performance under the April 4, 2023, and September 27, 2023 agreements is not at issue.

payment obligations. (Ex. 1 at App. 0032, 0049-50, 0033, 0039, at 120:7-9; 158:24-159:19; 121:5-8; 129:1-5). She further does not dispute product acceptance, receipt and accuracy of the invoices, or the amounts owed. (Ex. 1 at App. 0029, 0055-56, at 113:5-18; 171:8-172:15.)

To explain her nonpayment, Leeberg claims that she paid only when Medicare/insurance paid, relying on a verbal understanding with Apex/Logwood, not Legacy, that she would not "incur costs" unless reimbursed, and withheld payment because she believed the Instructions for Use ("IFU") was incorrect. (Ex. 1 at App. 0050, 0052, 0053, 0061, at 159:17-20; 163:15-20; 164:3-7; 197:19-25.) However, none of these excuses altered her contractual obligation to pay for the products used in her practice. The Agreements are fully integrated, require payment within 45–60 days regardless of reimbursement, and may be modified only by a signed writing—which indisputably does not exist. (Exs. 2-A–E at App. 0081-100, at ¶¶ 4, 6–7;) (Ex. 1 at App. 0032-33, 0037, 0039, at 120:21-121:8; 127:20-23; 129:1-5). Any alleged oral "no payment if no reimbursement" assurance is barred by the merger/no-oral-modification provisions and the parol evidence rule, and is independently precluded by the Uniform Commercial Code ("UCC") Statute of Frauds for contracts for the sale of goods exceeding $500. *See* Tex. Bus. & Com. Code § 2.201; *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019); *Bandera Drilling Co., Inc. v. Sledge Drilling Corp.*, 293 S.W.3d 867, 871 (Tex. App.—Eastland 2009, no pet.). And to the extent Leeberg attributes the alleged verbal understanding to Apex/Logwood, he lacked authority to modify Legacy's written payment terms. *See supra* Section VII.B.1.

Because Legacy delivered conforming products accepted and used by Leeberg, issued applicable credits for returns, invoiced pursuant to the Agreements, and repeatedly demanded payment, while Leeberg failed to remit the undisputed amounts when due, the record establishes

7

breach as a matter of law. *See* Tex. Bus. & Com. Code § 2.601(a); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 840–41 (S.D. Tex. 2013).

### D.    MEDICARE REIMBURSEMENT PROCESS

#### 1.    Dr. Leeberg, as the Treating Provider, Bore Sole Responsibility for All Medical Necessity Determinations and Billing.

Medicare Part B covers medical items and services, including grafts sold to physicians by suppliers. *See* 42 U.S.C. § 1395 et. seq. Payment is barred for services not deemed "reasonable and necessary," as determined by the Secretary. 42 U.S.C. § 1395y(a)(1)(A). Compliance with Medicare coverage and billing rules rests with the treating provider—not the product supplier and its contractors.[3] These duties are non-delegable. Accordingly, only Medicare makes coverage determinations and reimbursement decisions and suppliers cannot guarantee reimbursement.

The Medicare payment system reimburses providers only for providing its beneficiaries coverage, medically necessary services, and meeting Medicare's administrative and documentation requirements. (Ex. 3 at App. 0107, Kohler Report ¶ 18.) The Medicare Program Integrity Manual ("MPIM") outlines the provider's responsibilities to create and maintain complete, sufficient documentation that justifies both the medical necessity and the specific details of each service for which reimbursement is sought. (Ex. 7 at App. 0170, MPIM at § 3.6.2.2); (Ex. 3 at App. 0107, Kohler Report ¶ 18).  Payment is not made for improperly documented or inadequately justified services. (Ex. 3 at App. 0107, Kohler Report ¶ at 18). Reimbursement is intrinsically linked to the provider having incurred an actual cost for rendering a service to a beneficiary. (Ex. 3 at App. 0107, Kohler Report ¶ 19). The Medicare Benefit Policy Manual

---

[3] *See*, e.g., *Breeden v. Weinberger*, 377 F.Supp. 734, 737 (M.D. La. 1974) ("[U]nder the Medicare provisions of the Social Security Act, Congress intended that the responsibility for determining what services the patient requires rests primarily with the treating physician.").

("MBPM") establishes the principle of incurred expenses, and the underlying statute precludes payment for items or services for which no charge is made (in other words, is provided "free"). (Ex. 3 at App. 0107, Kohler Report ¶ 19).

Documentation is a fundamental, non-delegable responsibility of the provider in the Medicare reimbursement process. (Ex. 3 at App. 0109, Kohler Report ¶ 25.) Proper documentation is relied upon by MACs to ascertain coverage criteria are met and services or items rendered meet the threshold for the "reasonable and necessary" standard. (*Id.*) The provider's records must substantiate the clinical rationale, the services performed, and compliance with all coverage criteria. (*Id.*) The burden of proof for demonstrating the rationale for clinical decisions and justifying reimbursement is solely the provider's. (*Id.*) In the event of a disagreement, it is also the provider's responsibility-directly or via a designated proxy-to engage the Medicare appeals process. (Ex. 3 at App. 110, at ¶ 26.) Providers have the right to five levels of appeal involving redetermination and reconsideration of the claim. (*Id.* at ¶ 24.)

Medicare payments to medical providers are designed to reimburse reasonable costs or resource expenditures for services that have been legitimately provided and documented. (*Id.* at ¶ 19.) This structure ensures that federal funds are paid only for actual, justified healthcare expenses incurred by a qualifying provider on behalf of the beneficiary. (*Id.*) Coverage determinations are initially made by MACs in reliance on LCDs, and not the individual products' IFU. (*Id.* at ¶ 29.) Where no applicable or controlling LCD exists medical necessity is evaluated under the MPIM criteria based on the medical record. (*Id.* at ¶ 29). Indeed, in *Gateway Foot and Ankle Center, PLC*, an Administrative Law Judge found that Legacy's Impax graft—also an amniotic membrane allograft—was "medically necessary and reasonable for the treatment of the Beneficiary's condition; were provided in compliance with applicable coverage guidance; and are covered under

Medicare Part B." (Ex. 13 at App. 0260). The Judge confirmed that MPIM § 3.6.2.2 is "controlling" even in the "absence of a current LCD" and found that Legacy's grafts were safe, effective, and not investigational based on the clinical record. (*Id.*) (Ex. 3 at App. 0112, Kohler Report ¶ 39.)

Leeberg admits that she alone decided medical necessity, read the LCDs, and understood that her services must be reasonable, necessary, safe, effective, and non-experimental. (Ex. 1 at App. 0023, 0031, 0064, at 71:8-12; 115:7-19; 205:22-23). Leeberg understood these requirements under the LCDs and agreed that she was responsible for determining medical necessity on a patient-by-patient basis. (Ex. 1 at App. 0063, at 204:13-17). But, Leeberg nevertheless relied exclusively on Apex/Logwood for instruction about the use of Legacy grafts and how they work (Ex. 1 at App. 0012, at 70:3-5). Despite working as a medical professional for over 30 years, Leeberg did not independently investigate Legacy's products. (Ex. 1 at App. 0011, at 69:18-20.)

Not only was Leeberg contractually obligated to determine medical necessity, but federal law also required her to certify that every claim she submitted to Medicare was "medically necessary" for each patient and conformed with all applicable Medicare regulations and billing rules. 42 C.F.R. § 424.32(a)(i)(b) (requiring a provider to submit CMS Form 1500 to request payment for medical services); (*see* Ex. 8 at App. 00171-172); (Ex. 1 at App. 0058, at 176:10-15.)[4] As the healthcare provider offering wound care services and attesting to the medical necessity of those services, the responsibility of determining and documenting it fell solely on Leeberg. (Ex. 3

---

[4] CMS Form 1500 claims are submitted electronically using the HIPAA-standard 837 format, with the data required by the Health Insurance Claim Form developed and maintained by the National Uniform Claim Committee (NUCC). (*see* Ex. 8 at App. 0171-172); (Ex. 3 at App. 0108, Kohler Report ¶ 21.) Data submitted corresponding to Box 19 of the standardized Health Insurance Claim Form contains a catch-all for additional information, including specifics requested by LCDs such as the invoiced costs of or detailed descriptions of products reimbursement is requested for. (*Id.*). If requested, the provider will also send the supporting provider documentation or product invoices. The MAC's claims processing system then adjudicates the claim by applying a series of automated edits and policies. (*Id.*)

at App. 00109, Kohler Report ¶ 25.) Leeberg never disclosed to Medicare that her obligation to pay Legacy was allegedly contingent on reimbursement. (Ex. 1 at App. 0062, at 199:2-5.) When questioned about her certification on the CMS Form 1500, Leeberg changed her story, ultimately testifying that she did not know if she was representing to Medicare that she was obligated to pay for the grafts. (Ex. 1 at App. 0060, at 193:12-17.)

Leeberg also understood that Medicare does not preauthorize any payment for any services, and, instead, Medicare determines the coverage by the LCDs in place and the documentation she provides. (Ex. 1 at App. 0070, at 217:18-25.) Leeberg admitted that she reviewed the claims submitted by her biller for the products used before the claims were finalized and she reviewed her billing reports on a weekly basis. (Ex. 1 at App. 0057, at 175:13-22.) At some point, Leeberg even fired her graft biller because Leeberg believed that she was not "billing appropriately" and mishandling managing billing, claw backs, and audits. (Ex. 1 at App. 0004, at 29:6-15.)

### E.    INSTRUCTIONS FOR USE (IFU) DO NOT SUPPLANT PROVIDER RESPONSIBILITIES

While Leeberg relied on Apex/Logwood for product-use instruction, she was required to make and document clinical decisions herself, including documenting the method of fixation and medical necessity. The IFU Leeberg claims she relied upon *confirms* that fixation is governed by the treating provider's clinical judgment when medically necessary.

Under Medicare regulations and the Agreements, clinical decision-making and documentation remain the provider's responsibility and cannot be delegated to vendors. (Ex. 3 at App. 0110, Kohler Report ¶ 28.) While IFUs are manufacturer-created documents providing safety and procedural guidance, they are not definitive clinical or coverage determinations. (Ex. 3 at App. 0110, Kohler Report ¶ 27.) Providers must integrate IFUs with their own clinical judgment, patient-specific factors, and governing NCD/LCD criteria to determine what is medically

reasonable and necessary. (*Id.* at ¶ 27.) Medicare coverage hinges on the provider meeting these statutory and regulatory standards through proper documentation, not IFU language. (*Id.*)

While product distributors may serve as a source of information regarding availability and basic specifications of supplies, clinical decision-making and documentation remain the provider's exclusive responsibility and cannot be delegated to vendors. (*Id.* at ¶ 28.) Disregarding her duties, Leeberg testified that she relied exclusively on Apex/Logwood for instructions on product use and effectiveness (Ex. 1 at App. 0012, 0014, at 70:3-5, 72:10-13). Leeberg testified that her medical judgment dictated that graft fixation (sutures/staples) are used only "when medically necessary," and not every surgical use requires sutures or staples, including that suturing a diabetic ulcer would be "completely inappropriate." (Ex. 1 at App. 0067, 0069, at 212:1-12, 215:14-25) (Wound graft products "can be sutured or stapled when medically necessary. Every surgical procedure doesn't have to be sutured and stapled but it can still be a surgical procedure.") Although Leeberg's medical understanding was that the placement of the grafts did not require staples or sutures, Medicare disagreed with her view, as it was Medicare's assessment that sutures or staples were required for the patient. (Ex. 1 at App. 0078, at 276:19-21.)

In early 2024, Leeberg contacted her distributor, Apex/Logwood, and Legacy about her concerns with the IFU's accuracy. (Ex. 1 at App. 0083, 0019 at 83:6-7, 85:1-17). Leeberg claims Apex/Logwood acknowledged Medicare's misinterpretation of the IFU's language regarding sutures and staples. (Ex. 1 at App. 0019, at 85:9-17). In a subsequent discussion Leeberg alleged that Apex/Logwood and Brian Rowan, Legacy's VP of Sales, stated that the IFU was incorrect, that they were revising it, and that she should appeal the denials. (Ex. 1 at App. 0019, 0020, at 85:3-7, 86:15-17).

### F. DEFENDANT'S DENIALS WERE DUE TO HER OWN DOCUMENTATION AND BILLING DEFICIENCIES

Medicare issued several denial letters, dated November 14, 2023, describing post-payment audit reversals for services including E/M, debridement, dressings, and Zenith grafts. (Ex. 9 at App. 0173-0214); (Ex. 3 at App. 0111, Kohler Report ¶ 34.) For each denial, "insufficient documentation" was the primary reason, with the letters also noting coding/bundling issues and instructing the provider on what evidence to submit on reconsideration. (*Id.*) While one letter cited a lack of surgical anchors, the IFU provides that fixation is "based on the physician's choice … when medically necessary" making it a matter of clinical judgment that requires documentation of the rationale, especially when fixation is not used. (Ex. 3 at App. 0112, Kohler Report ¶ 36.) The absence of anchors rationale could have been addressed on appeal by applying the IFU and documenting clinical judgment, including when fixation is unnecessary and what alternative securement was used. (*Id.*)

The applicable First Coast LCD L36377[5], which governs coverage criteria for skin substitute grafts like Legacy's products, is consistent with the IFU, permitting the provider to anchor the graft by their "choice of fixation." (Ex. 3 at App. 0111, Kohler Report ¶ 32); (Ex. 10 at App. 0215-227, at 5 ("The graft is anchored using the individual's choice of fixation.")). The denials consistently reflect Leeberg's own documentation deficiencies, repeatedly citing missing clinical elements (e.g., separately identifiable E/M, operative detail for debridement, fixation rationale) and directing her to supply corrective materials on reconsideration. (Ex. 3 at App. 0113-14, Kohler Report ¶ 42). Even for non uses not addressed by the LCD, providers can substantiate

---

[5] "Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities," applies from January 8, 2019, through December 31, 2025. (Ex. 3 at App. 0110, Kohler Report ¶ 30); (Ex. 10 at App. 0215-0227).

coverage by documenting medical necessity supported by documentation, literature, and TRG correspondence. (*Id.* at ¶ 43).

These appeal letters appear limited to be first level appeals, with no indication that the five-level Medicare process was exhausted; remittance and redetermination notices identify next steps and the precise curative evidence requested. (*Id.* at ¶ 44.) Over a contract period exceeding two years, targeted documentation remediation (e.g., debridement detail, wound measurements, fixation rationale), and pursuit of reconsideration/ALJ review would likely have reduced Leeberg's exposure. (*Id.* at ¶ 45.)

Leeberg's own testimony undermines her position. She acknowledged that before any clawbacks, she was paid on approximately 95% of claims, despite having fired her biller for not "billing appropriately." (Ex. 1 at App. 0004, at 29:6-15; 177:3-8; 100:14-17) (acknowledging correctable "minor things" on appeal). She also conceded that some claims were denied for reasons other than the product's IFU, such as a lack of medical necessity, and that some issues were merely "minor things" that were correctable on appeal. (Ex. 3 at App. 0113-14, Kohler Report ¶¶ 42–43); (Ex. 1 at App. 0073, 0074, 0063, at 259:7-15, 261:1-14, 204:11-17.)[6] Leeberg even appealed one denial and won the appeal; the claim was sent back to the UPIC for further action. (Ex. 1 at App. 0071, at 238:17-22.)

Given the approximate two-year contract period and the 95% initial payment rate, there was ample opportunity and time to address the cited documentation deficiencies through the appeal process. Leeberg conceded that some denials reflected minor issues correctable on appeal. (Ex. 1

---

[6] The denial letters correspond to early stages of the Medicare appeals process and, absent additional communications, suggest the provider did not exhaust the five levels of appeal available when disputing a claim adjudication. Effective advocacy includes following the Remittance Advice and redetermination directives, tailoring reconsideration to the cited CARC/RARC codes, and supplying the specific clinical documentation and literature requested. (Ex. 3 at App. 0114, Kohler Report ¶ 44.)

at App. 0024, at 100:14-17.) The record indicates that earlier follow-up on denials and clawbacks could have mitigated any claimed damages; indeed, Leeberg reported approximately 95% payment before any clawbacks. (Ex. 1 at App. 0059, at 177:3-8.) In the expert's opinion, timely trend audits, targeted remediation, and escalation to reconsideration/ALJ review with supporting literature/TRG correspondence would have materially reduced exposure and improved outcomes. (Ex. 3 at App. 0114-15, Kohler Report ¶¶ 44–45).

## G. LEEBERG CANNOT ESTABLISH APPARENT AUTHORITY FOR APEX/LOGWOOD

The Legacy logo as well as the signature of the Legacy contract representatives appears on each Agreement. (Exs. 2-A-E at App. 0081-100.) Moreover, the customer onboarding forms identify Apex and Rick Logwood as the "distributor"—not as Legacy employees. (*Id.*). Leeberg's claims rest on alleged oral promises by Apex/Logwood to modify the Agreements, purportedly arising from "verbal conversations," despite performing no diligence whatsoever to confirm his agency relationship or authority. (Ex. 1 at App. 0009, at 60:23-61:2.)

Although Leeberg interacted almost exclusively with Logwood—and knew he had his own distributorship (Apex), his own Apex email, and even paid Apex at times—she nonetheless erroneously assumed Apex/Logwood had "100% authority" because he was her sole contact for supply of the grafts. (Ex. 1 at App. 0025, 0054, at 102:21-25; 165:1-7.) For example, despite the Agreements requiring her use of Legacy's IVR process, she used Apex's IVR forms and submitted them through Logwood. (Ex. 1 at App. 0022, 0079, at 97:13-21; 286:3-10.) The IVR form she utilized clearly identified Apex as Logwood's distributorship. (Ex. 1 at App. 0079, at 286:3-10.) Leeberg further believed that because she was "getting the grafts from Legacy, that everything was approved by Legacy." (Ex. 1 at App. 0046, at 149:8-11.)  But Legacy, from the inception of the relationship, made no other representation to Leeberg about Apex/Logwood: Legacy did not reach

15

out to Leeberg about him and Leeberg did not reach out to Legacy. (Ex. 1 at App. 0016, at 78:12-24). Aside from limited calls with Brian Rowan, in or about March 2024, about the IFUs, she had virtually no direct communication with Legacy. (Ex. 1 at App. 0016, 0021, at 78:12-24, 93:4-9.) Leeberg's belief that "everything was approved by Legacy" because she received grafts is an assumption, not a manifestation of authority by Legacy.

It is undisputed that Leeberg never notified Legacy of any purported payments to Logwood or requested reconciliation of her account. (Ex. 1 at App. 0054, 0077, at 165:21-25; 274:21-24.) She testified that, before signing the Agreements, Logwood told her multiple times that she would not be liable for payment on unreimbursed claims, yet she admitted there was no writing memorializing this alleged guarantee. (Ex. 1 at App. 0015, 0016, at 77:17-20; 78:2-6.) Further, she admitted that she never sought to confirm Logwood's alleged representations with anyone at Legacy. (Ex. 1 at App. 0016, at 78:10-13.)

## IV.    PROCEDURAL HISTORY

On April 7, 2025, Legacy filed its First Amended Complaint asserting breach of contract and related claims and attaching, among other exhibits, a sworn account reflecting a balance of $7,335,930.32. (ECF No. 6.) On April 21, 2025, Leeberg moved to dismiss the Amended Complaint, or in the alternative, to transfer to the Middle District of Florida, challenging venue, personal jurisdiction, and Legacy's alternative theories. (ECF No. 15.) On May 12, 2025, Legacy filed its opposition supported by the Declaration of Kimberly R. Bini and exhibits. (ECF No. 16.) On June 4, 2025, the Court denied Leeberg's motion to dismiss or transfer.  (ECF No. 17.)

On August 8, 2025, Defendant filed counterclaims alleging breach of contract and fraudulent misrepresentation arising from the parties' agreements and communications. (ECF No. 20.) On September 15, 2025, Defendant filed a separate Counterclaim pleading on the docket

amplifying allegations related to product use and insurance denials. (ECF No. 21.) On September 25, 2025, Legacy moved to dismiss the counterclaims and filed an appendix that included, among other things, insurance-related materials. (ECF No. 23.) On December 1, 2025, the Court denied Legacy's motion to dismiss the counterclaims, stating that "the Court finds that the matters presented are more appropriately raised in a motion for summary judgment." (ECF No. 34.) On December 15, 2025, Legacy answered and asserted affirmative defenses. (ECF No. 39.)

## V.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242–43 (1986). A fact is "material" if it would affect the case's outcome. *Id.* at 248. Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* The movant bears the initial burden to show the absence of a genuine issue; if met, the non-movant must set forth specific facts demonstrating a triable issue, not merely rely on allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); Fed. R. Civ. P. 56(c).

In evaluating the record, the Court views the evidence in the light most favorable to the non-movant. *See First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). The Court may consider materials in the record but need consider only those cited by the

parties. Fed. R. Civ. P. 56(c)(1)–(3). The Court is not required to "mine" the record on a party's behalf, and conclusory assertions or a mere scintilla of evidence will not defeat summary judgment. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

## VI.    ARGUMENT

The undisputed record establishes Legacy's breach-of-contract claim: Leeberg ordered, received, and used the products, that by her own admission "worked" for her patients, but failed to pay the undisputed invoices as required. The Agreements required payment within 45–60 days, and permitted modification only by a signed writing; no such modification exists. Her oral "no payment if no reimbursement" theory fails for multiple reasons: Apex/Logwood lacked authority to alter Legacy's written payment terms; the Agreements' merger and no-oral-modification provisions foreclose any contrary understanding; and the parol evidence rule bars reliance on extracontractual assurances that contradict the unambiguous contracts. Her fraud-based counterclaims likewise fail as a matter of law: the Agreements preclude justifiable reliance; Medicare places medical-necessity, documentation, and billing obligations squarely on the provider; and the CMS denial letters reflect her own documentation and coding deficiencies, not any misrepresentation or breach by Legacy.

### A.    LEEBERG CANNOT ESTABLISH ACTUAL OR APPARENT HAD AUTHORITY TO MODIFY THE INTEGRATED AGREEMENTS.

Leeberg fails to show any actual or apparent agency relationship between Apex/Logwood and Legacy. Simply labeling Apex/Logwood an "agent" or invoking her "belief" does not create authority. Even if Apex/Logwood made oral false statements, he lacked power to bind Legacy or modify the Agreements, which explicitly prohibit oral changes. (Exs. 2-A-E at App. 0081-0100, Agreements, at ¶ 7.) Texas's UCC independently bars oral modifications where, as here, the contracts contain a no-oral-modification clause requiring a signed writing. Tex. Bus. & Com. Code

§ 2.209(b).

Under Texas law, agency "is a consensual relationship between two parties by which one party acts on behalf of the other, subject to the other's control." *Armendariz v. Hudgens, et al.*, 618 S.W.3d 750, 758-59 (Tex.App.—El Paso, 2020) (citations omitted). A principal is liable for the acts of its agent only when the agent has actual or apparent authority to do those acts. *Id.* at 759 (citing *Sanders Oil & Gas GP, LLC, et al. v. Ridgeway Elec.*, 479 S.W.3d 293, 301 (Tex.App.—El Paso, 2015, no pet.)). Absent either actual or apparent authority, an purported agent cannot bind a principal. *Protect Envtl. Servs., Inc. v. Norco Corp.*, 403 S.W.3d 532, 540 (Tex.App.—El Paso, 2013, pet. denied).

Texas courts do not presume agency. *Community Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017) (citing *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). The party asserting agency bears the burden to prove, by a preponderance of the evidence, both the purported agent's consent to act on the principal's behalf and subject to the principal's control, and the principal's authorization for the agent to act. *Id.* at 691 (citing *Grissom v. Watson*, 704 S.W.2d 325, 326 (Tex. 1986)). Conclusory assertions of "agency," without evidence of Legacy's manifestations to Leeberg about Apex/Logwood creating authority, do not raise a fact issue.

Leeberg's reliance on alleged verbal "guarantees" by Apex/Logwood does not satisfy that burden. The record contains no evidence that Legacy authorized Apex/Logwood to change the Agreements, which, by their terms, can be modified only by a signed writing. (Exs. 2-A-E at App. 0081-0100, Agreements, at ¶ 7.) Leeberg identifies no proof—written or otherwise—that Legacy permitted anyone to override those terms. Her belief that Apex/Logwood could modify the Agreements is both legally irrelevant and unreasonable in light of the unambiguous payment

19

provisions she acknowledged and signed five times over nearly two years.

(i)    Leeberg Cannot Show Actual Authority.

Apex/Logwood lacks authority to modify the Agreements or bind Legacy, and Legacy never indicated otherwise. His Agency Commission Agreement limits Apex/Logwood's authority to marketing Legacy products and explicitly prohibits any ability to "obligate or bind" Legacy. (Ex. 11 at App. 0233, 0235, at §§ 10, 12(e).) His authority is limited to product promotion and he was not permitted to lead any third party to believe that Legacy and Agent are not separate and distinct entities. (Ex. 11 at App. 0229, at §3k). Moreover, Apex/Logwood has no "authority to obligate or bind [Legacy] in any manner whatsoever" and no authority to "create any obligation, expressly or implied, on behalf of [Legacy]." (Ex. 11 at App. 0233, 0235, at §10, 12(e).) Accordingly, Apex/Logwood did not have actual authority to alter the clear payment terms of any Agreements.

Under Texas law, actual authority arises from the principal's written or spoken words or conduct communicated to the purported agent. *Armendariz*, 618 S.W.3d at 759. To establish actual authority, the record must contain evidence proving that either the purported principal: "(1) intentionally conferred authority on another to act as its agent, or (2) the principal intentionally, or by want of due care, allowed the agent to believe that it possessed authority to act as the principal's agent." *See Sanders Oil & Gas GP, LLC*, 479 S.W.3d at 301–02. "In determining whether an agent had actual authority to act for his principal, courts examine only the principal's words and conduct relative to the agent, and do not consider the representations made by the agent to the third party." *Armendariz*, 618 S.W.3d at 759–60.

Here, the distributor agreement explicitly cabins Apex/Logwood's authority to marketing activities and bars him from holding himself out as having any right to bind Legacy or from using

Legacy's name in a manner that could suggest non-separateness. (Ex. 11 at App. 0228, 0233, 0234, Agreement §§ 2, 3(a), 3(e), 10, 12(e).) Apex/Logwood could not represent himself "as having, any right or authority to obligate or bind" Legacy "in any manner whatsoever," nor could he use Legacy's name in any manner that could cause confusion or suggest non-separateness between Legacy and Apex/Logwood. (Ex. 11 at App. 0228, 0233, 0234, at §§ 3(e), 10, 12(e).) Nothing in that agreement confers any authority—much less authority to alter contract payment terms—or authorizes any oral modification of Leeberg's Agreements. All five Agreement that Leeberg signed require that any change be made by a signed writing. (Exs. 2-A–E at App. 0081-0100, ¶ 7.)

Leeberg cannot establish that Apex/Logwood had actual authority because her Agreements with Legacy explicitly state that the parties can only alter the terms of the Agreements with a ***signed writing***. (Exs. 2-A-E at App. 0081-0100, at ¶ 7.) And Leeberg well knew Apex/Logwood was acting as a distributor through his company, Apex Medical. (Ex. 1 at App. 0008, 0043, 0044, at 59:6-11, 146:16-25, 147:8.) On this record, there is no evidence of Legacy's manifestations conferring authority to Apex/Logwood, and actual authority fails as a matter of law.

(ii)    <u>Leeberg Cannot Show Apparent Authority.</u>

Legacy's relationships with its independent distributors are limited and explicitly defined: distributors may only market Legacy products. Apparent authority must arise from Legacy's manifestations to the third party—not from Apex/Logwood's statements about his own authority. And Leeberg knew that:

- Legacy never represented that Logwood had any authority to negotiate terms or to modify payment provisions in the Agreements (Ex. 1 at App. 0017, at 79:6–10);
- Logwood ran his own distributor business, Apex (Ex. 1 at App. 0007, 0044-45, at 58:24–25; 147:24–148:1);
- Logwood's email domain was that of his own business (Apex), not Legacy's (Ex. 1 at App. 0027, at 105:22–23);

21

- Logwood was a distributor for multiple suppliers, not just Legacy (Ex. 1 at App. 0007-8, at 58:24–59:4);
- No records showed Logwood was ever employed by Legacy (Ex. 1 at App. 0009, at 60:12–14); and
- Leeberg used Logwood's Apex forms—not Legacy's—to verify patients' insurance eligibility (Ex. 1 at App. 0022-23, at 97:22–98:6).
- She even made payments for Legacy products to Apex/Logwood. (Ex. 1 at App. 0053, at 164:21-23.)

These facts confirm separation – Leeberg understood that Legacy supplied grafts and Apex/Logwood distributed them. Any contrary contention is an after-the-fact attempt to avoid liability.

Under Texas law, apparent authority requires: (1) a reasonable belief in the agent's authority; (2) generated by some holding out or neglect of the principal; and (3) justifiable reliance on that authority. *Protect Envtl. Servs., Inc. v. Norco Corp.*, 403 S.W.3d 532, 541 (Tex.App.– El Paso 2013, pet. denied). Courts look only to the principal's conduct to the third party—i.e., manifestations by Legacy to Leeberg—not to the purported agent's statements. *Armendariz*, 618 S.W.3d at 761. Apparent authority is an estoppel doctrine and arises only when the principal knowingly permits the agent to hold himself out as having authority or, by lack of ordinary care, clothes the agent with indicia of authority leading a reasonably prudent person to believe in that authority. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) (internal quotations omitted). And even providing a distributor with materials containing the manufacturer's logo is insufficient to establish apparent authority. *Coffey v. Fort Wayne Pools, Inc.*, 24 F.Supp.2d 671, 681–82 (N.D. Tex. 1998). "A manufacturer is not liable under apparent agency merely because their dealer exhibited signs, advertisements, and pamphlets with the manufacturer's logo." *Id.* at 681 (citing *House v. Chrysler Corp.*, No. 01-93-00854-CV, 1994 WL 320423, at *1-2 (Tex. App. –Houston [1st Dist.] July 7, 1994)).

Application of these principles is straightforward. Leeberg concedes she never verified with Legacy any alleged "no payment unless reimbursed" promise she attributes to Apex/Logwood. (Ex. 1 at App. 0016, at 78:7-13.) Even if Apex/Logwood's name appeared on onboarding materials, the mere use of Legacy's logo or marketing materials cannot establish apparent authority. *See Coffey*, 24 F.Supp.2d at 681.

Moreover, any reliance on Apex/Logwood's purported authority would be unreasonable because the alleged oral "no collections" modification directly contradicts the unambiguous contract language—language that Leeberg agreed to five separate times over approximately two years.. [7] The Agreements are Legacy's controlling statements to customers: they require payment within 45–60 days regardless of any insurance reimbursement, and contain no guarantee of insurance payment. Those terms foreclose reliance on any pre- or post-contract oral "no collections" assurance.

Texas law also places the diligence burden on the party dealing with a purported agent. A party must ascertain both the fact and scope of the agent's authority; dealing with the agent without doing so is at the party's own risk *See Nat'l Advert. Co. v. Brown,* 894 S.W.2d 785, 787 (Tex. App.– Tyler [12th Dist.] 1994*)* ("Apparent authority arises either from a principal knowingly permitting an agent to hold himself out as having authority or by principal's actions which lack such ordinary care as to clothe an agent with indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority she purports to exercise . . . A prerequisite to finding apparent authority is *evidence of conduct by the principal relied upon by the party asserting estoppel which would lead a reasonably prudent person to believe an agent had authority*.")

---

[7] Even if Leeberg did speak to Brian Rowan in or around March of 2024 about the IFU, the conversation was almost five months after she signed the last Agreement in November 2023, so statements made months later could not have induced her to enter into the Agreements.

(internal citation omitted) (emphasis added); *Humble Nat. Bank v. DCV, Inc.,* 933 S.W.2d 224, 237 (Tex. App.–Houston [14th Dist.] 1996). ("[A] party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, he does so at his own risk.") **(**emphasis added) (finding defendant bank's own failure to ascertain fact and scope of agency precluded bank "from relying on the apparent authority doctrine."); *see also Lifshutz v. Lifshutz,* 199 S.W.3d 9, 23 (Tex. App. –San Antonio [4th Dist.] 2006) (same); *Suarez v. Jordan,* 35 S.W.3d 268, 272-74 (Tex. App.—Houston [14th Dist.] 2000) (finding purported principal whose name appeared as party in settlement agreement was not bound by signature of purported agent because purported principal made no representations indicative of apparent authority).

Here, Leeberg's mere belief and sole reliance on Apex/Logwood's assurances in the face of five written agreements to the contrary, coupled with her failure over two years to contact Legacy to confirm any authority to alter payment terms negate justifiable reliance as a matter of law. (Ex. 1 at App. 0017, at 79:6–10). Apparent authority must stem from Legacy's manifestations to Leeberg, not from Apex/Logwood's statements. On this record, any reliance was not justifiable, and apparent authority fails as a matter of law. *See Wal-Mart Stores, Inc. v. Guerra*, No. 04-08-00146, 2009 WL 1900411, at *8 (Tex. App.—San Antonio 2009) (Tex. App. –San Antonio [4th Dist.] 2009) ("Finally, there is no evidence in the record that [appellee] made any effort to confirm the fact and scope of [purported agents'] authority to make a lifetime employment contract.").

## B.   SUMMARY JUDGMENT SHOULD BE GRANTED ON LEGACY'S BREACH OF CONTRACT CLAIM

The elements are well-settled under Texas law: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and

(4) damages sustained by the plaintiff as a result of the breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009). A breach occurs when a party fails to perform what it expressly promised. *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp.2d 587, 602 (N.D. Tex. 2014.). "To plead a breach of contract claim, a [counterclaim-plaintiff] must identify a specific provision of the contract that was allegedly breached." *Id.* (citation modified). Under Texas law, "[a] contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019) (citation omitted). Courts glean intent from what the parties said in their contract, not what they allegedly meant. *Union Pacific R.R. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 421 (Tex. App. –Houston [1st Dist.] 2003, pet. denied).

When, as here, the contract language is unambiguous, the "court must ascertain the true intentions of the parties as expressed in the writing itself." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (citation omitted). Courts cannot add language to the contract that is not there under the guise of interpretation. *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 638 (Tex. App.– Dallas 2012, pet. denied); *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("[W]e may neither rewrite the parties' contract nor add to its language."). Mere general references to the contract or to alleged oral representations are insufficient, and extrinsic or parol evidence may not be considered when the contract is unambiguous or contains a merger or integration clause. *See Carrizo.*, 590 S.W.3d at 483; *Bandera*, 293 S.W.3d at 871.

### 1.    Existence of valid contracts and Legacy performed.

The record clearly establishes the first two elements: the existence of a valid contract and performance by the plaintiff.

*First*, there is no genuine dispute that there were valid Agreements between Legacy and Leeberg. Between July 25, 2022, and November 7, 2023, Leeberg signed five written purchase agreements as the "customer," governing her repeated orders of human tissue products. (Exs. 2-A-E at App. 0081-0100.) Leeberg does not dispute signing each of the five Agreements, ordering and receiving the products and invoices. (*See* Ex. 12 at App. 0248-252, RFAs ¶¶ 2-3, 7, 10, 13); (Ex. 1 at App. 0026, 0035, 0040, 00141, at 104:11-15; 123:12-23; 130:8-10; 136:13-15.) Because there is no genuine dispute that there was an offer and acceptance, and because the parties acted in a manner consistent with the existence of a contractual relationship, valid contracts existed between Legacy and Leeberg. *See* Tex. Bus. & Com. Code Ann. § 2.204(a); *Impact Finishing, Inc. v. Wild Card, Inc.*, 713 F. Supp. 3d 322, 336 (N.D. Tex. 2024).

*Second*, the record conclusively establishes Legacy's performance under the Agreements and Defendant's breach. *See Impact Finishing, Inc.*, 713 F. Supp. 3d at 337. The process was straightforward: (1) Leeberg placed product orders; and (2) Legacy generated the order statements, promptly packed and shipped the products, and invoiced Leeberg accordingly. (Ex. 1 at App. 0003, 0055-56, at 26:17-19, 171:8-172:15.) Over nearly two years, Legacy processed and shipped 770 orders to Leeberg, totaling about $14.8 million, consistent with the written terms. (ECF No. 16-1, at ¶¶ 5-6, 13).

### 2. Leeberg Breached the Agreements.

The record establishes the third element of Legacy's breach of contract claim: Leeberg failed to pay Legacy for human tissue products from July 25, 2022, to May 17, 2024, totaling at least $7,335,930.32. (*Id.*) A buyer's failure to pay when under an obligation to do so is a breach of the contract. *See* Tex. Bus. & Com. Code Ann. § 2.601(a); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 840 (S.D. Tex. 2013) ("A seller may sue for the price of the goods

when the buyer failed to pay as that bill became due."). Texas law expressly authorizes an action for the price where, as here, goods have been accepted but not paid for. Tex. Bus. & Com. Code § 2.709(a)(1). The Agreements required timely payment; Leeberg breached by failing to pay invoiced amounts, despite receiving the contracted-for products and repeated demands.[8]

Leeberg admits she did not pay all invoices within the contractual window. (Ex. 1 at App. 0032, at 120:7-9) ("Q. Did you pay all invoices from Legacy within 45 days? A. No"). That failure to remit is a failure to perform an express contractual promise and is a breach as a matter of law.

(i)  <u>The Statute of Frauds precludes any oral modification of the Agreements.</u>

A contract for the sale of movable goods is governed by article 2 of the UCC. Tex. & Com.Code Ann. §§ 2.101–2.725; *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 136 F. Supp. 3d 792, 809 (S.D. Tex. 2015). When a contract "requires a signed writing for modification," any attempted oral change "must be signed" to be enforceable. Tex. Bus. & Com. Code § 2.209(b). Even where a contract both sales and services, as in a distribution agreement, § 2.201 applies where the sale of goods is the "dominant factor" or "essence of the transaction." *East Hill Marine, Inc. v. Rinker Boat Co., Inc.,* 229 S.W.3d 813, 818 (Tex.App.-Fort Worth 2007, pet. denied). Moreover § 2.106 states that "'contract for sale' includes both a present sale of goods and a contract to sell goods at a future time." *Jonibach Mgmt. Tr.,* 136 F. Supp. 3d at 810 (citations omitted).

All contracts for the sale of goods of $500 or more are unenforceable absent a writing. Tex. Bus. & Com. Code Ann. § 2.201.[9] In Texas, distributorship agreements, such as Leeberg's, are

---

[8] Specifically, Leeberg breached Paragraph 6 of the Agreements which unequivocally states Leeberg's obligation to remit payment to Legacy within the specified timeframe. (Exs. 2-A-E at App. 0081-0100, at ¶ 6).

[9] A valid oral contract may be formed under the exceptions of § 2.201(c)(2) and (3) to the UCC's statute of frauds. See Section § 2.201(a) and cmt. 1 (a contract for the sale of goods for the price of $500 or more is not enforceable absent some writing evidencing such a contract that is signed by the party against whom enforcement is sought and

generally controlled by the UCC. *Coburn Supply Co. v. Kohler Co*., 342 F.3d 372, 375 (5th Cir. 2003); *see, e.g., Glenn Thurman, Inc. v. Moore Const., Inc*., 942 S.W.2d 768, 771 (Tex.App.— Tyler 1997, no pet.) ("When parties enter into a contract for the sale of goods, [the UCC] controls the conduct of the parties.")  Where the Statute of Frauds applies, "whether an oral contract was in fact made is not a material issue of fact which would preclude the entry of summary judgment where, as here, there is no writing sufficient to satisfy the statute of frauds." *Great Western Sugar Co. v. Lone Star Donut Co.*, 567 F.Supp. 340, 344 (N.D. Tex. 1983) (citing Tex.Bus. & Com.Code Ann. § 2.201(a); *Hammonds v. Calhoun Distributing Co., Inc.,* 584 S.W.2d 473, 475 (Tex. App.— Texarkana 1979, writ ref'd n.r.e.)).

The purpose of the Statute of Frauds is to "remove uncertainty, prevent fraudulent claims, and reduce litigation." *Givens v. Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984). To allow parol agreements to rescind contracts required to be in writing would permit all of these effects. *Id.* Then, claims of oral rescission would occur whenever the terms of a contract become onerous to one of the parties. *Id.* To allow the very existence of a contract to be negated by parol evidence would be to render the Statute of Frauds a nullity, and, in fact, encourage "frauds." *Id.* Further, Texas law does not even permit mutual oral rescissions of contracts required to be in writing. *Id.* ("It goes without saying that a contract required to be in writing cannot be orally modified except in limited circumstances" which are not applicable to the facts here.)

Here, each Agreement governs the sale of Legacy products and exceeds $500 in value.[10] Texas law therefore requires a writing. (*See* Ex. 1 at App. 0016, at 78:3-6) ("Q. So I guess the answer is no. It was never written down? A. No.")  It likewise requires any modification to be in

---

that specifies a quantity.)

[10] Each order/invoice amount exceeded $500. (Ex. 6 at App. 0138-69.)

a signed writing when the parties—like these—agree to a no-oral-modification clause. Tex. Bus. & Com. Code § 2.209(b). Regardless of any alleged oral modifications by Apex/Logwood, her contract defenses fail as a matter of law.

(ii)    <u>The Court should not consider extracontractual parol evidence to rewrite the plain payment terms of a contract.</u>

Leeberg's defenses are also barred by the parol evidence rule and, therefore, fail to excuse her nonperformance. "The parol evidence rule bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement." *Barrow-Shaver Res. Co.*, 590 S.W.3d at 483. In the Article 2 context, the UCC likewise codifies these limits: a final written expression "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Tex. Bus. & Com. Code § 2.202; and where, as here, the parties require a signed writing for modification, "a signed writing is necessary." *Id.* § 2.209(b). That rule applies with even greater force where, as here, the Agreements include an integration clause and an express no-oral-modification requirement (¶ 7). "Evidence of prior or contemporaneous agreements is inadmissible as parol evidence when the contract is unambiguous." *Id.* "The parol evidence rule applies to writings that evidence the creation, modification, termination, or securing of a right or obligation under the contract." *Id.* In short, "extrinsic evidence can be considered only to interpret an *ambiguous* writing, not to create ambiguity." *Id.* (emphasis in original).

Likewise, extrinsic evidence may not be considered when "a contract contains a merger or integration clause, [because] the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and [so,] it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence." *Bandera Drilling Co., Inc.*, 293 S.W.3d at 871 ("[W]hen the parties utilize a merger provision, the substance

29

of any pre-execution negotiations, including the text of any prior drafts, is not a permissible consideration absent pleading and proof of an ambiguity, fraud, or accident.") (*accord* ¶ 7 of the Agreements (integration and no-oral-modification)).

Leeberg's claim – that Apex/Logwood verbally assured her that she would not be liable to pay Legacy if she was not reimbursed – directly conflicts with these well-established principles. (Ex. 1 at App. 0015, at 77:22-24.) Indeed, Leeberg admitted there is no written document memorializing such a guarantee, and the Agreements contain integration clauses with no written amendments. (Ex. 1 at App. 0025, at 102:5-7) ["Q. ... Nothing in writing that says you are guaranteed you do not have to pay? A. No."]); (Ex. 1 at App. 0033, at 121:1-8 ["Q. … Was this agreement ever modified after it was signed by you? A. No."]). Under § 2.209(b), any modification of the payment terms "must be in a signed writing," and Leeberg admits none exists. Despite her alleged belief in these verbal assurances, the written agreements themselves do not state that payment is contingent on reimbursement or IFU-related approval. (Ex. 1 at App. 0039, at 129:6-9 ["Q. [D]oes this agreement indicate that payment by you was contingent upon approval by Medicare? A. No."]). Because the Agreements are unambiguous and fully integrated, parol evidence cannot be used to create ambiguity or to contradict the clear, unconditional payment obligation. Leeberg's payment obligation is clear: an her reliance on purported extracontractual promises does not excuse her non-payment as a matter of law.[11]

---

[11] Because the Agreements are integrated and unambiguous, extra-contractual assurances—such as an alleged "no-collections" guarantee—cannot alter the written obligation to pay regardless of reimbursement. Texas courts have held that when a contract is unambiguous, course of dealing evidence is not considered. *James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 437 (Tex.App.-Dallas 2006, no pet.) ("When a contract is unambiguous, a court does not consider course of dealing."). The UCC is to the same effect: a final written expression "may not be contradicted" by prior or contemporaneous agreements, and any alleged modification requires a signed writing where, as here, the parties so agreed. Tex. Bus. & Com. Code §§ 2.202, 2.209(b). The law enforces these terms as written and precludes parol evidence to add, vary, or contradict them.

### 3. Damages sustained by Legacy as a result of the breach.

There is no genuine dispute that Legacy suffered damages proximately caused by Leeberg's breach. As of May 2024, the liquidated, outstanding balance on the account is at least $7,335,930.32 for products shipped and invoiced but not paid. (Ex. 6 at App. 0138-0169). The pleadings and Appendix quantify this amount specificity, identify the relevant billing periods, and reflect all credits and returns, leaving a net, liquidated sum certain. (*See* Ex. 6 at App. 0138-0169.) These losses flow directly from Leeberg's nonperformance and satisfy the damages element. *See* Tex. Bus. & Com. Code § 2.607(1) (buyer must pay at the contract rate for goods accepted); *id.* at § 2.709(a)(1) (seller's action for the price of goods accepted).  Leeberg further admitted she failed to pay at least some invoices for products received between July 25, 2022, and May 17, 2024. (Ex. 1 at App. 0051, at 162:2-8.) In addition to the principal balance, Legacy is entitled to the price for accepted goods, plus incidental damages, contractual late charges/interest, and prejudgment and post-judgment interest at the contract rate (or, absent a contract rate, at the statutory rate). *See* Tex. Bus. & Com. Code §§ 2.709(a)(1), 2.710; Tex. Fin. Code § 304.003. Because Legacy fully performed and has not been fully compensated under the Agreements, it has established the fourth element as a matter of law. *See* Tex. Bus. & Com. Code Ann. § 2.709(a)(1).

In the alternative, the undisputed evidence shows that Leeberg ordered, accepted, and used the grafts without paying for them; therefore, Legacy is also entitled to judgment on its quasi-contract theories.  (Ex. 1 at App. 0047-48, at 155:14-156:25.)

### C. LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS

*First*, the undisputed record establishes that distributor Apex/Logwood lacked actual or apparent authority to alter the parties' fully integrated Agreements, which require payment within 45–60 days and permit modification only by a signed writing. *See supra* Section VI(A). This alone

precludes any argument contrary to the terms of Leeberg's signed Agreements. *Second*, Defendant's IFU-based contract theories fail: the IFU is not incorporated into the Agreements, and, in any event, places fixation and application in the treating provider's clinical judgment; Legacy's products were fit for their intended use by Leeberg's own admission. *Third*, causation fails because Medicare's framework assigns medical-necessity determinations, documentation, and billing compliance squarely on the provider, and the denial letters reflect provider-level deficiencies, not any breach by Legacy. *Fourth*, the fraud counts independently fail for lack of a material misrepresentation, falsity, scienter, and—critically—justifiable reliance in light of the Agreements' unambiguous terms and integration clauses, and the economic-loss rule bars tort recovery where the alleged duties and injuries arise solely from the contracts and concern only economic loss to the contractual subject matter. These defects leave no genuine dispute of material fact, and the counterclaims should be dismissed as a matter of law.

### 1.      Summary Judgment Should Be Granted on Counts I–III (Breach of Contract)

As to Counts I-III concerning the IFU, Legacy cannot breach an alleged obligation that is not expressed or contemplated by the Agreements. *First*, the goods conformed to the contracts and their intended use. *Second*, the IFU is not a contract term. *Third*, even if considered, the IFU confirms Legacy's position by placing the method of fixation within the provider's clinical judgment and not imposing any staples/sutures-only or post-surgical-only mandate.  *Finally*, Count II separately fails for a product/IFU mismatch—Zenith contract, Impax IFU—leaving no contractual tether to the agreement asserted in Count II.

### (i)      Legacy's products conformed to their intended use

Defendant's theory hinges on asserting that Legacy breached Paragraph 1 of the Agreements by selling to Defendant "human tissue and cell products that were non-conforming to

their intended use as described in the IFU furnished by Legacy to Leeberg." (ECF No. 21, at ¶¶ 56, 63, 70). The problem is: Legacy's products did conform to their intended use.

Contracts for the sale of goods are governed by the UCC. *Minsa Corp. v. SFTC, LLC*, 540 S.W.3d 155, 159 (Tex.App.—Amarillo 2017). Under the perfect-tender framework, rejection requires timely rejection and seasonable notice; after acceptance, the buyer must pay the price and is limited to post-acceptance remedies that require seasonable notice. *See* Tex. Bus. & Com. Code §§ 2.601 (perfect tender); 2.602(a) (manner of rejection); 2.607 (effect of acceptance); 2.608(b) (revocation of acceptance) 2.709(a) (action for the price). Here, it is undisputed that Legacy shipped the products and that Leeberg accepted them. (Ex. 1 at App. 0029, at 113:5–23). She neither revoked her acceptance, nor provided seasonable notice of revocation. Not only that, she continued to accept the products for another nine months after being notified of the Medicare appeals denials in November 2023.

On the merits, the goods conformed to the parties' contracts. Legacy agreed to sell—and Leeberg agreed to buy—specified human cell and tissue products, and Legacy delivered exactly that. (Exs. 2-A–E at App. 0081-0100). Leeberg testified there were no issues with the products after use, that she "liked the products," and that they "worked." (Ex. 1 at App. 0029-30, 0047, at 113:11–13; 113:20–114:1; 155:19–22). She did not dispute invoice accuracy. (Ex. 1 at App. 0055-56, at 171:8–172:15.) Indeed, in *Gateway Foot and Ankle Center, PLC*, an Administrative Law Judge found that Legacy's grafts were safe, effective, and not investigational based on the clinical record for wound cover. (Ex. 3 at App. 0112, Kohler Report ¶ 39.) On this record, no reasonable factfinder could find nonconformity. Instead, the truth is Leeberg brings her claims not because the products were non-conforming, but because she is upset that Medicare refuses to reimburse her for how she used the products with her patients.

33

But, in Texas, goods are conforming to the contract "when they are in accordance with the obligations under the contract." *Minsa Corp. v. SFTC, LLC*, 540 S.W.3d 155, 159 (Tex.App.— Amarillo 2017). "The crucial factor in determining whether the buyer has a breach of contract . . . claim is whether the buyer has finally accepted the goods." *Id.* Under the Agreements, Legacy agreed to sell—and Leeberg agreed to buy—specified human cell and tissue products. (Exs. 2-A– E at App. 0081-0100.) Legacy did just that. Indeed, Leeberg confirmed that there was no dispute that Legacy shipped the exact products she requested and that there were no issues with the products after being used. (Ex. 1 at App. 0029, 0047, at 113:11–13; 155:19–22.) And when asked what she thought of the products, she said, "I liked the products." (*Id.* at 113:20–23.) Indeed, when asked whether she would say the products "worked" for her patients, she unequivocally said, "Yes." (Ex. 1 at App. 0029, at 113:25–114:1.)

(ii)   <u>The IFU is not part of the Agreements.</u>

Summary judgment is also warranted because Defendant predicates breach on purported terms not found in the contracts. The Agreements do not incorporate any IFU. *See Rainer Southlake DST v. Woodbury Strategic Partners Fund, LP*, No. 02-16-00263-CV, 2017 WL 6047725, at *5 (Tex. App. Dec. 7, 2017). That ends the analysis.

Even if considered, the IFU confirms that fixation is the provider's clinical decision and permits the physician's choice of fixation, including staples or sutures in surgical procedures when medically necessary. Defendant alleges that the IFU she received from Legacy explicitly advised that "the product must be applied with staples or sutures and that the product was designated for post-surgical application." (ECF No. 21, at ¶ 22.) But the IFU on its face contradicts her claim. The IFU states:

**PRODUCT USE**

**IMPAX Membrane** grafts are in sheet form. **IMPAX Membrane** is intended for use as Human Cell, Tissue, and Cellular Tissue-Based Product (HCT/P) for repair, reconstruction, replacement and/or <u>supplementation</u> by providing tissue in the form of scaffolding in partial and full-thickness acute and chronic wounds. <u>The IMPAX Membrane graft is intended to remain on the recipient and is absorbed into the wound bed. The graft is anchored based on the *physician's choice of fixation* including staples or sutures in surgical procedures when medically necessary</u>."

(ECF No. 21, at Ex. D) (emphasis added). Leeberg's assertion that the graft always "must be applied with staples or sutures" and that the product was designated only for "post-surgical application" is squarely refuted by the actual IFU instructions, which explain that the product is intended to be absorbed into the open wound, and that it is "anchored based on the ***physician's choice of fixation***." *Id.* (emphasis added). Properly construed, this can only mean that the medical provider can anchor the graft by her "choice of fixation," including—when medically necessary—staples or sutures in surgical procedures, or non-suture fixation methods such as dressings that allow the graft to "remain on the recipient." *Id.*

Further, the written Agreements between the parties, reinforced by the LCDs, expressly state that use of any product is at the sole discretion of the treating provider. (Ex. 3 at App. 0110-111, Kohler Report ¶¶ 28-31) ("Clinical decision-making and documentation remain the provider's responsibility and cannot be delegated to vendors"); (Exs. 2-A-E at App. 0081-100, Agreements at ¶ 6.) Accordingly, there is no nonconformity: the IFU's instructions are consistent with the LCDs in assigning provider-level clinical judgment; accordingly, there can be no contractual breach. (Ex. 3 at App. 0110-111, Kohler Report ¶¶ 28-31); (Ex. 10 at App. 0215-0227).

Legacy's alleged instructions to appeal the denied claims because Medicare misinterpreted the IFU do not establish product nonconformity. (Ex. 1 at App. 0019-0020, at 85:9-17, 86:15-17.) At most, they reflect a reimbursement dispute with Medicare—not any defect or deviation in

product performance or instructions. This only shows that Medicare's misinterpretation of the IFU could be corrected on appeal. Legacy instructed Leeberg consistently therewith. (Ex. 3 at App. 0108-09, Kohler Report ¶ 23.) Legacy counseled Leeberg consistent with the plain terms of the IFU, as confirmed in the controlling LCD. Leeberg alone must determine that the product as applied was "safe and effective" for her patients and document appropriately. (Ex. 7 at App. 170, MEDICARE PROGRAM INTEGRITY MANUAL ("MPIM"), Ch. 13, § 13.5.4); (Ex. 1 at App. 0064, at 205:22.)

Count II independently fails because the asserted breach theory rests on the wrong product/IFU pairing. Legacy has shown that the agreement underlying Count II relates to the Zenith membrane, whereas Leeberg's breach theory relies on alleged representations about the Impax IFU—an apples-to-oranges mismatch that defeats the claim as a matter of law. This inconsistency is dispositive on summary judgment because the alleged breach is not tethered to the terms or instructions pertinent to the contract in Count II. Furthermore, Count II of Leeberg's counterclaims also fail because the agreement at issue in Count II is for Zenith membrane, not Impax. Leeberg's allegations of breach hinge upon Legacy's misrepresentations regarding the Impax IFU, not the Zenith IFU. *Compare* (ECF No. 21, at ¶¶ 60-66 with *id.* at Ex. B.)

### (iii) Causation Fails as a Matter of Law Because Medicare Denials Turn on Leeberg's Medical-Necessity Determinations and Billing, Not on Legacy's Contractual Performance (Counts I–III).

Even assuming arguendo a breach, the undisputed Medicare reimbursement framework allocates the determination of medical necessity and the attendant reimbursement risk to the billing provider, not to the supplier, defeating causation as a matter of law. Under Texas law, proximate cause requires both cause-in-fact and foreseeability; injuries that are the result of intervening, independent third-party determinations are not proximately caused by a supplier's alleged contract

36

breach. The governing Medicare rules place the responsibility on the provider for clinical judgment about product placement and compliant billing, as do Legacy's Agreements. Medicare's coverage decisions turn on the provider's documentation, coding, and demonstration of medical necessity-not on supplier conduct-rendering any alleged breach by Legacy not a substantial factor in bringing about the denials. Leeberg's denials cite medical necessity and billing errors that cannot be imputed to Legacy's alleged contractual breach. Leeberg seeks to avoid her contractual and legal obligation to determine "medical necessity" for her individual patients. *See US ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 489 (3d Cir. 2017) ("[T]he doctors are best suited to evaluate each patient and determine whether a treatment is 'reasonable and necessary *for [that] individual patient.*'").

For a breach of contract claim to survive under Texas law, the damages alleged must have resulted from the breach. *Hunter*, 749 F.Supp.3d at 748; *see also Innova Hosp.*, 995 F.Supp.2d at 602. She asserts that "Medicare's denial was . . . based on the product not being utilized in accordance with the terms of the IFU," (Ex. 1 at App. 0069, at 215:1-5), which she claims would not have happened but for Legacy telling her one thing while the Impax Membrane IFU said another. *See id.* at ¶¶ 23, 30. That theory fails because it collapses the separate roles of supplier and provider and ignores that Medicare evaluates the provider's own records to decide medical necessity and compliance.

*First*, the Impax IFU makes clear that the membrane is "restricted to use by or on the order of a licensed healthcare professional" and only to be used "when medically necessary." *Id.* at Ex. B. Second, under the Agreements, Leeberg acknowledges that the "use of any Product is at the sole discretion of the treating provider, pursuant to his or her professional medical judgment." (Exs. 2-A-E at App. 0081-100, at § 4). She further agreed: "Customer will treat the patient as

medically necessary." *Id.* Thus, the contracts, IFU, and Medicare regulations both place the responsibility for proper application and billing on the provider, not the supplier. (Ex. 3, App. 110, Kohler Report, ¶ 28). Because the provider is the certifying party on the claim and the sole decision-maker on whether, how, and when to use the product, any adverse Medicare decision necessarily rests on the provider's showing (or lack thereof) and breaks any causal chain to Legacy.

*Second*, any Medicare claim may be subject to denial for lack of medical necessity as a matter of law. This is because only Medicare has the right to determine if any claim is "reasonable or necessary." Those determinations are independent, multilayered, and reviewable through a separate administrative process, further underscoring that they are intervening causes not attributable to Legacy.

*Third*, the Leeberg's Medicare denial letters make clear that she received denials for reasons besides the IFU. (Ex. 1 at App. 0072, 0073, 0075, 0076, at 258:16-25, 259:1-25; 262:14-25, 263:1-10). She also continued ordering and using products for almost six months after the November 2023 redetermination denials-conduct that negates any claim that Legacy's alleged statements caused her subsequent losses. Medicare's role is distinct: it reviews whether the provider's documentation and coding demonstrate that coverage criteria are satisfied, and it may deny claims when they are not. Reimbursement is never guaranteed and remains subject to post-payment review of medical-necessity determinations, which are applied to the provider's records at the time of service Medicare also provides a multi-level administrative appeal process through which the provider can challenge adverse determinations. This independent review structure confirms that any denial stems from Medicare's assessment of the provider's compliance, not from any supplier conduct.

The denial record here underscores the point. First Coast's November 14, 2023 redetermination decisions for services on September 20, 2022; September 27, 2022; October 4, 2022; November 16, 2022; and November 30, 2022, uniformly cite provider-level medical-necessity and documentation defects, not Legacy's performance. (Ex. 9 at App. 0173-0214). Specifically, each decision states that the services are "non-covered … because this is not deemed a 'medical necessity' by the payer" and that the provider is responsible for the cost. *Id.* Expert analysis in the record reaches the same conclusion: the denials reflect inadequate provider documentation and billing, not any conduct by Legacy. (Ex. 3 at App., Kohler Report, ¶¶ 28, 42. As importantly, Leeberg admits to billing errors and firing her biller because of those errors. (Ex. 1 at App. 0004, at 29:6-15).

Nor can Leeberg recast Medicare's independent denials as damages proximately caused by Legacy. Under Texas law, contract damages must result from the alleged breach. *See Hunter*, 749 F. Supp. 3d at 748; *Innova Hosp.*, 995 F. Supp. 2d at 602. Here, Leeberg herself alleges that Medicare denied because the product was not used in accordance with the IFU. But it was Leeberg's non-delegable responsibility—by contract, by IFU, and by federal regulation—to interpret the IFU, decide whether and how it applied to each patient, and document and bill properly. Where Medicare determines that the provider's documentation does not establish medical necessity or IFU-compliant use, that determination is an intervening cause that defeats proximate cause as a matter of law. *See, e.g., Breeden*, 377 F. Supp. at 737 (medical necessity determinations rest with the provider).

At least in some of the denials, the Medicare contractor faulted Leeberg for failing to adequately document the medical necessity for use of the graft. Federal law also required that she certify each claim she submitted to Medicare as "medically necessary" for her individual patients

and that she was submitting the claims in conformance with the applicable Medicare regulations and billing rules. 42 C.F.R. § 424.32 requires the provider's certification of medical necessity and compliance-obligations borne solely by the billing provider. Based on the framework required for Medicare reimbursement and the explanations contained in the denial letters supplied by Leeberg, the MAC's denials were caused by Leeberg's lack of proper documentation and not by Legacy. (Ex. 3 at App. 0113-14, Kohler Report ¶ 42.) The provider failed to provide sufficient documentation to support her claims. (*Id.*) These facts foreclose any causal link between Legacy's conduct and the denials.

As the healthcare provider offering wound care services and attesting to the medical necessity of those services, the responsibility of determining medical necessity and proper billing fell solely on Leeberg's shoulders after her evaluation of each patient's medical condition. Leeberg knew there was no preauthorization and that her claims were always subject to review by Medicare for conformance with the LCD documentation and billing requirements. (Ex. 1 at App. 0070, at 217:18-25.) Leeberg's responsibility to bill and document her claim correctly and Medicare's denials of her claims on that basis are intervening factors which breaks the chain of causation. Leeberg cannot now abdicate her responsibilities as a medical provider and blame Legacy for her failure to properly use the product and document medical necessity for her Medicare claims.

### 2.    Summary Judgment Should Be Granted on Counts IV and V (Fraudulent Misrepresentation)

#### (i)    Leeberg fails to show that Legacy made any false representation.

"Under Texas law, there are two types of common-law fraud: (1) simple fraud, also known as fraudulent misrepresentation, and (2) fraudulent inducement, which is when someone allegedly induces another to enter into a contract by using false representations." *AHBP LLC v. Lynd Co.*, 649 F. Supp.3d 371, 388-89 (W.D. Tex. 2023). "Although fraudulent misrepresentation and

fraudulent inducement are separate causes of action, both have the same elements. These elements are: (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Id.* at 389.

Leeberg cannot establish "falsity" as to the IFU: her own exhibits and the IFU language foreclose any claim that Legacy misrepresented product-use requirements, because the IFU states the graft is affixed by the provider's "choice of fixation," which may include staples or sutures "when medically necessary." Her allegation that products had to be stapled or were "post-surgical only" is contradicted by the IFU itself. (Ex. 1 at App. 0065, at 209:22-24.) Leeberg admitted she understood the IFU this way. (Ex. 1 at App. 0066, at 210:8-21.)  The applicable LCD confirms that the IFU was accurate. (Ex. 10 at App. 0215-0227) ("The graft is anchored using the individual's choice of fixation.") Because the governing written instruction assigns fixation to the provider's clinical judgment and permits multiple fixation methods, Defendant cannot show any Legacy statement that misrepresented the product's use requirements – that allocation of responsibility defeats falsity.

(ii)    <u>There is no scienter.</u>

A fraud claim predicated on a promise of future performance requires proof that, at the time the promise was made, the speaker had no intention of performing.  *AHBP LLC v. Lynd Co.,* 649 F. Supp. 3d 371, 389 (W.D. Tex. 2023) (citing *Fluorine on Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004)). Leeberg identifies no evidence that Apex/Logwood—or anyone at Legacy— "never" intended this alleged promise to write off denied claims at the time it was made.

Simply put, there is no evidence that Logwood or Legacy intended to deceive Leeberg at the time the alleged statements were made or that they knew they were making a false promise.

Similarly, the IFU was consistent with the applicable LCD, it assigns fixation to the provider's clinical judgment and does not mandate staples/sutures or exclusively post-surgical use. (ECF No. 21, at Ex. D); (Ex. 10 at App. 0215-0227); (Ex. 3 at App. 0110-11, Kohler Report ¶¶ 28–32). Medicare's later disagreements in denial letters—rooted in provider documentation and medical-necessity assessments—provide no evidence of Legacy's contemporaneous intent to deceive.

(iii)      <u>There is no justifiable reliance.</u>

To prove "reliance on the representation," the plaintiff must show both actual and justifiable reliance. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015); *see also 5AIF Sycamore 2, LLC v. Beit Nes, LLC*, No. 1:19-cv-0431-RP, 2022 WL 2903122, at *9 (W.D. Tex. Jan. 6, 2022); *Cleary v. American Airlines, Inc.*, No. 4:21-cv-00184-O, 2022 WL 5320126. Texas courts assess reliance objectively, asking whether a reasonably prudent person in the plaintiff's position could rely on the representation in light of the written contract.

When evaluating "justifiable reliance," Texas courts will consider whether the plaintiff is party to a written agreement: "as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Nat'l Prop. Holdings, L.P.*, 453 S.W.3d at 424. "This is particularly true when the party had a reasonable opportunity to review the written agreement but failed to exercise ordinary care to do so." *Id.* at 425; *see also Cleary*, 2022 WL 5320126, at *5. Courts will also look to see what the plaintiff knew about the alleged falsity of the statement: "if a party knows that a representation is false before acting upon it, he cannot reasonably rely on the misrepresentation and has no claim

42

for fraud or negligent misrepresentation." *Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*, 377 Fed.App'x. 422, 428 (5th Cir. 2010). And where the written agreement directly contradicts the alleged oral representation, reliance is unjustifiable as a matter of law. *See JPMorgan Chase Bank, N.A. v. Orca Assets*, 546 S.W.3d 648, 658 (Tex. 2018).

    *First*, this alleged "guarantee" to write off denied claims is contradicted by the five written Agreements Leeberg signed over two years.  Leeberg testified that Logwood represented "if the grafts are not paid by Medicare, you will not be held liable for them," and that this assurance was repeated "over and over." (Ex. 1 at App. 0015, at 77:22-24). Yet time after time, she signed five agreements which unequivocally stated the payment terms to the contrary. All five Agreements expressly require timely payment regardless of reimbursement and contain integration and no-oral-modification clauses, foreclosing reliance on contrary verbal assurances. (Ex. 2 A-E at App. 0081-0100, at ¶ 7). As a sophisticated medical provider who reviewed and executed the Agreements repeatedly over nearly two years, Leeberg cannot claim justifiable reliance on statements that the contracts unambiguously disallow. *See Orca Assets*, 546 S.W.3d at 654-58.

    Texas law is clear that a party to a written contract cannot justifiably rely on oral misrepresentations that contradict the contract's unambiguous terms, especially where the contract contains an express integration clause. *See Nat'l Prop. Holdings, L.P.*, 453 S.W.3d at 424-25. One such circumstance is the reliance upon an oral representation is directly contradicted by the express, unambiguous terms of a written agreement between the parties. *Roxo Energy Co., LLC v. Baxsto*, LLC, 713 S.W.3d 404, 409 (Tex. 2025). This principle also defeats any attempt to reframe the theory as fraudulent inducement: even where the parol-evidence bar yields to a fraud claim, the plaintiff still must show justifiable reliance, which is negated when the contract clearly speaks to the point at issue. *See id.; Orca Assets*, 546 S.W.3d at 654-58.

43

Defendant argues the Agreements' integration clauses do not bar her fraud claims. But that argument conflates two distinct doctrines. Texas' parol evidence rule and merger clauses prevent using extrinsic evidence to vary an unambiguous written agreement. Fraudulent inducement is an exception to the parol evidence rule; a generic merger clause alone may not bar proof of fraud in the inducement. But even where fraud can be alleged, the plaintiff must still plead and prove justifiable reliance. On this point, Texas courts have consistently held that a party cannot justifiably rely on oral statements that contradict a contract's unambiguous terms, particularly where the party had the opportunity to read the agreement. That doctrine applies irrespective of whether the merger clause is "barebones." *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 859 (Tex. App. –Houston 2003) ("[T]he prevailing rule, recited above, is instead that a party who enters into a written contract while relying on a contrary oral agreement does so at its own peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract.").

To avoid this, Leeberg tries to claim that "Leeberg's justifiable reliance upon Apex/Logwood's verbal guarantees was . . . rooted in Legacy's 'prior authorization' process whereby Legacy would verify that a patient's insurance provider would pre-authorize payment for services." (Def. Countercl., Doc. No. 21, at ¶ 33.) She alleges that "[o]nce pre-authorization was obtained, medical providers like Leeberg, by and through PIM, would proceed with treating their patients accordingly." (*Id.* at ¶ 34.) But Medicare does not provide pre-authorization for the physician services at issue, and the Agreements contain no promise of prior authorization or reimbursement; to the contrary, they disclaim any guarantee of coverage. Indeed, Leeberg concedes pre-authorization of Medicare claims does not exist under federal law. *See* 42 U.S.C. § 1395y(a)(1)(A); (Ex. 1 at App. 0070, at 217:18-25.) Nor does it exist under the terms of her

Agreements. (Ex. 1 at App. 0039, at 129:6-9.) That said, assuming *arguendo* that Leeberg is actually referring to Legacy's Insurance Verification Request ("IVR"), which is referenced in her Agreements, (Exs. 2-A-E at App. 0081-0100, at ¶ 2), Leeberg's claims fail because she concedes she never used the Legacy IVR, as required by the Agreements.[12]

She chose to ignore the terms of the Agreements and use Apex/Logwood's IVR process. The terms of the Legacy IVR are clear—it only verifies that the patient's insurance benefits are active and does not guarantee coverage or payment:

> Legacy Medical offers insurance verification as an information service only. Information gathered during the requested research will be provided by the insurer or third-party payer. **Results of this research are not a guarantee of coverage or reimbursement in the future**. Legacy Medical disclaims liability for payment of any claims, benefits, or costs.

(Ex. 4 at App. 0133.) (emphasis added). The Legacy IVR refutes any reliance claim. Moreover, Leeberg's self-serving claim of reliance on Apex/Logwood's so-called verbal guarantee is belied by her own actions. By continuing to order and use products for many months after receiving denials she attributed to IFU use, Leeberg confirms she did not in fact rely on any alleged no-collections promise. It is clear from her own documents that she continued to order products for six months even after receiving her first denial in November 2023, knowing that some of the denials were based upon her lack of use of sutures or staples. Her conduct in continuing to order products for twenty months until May 2024 in the face of denials, shows she chose to ignore the payment terms of her Agreements.

---

[12] Attached hereto as Exhibit 4 is a copy of the express terms of Legacy's "Patient Insurance Verification and Prior Authorization Request Form" in effect for the Zenith™ and Impax™ which the Court may consider even though not formally attached to Leeberg's counterclaims, because both Leeberg and the Agreement refers to it. *Walcott v. Sebelius, et al.*, 653 F.3d 757, 763 (5th Cir. 2011).

As Leeberg concedes, "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests ... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party. *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015). Leeberg is also correct that "when a party fails to exercise such diligence, it is 'charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated.'" *AKB Hendrick, LP v. Musgrave Enters, Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.). Finally, Legacy agrees with Leeberg that "[t]o this end, the party 'cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon [them].'" *Shafipour v.Richson Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App. – Eastland 2015, no pet.). Those diligence principles squarely apply here and dispose of justifiable reliance.

In sum, Leeberg's reliance fails for three independent reasons: (1) Apex/Logwood's alleged oral "no collections" promise contradicts the contracts' unambiguous payment and provider-duty terms, defeating justifiable reliance; (2) there was no reliance in fact because Leeberg continued to order products even until May 2024 after receiving the denials in November 2023; and (3) the merger/non-reliance provisions assign payment risk to Leeberg and leave product use and billing to the provider's medical judgment. In sum, because the so-called no collection action guarantee conflicts directly with the Agreements explicit payment terms as well as the integration clause, there is no justifiable reliance. *Nat'l Prop. Holdings, L.P.*, 453 S.W.3d at 424.

(iv)    <u>Fraud claims arising solely from a contractual relationship fail.</u>

If an allegation of fraud arises solely from the parties' contractual relationship, the fraud claim cannot survive. *See, e.g., Miller v. CitiMortgage, LLC*, 970 F.Supp.2d 568, 583-584 (N.D.

Tex. 2013). "Thus, the economic loss rule 'generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract.'" *Id.* at 584 (quoting *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007). "In determining whether a tort claim is merely a repackaged breach of contract claim, a court must consider: (1) whether the claim is for breach of duty created by contract, as opposed to a duty imposed by law; and (2) whether the injury is only the economic loss to the subject of the contract itself." *Id.* at 584. This is especially true where, as here, the alleged misrepresentations address performance under the Agreements rather than any independent duty sounding in tort. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (tort claim must be based on independent duty).

Specifically, the economic loss rule precludes Count V. The economic loss doctrine and the contracts' integration/non-reliance provisions bar the fraud claims, which are repackaged contract disputes. Count V, in particular, repackages alleged product-use assurances as a tort claim indistinguishable from the alleged contractual nonconformity and payment dispute, triggering the economic loss rule. The economic loss rule precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract. *Miller v. CitiMortgage, LLC*, 970 F.Supp.2d 568, 584 (N.D. Tex. 2013). Defendant's fraud claim at Count V is nothing more than a repackaged breach of contract claim**,** and since it arises solely from the parties' contractual relationship, the fraud claim must be dismissed. *Id.* at 583-584. "In determining whether a tort claim is merely a repackaged breach of contract claim, a court must consider: (1) whether the claim is for breach of duty created by contract, as opposed to a duty imposed by law; and (2) whether the injury is only the economic loss to the subject of the contract itself." *Id.* at 584.

Here, Leeberg alleges that Legacy is liable for fraudulent misrepresentation, a tort, because it violated the Agreements. (ECF No. 21, at ¶¶ 81-88 (Count V)). Specifically, Leeberg claims Legacy, by and through alleged agents, fraudulently misrepresented the terms of the Impax IFU by instructing her to "apply the IMPAX Membrane products in manners that did not comport with the IFU's directives[.]" (*Id.*) Leeberg claims Medicare denied her claims for reimbursement because of Legacy's alleged misrepresentations about its products' use. (*Id.* at ¶¶ 87-88.) These allegations are virtually identical to those in Counts I through III, which sound solely in contract, not tort and, therefore, must be dismissed under the economic loss rule. Defendant's fraud theory merely repackages alleged nonperformance of contractual promises regarding product use and payment; because it alleges no independent tort duty or injury distinct from the contract itself, the economic-loss rule forecloses recovery in tort. *See LAN/STV v. Martin K. Eby Const. Co.,* 435 S.W.3d 234, 234-45 (Tex. 2014); *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415-17 (Tex. 2011).

Defendant's fraud claim in Count V is based entirely on alleged representations regarding the same subject matter as the parties' contracts— namely, payment obligations and product use. Because these claims do not arise from any independent legal duty, but rather from the contractual relationship itself, they are barred by the economic loss rule.

## VII.    CONCLUSION

For the foregoing reasons, judgment should be granted on Legacy's contract and quasi-contract claims, and, as to the quasi-contract claims, in the alternative to contract. Further, because the counterclaims are foreclosed by the unambiguous terms of the parties' written agreements, their integration and no-oral-modification provisions, the statute of frauds, the lack of justifiable reliance, scienter, and causation,  as well as the economic-loss rule, Legacy respectfully requests

that this Court enter summary judgment on all of Leeberg's counterclaims and dismiss them with prejudice. Judgment with prejudice is warranted to uphold the integrity of written contracts and to bring finality to this dispute by entering final judgment in Legacy's favor.

Dated: February 2, 2026                    Respectfully submitted,

                                          **BLANK ROME LLP**


                                          /s/ Megan A. Altobelli
                                          Gregory J. Moore (*NDTX adm'n pending*)
                                          Texas Bar No. 24055999
                                          Audrey F. Momanaee
                                          Texas Bar No. 24055993
                                          Fed Bar No. 724132
                                          717 Texas Avenue, Suite 1400
                                          Houston, Texas 77002
                                          (713) 632-8613
                                          Gregory.Moore@BlankRome.com
                                          Audrey.Momanaee@BlankRome.com

                                          -and-

                                          Megan A. Altobelli (local counsel)
                                          Texas Bar No. 24107116
                                          200 Crescent Court, Suite 1000
                                          Dallas, Texas 75201
                                          (972) 850-1467 M. Altobelli Direct
                                          Megan.Altobelli@BlankRome.com

                                          **ATTORNEYS FOR PLAINTIFF**


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served on all parties and counsel of record through the Court's CM/ECF filing system on this 2nd day of February 2026, in accordance with the Fed. R. Civ. P. 5(b)(2).


                                          /s/ Megan A. Altobelli
                                          Megan A. Altobelli