# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

                          No. 4:25-cv-00319-P

LEGACY MEDICAL CONSULTANTS,
LP, SUCCESSOR IN INTEREST TO
LEGACY MEDICAL CONSULTANTS,
LLC,

          Plaintiff,

v.

CRISTI LEEBERG D/B/A
PRACTITIONERS IN MOTION, PLLC,
          Defendant.
_____/

          DEPONENT:   CRISTI LEEBERG
          DATE:       December 5, 2025
          LOCATION:   Zarco Einhorn Salkowski & Brito, P.A
                      One Biscayne Tower
                      2 South Biscayne Boulevard
                      34th Floor
                      Miami, FL 33131
                      Phone: (305) 374-5418

          TIME:       10 a.m. to 5:05 p.m.


          M A G N A L E G A L S E R V I C E S
            ( 8 6 6 ) 6 2 4 - 6 2 2 1
          w w w . M a g n a l s . c o m



APP_0001

A.    Sure.   I was a Nursing Assistant in '90.   I became a Licensed Practical Nurse in '95.   I got my two year degree in 2003.   A four year bachelors in 2005. Went back for my master's degree 2008.   And when I did my post grad, and graduated 2011 with my Nurse Practitioner.

Q.    And what institutions did you attend?

A.    I went to originally was BCC, which is now Eastern Florida State.   Then I went to Regents, New York.   And then I went to University of Phoenix for my masters.   And then I went Ball State for my post grad.

Q.    And I apologize if you answered this.   What year did you graduate from your postgraduate work?

A.    2011.

Q.    And that was an Advance Nurse Practitioner?

A.    Correct.

Q.    What was your first job coming out of Ball State?

A.    I worked with Family Home Physicians, which is on the West Coast.   Was a mobile primary care group, and I started the East Coast Primary Care for them.   Mobile.

Q.    Okay.   And what year was that?

A.    2011, December.   I stayed with them approximately two years.

Q.    And what was your -- I am sorry?



APP_0002

Q.    Like a medical assistant?

A.    She is not a medical assistant.  She is an office assistant.

Q.    And how did she assist with the wound care side of business?

A.    Packs the bag.  Carries the bag.  Hands things to the practitioner.

Q.    Did you, yourself, handle wound care?

A.    I do.

Q.    And have you always?

A.    Yes.

Q.    What employees are involved in ordering, receiving, billing, or applying, the Legacy products?

A.    Myself, Robert Johnson, Pete Ciechanowski.

Q.    So Robert Johnson does that as well, though?

A.    Yes.

Q.    So I guess, lets break this down.  Who handles the ordering?

A.    With Legacy me.

Q.    None of the other employee handle any ordering at all.  What about receiving of the product, and the intake of it?  Who handles that?

A.    Whoever was at the office to sign for it.

Q.    So it could have been any employee?

A.    That signed for it sure.



Page 29

MR. ESPOSITO:  Longwood.

MR. SHELOWITZ:  Rick Logwood.  Just for a clean record.

MR. ESPOSITO:  My apologies.  I misspoke.

BY MR. ESPOSITO:

Q.  Why did you guys -- why did you part ways with her?

A.  I don't believe she was billing appropriately.

Q.  When you say you don't think she is billing appropriately.  Can you elaborate a little bit further? What do you mean?

A.  She provided invoices to me that I don't know were correct.  And I couldn't get her on the phone a lot of the times.  When the audit started, she just wasn't appropriate to handle it.

Q.  When you say the audit started.  Can you clarify a little bit?

A.  When I started getting letters from Medicare with clawback's and audits.  Debbie didn't handle them appropriately.

Q.  And those audits and clawback's.  Were they strictly to the grafts?

A.  Correct.

Q.  Did she only do your billing for grafts, or did she handle other aspects as well?



Page 34

A.    It does.

Q.    And that you are the registered agent?

A.    Yes.

Q.    And it also list you as the manager?

A.    Yes.

Q.    Are there any other individuals that have any ownership interest, management interest, control over?

A.    No.

Q.    So all decisions whether financial, whether financial, or managerial, are made by you?

MR. SHELOWITZ:   Object to form.

THE DEPONENT:   Correct.

BY MR. ESPOSITO:

Q.    And it appears based on this that, you filed the documentation to create this entity back in 2015, and have maintained it with the annual reports, all the way through 2025.  Correct?

MR. SHELOWITZ:  Object to form.  You can answer.

THE DEPONENT:  Yes.

BY MR. ESPOSITO:

Q.    I am going to hand you what will be Exhibit 3.

(Thereupon, Plaintiff's Exhibit Number 3, was marked for identification.)

BY MR. ESPOSITO:



Page 53

MR. SHELOWITZ:  We noted the prior request for the payment records.

MR. ESPOSITO:  So you guys, just to clarify produced all the payment records already?

MR. SHELOWITZ:  No.  No.  No.  I am mentioning we noted your prior request on the record for payment records which subsumes this request.

MR. ESPOSITO:  Okay.  I just wanted to clarify for the record.

MR. SHELOWITZ:  Yes, I understand.

BY MR. ESPOSITO:

Q.   Have you ever testified as an Expert in any legal proceeding before?

A.   Yes.

Q.   How many?

A.   A handful.

Q.   Is a handful 2?  5?  10?

A.   I don't know the answer to that.  It was many years ago.

Q.   That was my next question.  How long ago was that?

A.   Over 10 years ago.

Q.   So you no longer testify as an Expert?

A.   No.

Q.   What kind of testimony would you provide?



APP_0006

Page 58

Q.   So Nick Petrillo introduced you to Rick?

A.   He did.

Q.   And how did you guys first meet?

A.   On the phone.

Q.   And what were the -- what was the initial discussion about?

A.   The discussion was about the skin substitutes. He started introducing me to look into how they heal wounds.  And the advanced products, and just the wonderful outcomes that they have.

And that is when our relationship started. And I started ordering grafts through Rick.  I questioned him and questioned him about, you know, the product.  How it worked.  How to use it.  How to bill it.

And everything came through, you know, Rick Logwood.  How to use the product.  How to bill the product.  That by any means, at any given time, if we didn't get reimbursed for it.  That I wouldn't be liable for it.  With every conversation we had it was all positive.

Q.   You had mentioned Apex?

A.   Mm-hmm.

Q.   Who is Apex?

A.   Rick Logwood's business.



Page 59

Q.   What business is that?

A.   He was a distributor for Legacy and BioLab.

Q.   I am sorry.  What was that last part?

A.   And BioLab.

Q.   So you knew when you first met Rick that he was a distributor for Legacy?

A.   No, not Legacy.  At the time I just knew BioLab.

Q.   Did you ever think that Rick was employed by Legacy?

A.   Employed, he is distributor for the companies.

Q.   So what does that means in your eyes?

A.   That means he distributed their products.  Educated on their products.  Spoke for them.  Got paid by them.

Q.   But do you know if he is an employee?

A.   W-2 or 1099.  I didn't question that.

Q.   Did he ever indicate to you that he was an employee of Legacy?

A.   Employee.  He told me he worked with Legacy.  Excuse me.  He told me he worked with BioLab.  And then when he started working with Legacy, he said he was working with Legacy.

Q.   So it was your understanding that -- or I guess is it your understanding that as a distributor,



APP_0008

Page 60

Mr. Logwood through Apex, was not employed directly by Legacy?

A.   It was my understanding he was employed by Legacy.

Q.   So do you believe that all distributors who operate under a separate entity such as Apex, are employed by the manufacturer distributor of those products?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Yes.

BY MR. ESPOSITO:

Q.   Do you have any records in this case that show he was employed directly by Legacy?

A.   No.

Q.   Do you have any records that indicate he has any authority to buy Legacy --

MR. SHELOWITZ:  Object to form.  Calls for legal conclusion.

THE DEPONENT:  Records no.

BY MR. ESPOSITO:

Q.   Then when you say records now, what do you think you have?

A.   Verbal conversation.  I mean he is the one who brought the product.  He is the one that paid for the product.  I paid him.  He paid Legacy.  In the



APP_0009

Page 61

beginning, everything went through Rick.  All the contracts.  Everything went through Rick Logwood.

Q.    So how frequently did you interact with him?

A.    In the beginning frequently.  Then I didn't really need to a whole lot for a while.  And then towards the end, more frequently.

Q.    So how often do you think you guys communicated?

A.    In the beginning weekly.  The end monthly.

Q.    And were those communications telephonically? In person?

A.    Talked.  We talked.  We spoke.

Q.    Were there ever -- was there ever any text communication, or e-mail communication between you guys?

A.    I didn't text him.  They were a few e-mails.

Q.    Was there a reason you didn't text him?

A.    No.  He is not my friend.  I didn't text him.

Q.    So your relationship with him was strictly professional?

A.    Yes.

Q.    And strictly with regard to graft products?

A.    No.

Q.    What other products?

A.    He also brought Ultra Mist to my company.  He taught me how to use it.  Did the education.  And was



APP_0010

Page 69

Q.    And you said the grafts themselves, the layers of the grafts?

A.    Correct.

Q.    So that was either to the Practitioner's e-mail or your gmail, your individual gmail account. Neither of those you are able to locate.

Have you performed that search?

A.    I did.

Q.    Were there any other contents in that e-mail beyond the attachment?

A.    Not that I recall.

Q.    Did he make any representations about the product itself in that e-mail?

A.    Not that I recall.

Q.    Did he provide any other documents about that product, or Legacy?

A.    Not that I recall.

Q.    Did you do any kind of independent investigation into the product?

A.    I did not.

Q.    What about Legacy?

A.    No.

Q.    So did you -- based on that single brochure he provided for Zenith.  Is it your testimony that you relied on that document solely, to start using those



products?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I relied on Rick Logwood's communication to me about the grafts.  How to use them, and how well they worked.  I relied on Rick.

BY MR. ESPOSITO:

Q.    Do you recall the e-mail address that Rick sent it from?

A.    No.

Q.    Was it a Apex e-mail domain?

A.    I don't know.

Q.    Do you know was anybody from Legacy copied on that e-mail?

A.    I don't recall.

Q.    Was anybody copied on the e-mail?

A.    I don't recall.

Q.    Did Mr. Logwood say anything about regulatory approvals, FDA?  FDA compliance, or any other kind of legal consideration for those Zenith products, or Legacy itself?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I don't recall the whole conversation.  It was several years ago.

BY MR. ESPOSITO:

Q.    Did he at any point?



Page 71

A.   That they were approved.  Yes.

Q.   Do you know what context he meant they were approved?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Medicare approved skin setups for wound care.

BY MR. ESPOSITO:

Q.   Did you do any investigations into those approval on your own?

A.   Yes.

Q.   What did those investigations entail?

A.   Reading the LCD's.

Q.   And can you for the record explain what an LCD is?

A.   It's the Local Determination Cost of the grafts, and how they are to be used.

Q.   And who published those?

A.   CMS.

Q.   CMS is?

A.   Center for Medicare Services.

Q.   And those LCD's are published by CMS?

A.   Yes.

Q.   Did you look at any -- did you review any kind of performance matrix, or studies.  Any other testimony about these products, or data at all?



Page 72

A.    Not that I recall.

Q.    Why would that be?  Why would you not?

A.    I can't answer that.  I don't have an answer for that.

Q.    Is it common practice in your practice to start utilizing medical products without doing any kind of analysis, or excuse me, investigation into their performance?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Again, I relied on a medical doctor educating me, and showing me what these products could do, and I trusted him.  So after being educated, and trained, by a medical doctor.

BY MR. ESPOSITO:

Q.    I guess what education did he provide you?

A.    He described how they worked.  How to use them.  The outcomes of them.

Q.    How did he describe how they worked?

A.    Rick?

Q.    Yes.  That is who you are referring to?

A.    Rick Logwood, yes.

Q.    Yes.

A.    He went through the whole process of how you clean the wound, debride the wound.  Apply the skin substitutes into the wound.  I am not sure exactly how



Page 77

Legacy?

A. The contract?

Q. Nothing. No other materials beyond that, that you recall?

A. Not that I am aware of.

Q. And you don't have any other materials somewhere that he provided you?

A. No.

Q. Have you produced all materials that he has given you in this case?

A. No.

Q. You have not produced them all?

A. I couldn't find the e-mail.

Q. What you able to locate has been produced, you are saying?

A. Correct.

Q. Okay. Is it your position, or claim, I guess that Rick made a representation to you that Legacy would waive payments for the products they sent?

A. If Medicare didn't pay, yes.

Q. How did he make that representation to you?

A. He said if the grafts are not paid by Medicare, you will not be held liable for them. Over and over and over.

Q. You are saying he said. Was that spoken?



A.    Spoken.

Q.    Never written down anywhere?

A.    We always spoke.

Q.    So I guess the answer is no.  It was never written down?

A.    No.

Q.    So if you were not reimbursed, you would not have to pay Legacy, is what his statements were?

A.    Correct.

Q.    Do you ever confirm that with anybody at Legacy?

A.    The only communication I ever had from Legacy was through Rick Logwood.  He was the only representation of the Legacy, first couple of years.  No one from Legacy ever ever spoke to me, until issues down the road.

It was always through Rick.  And then when Rick -- when there was issues, Rick was on there with them.  They never said that he didn't represent them. Rick was always the person I spoke with that had anything to do with Legacy.

There was no other representation from Legacy to me.  No one ever reached out from Legacy to me, other than Rick Logwood.

Q.    And you never reached out to somebody at



Legacy either?

A.   No.

Q.   Why was that?

A.   I didn't need to.  Rick was their representation.

Q.   But besides his verbalization to you that he represented them.  There was no other documentation, or anything provided that substantiated that claim, right, that he represented them?

A.   No.

Q.   You have referenced Brian Rowan?

A.   Mm-hmm.

Q.   Who is Brian Rowan?

A.   I believe he is one of the VP's of Legacy.  I know he works directly with Legacy.

Q.   How do you know that?

A.   Because I was on a call with him and Rick Logwood.

Q.   Do you recall the date of that call?

A.   No, I can find it.  But no.

Q.   What do you mean you can find it?

A.   Well, there was two calls.  One was originally with me, Rick, and Brian.  And then we had the Zoom call later, which I believe is in here, the date of that one.

Q.   So initially the telephone call?



Page 83

appointment for that?

A.    No.

Q.    Would you be able to confirm at all in any means whatsoever?

A.    No.

Q.    And who was on that call?

A.    Myself, Rick Logwood, and Brian Rowan.

Q.    So Matthew was not on there?

A.    Not that I was told.

Q.    And what was the -- I guess what brought on the call?

A.    The appeals.

Q.    The appeals from?

A.    From Medicare.

Q.    About?

A.    About their grafts being experimental.  And that we weren't -- we were going to get clawback all the money.  Because their grafts were not approved, and experimental, for the way that they told me to use them.

Q.    You are saying their grafts?

A.    Legacy.  I am sorry.  Zenith and Impax.

Q.    Okay.  And what was the content of the conversation at that time?

A.    At that time the content was that I was told from Brian Rowan, with Rick Logwood on there, that they



Page 85

Q.    And what statements did Brian Rowan make on the initial call to you?

A.    As far as his IFU being incorrect.  And they were going to correct it with Medicare.  And I had nothing to worry about.

Q.    Those were directly from Brian Rowan?

A.    Those were directly from yes.

Q.    And did he articulate what was wrong?

A.    Yes.  Medicare was misinterpreting their verbiage of having to suture, and staple, the graft in place.

Q.    Did he say why -- what he meant by misinterpret?

A.    That their grafts were approved, and they didn't have to be sutured, or stapled, in place.  And Medicare was misinterpreting their IFU.  And a change had been put in to correct it.

Q.    Did they provide -- were there any e-mails exchanged after these conversations with you guys?

A.    No.

Q.    Was anything done in writing?

A.    No.

Q.    About this misunderstanding in the IFU?

A.    No.

Q.    The misstatement?



Page 86

A.   No.

Q.   During these conversations, did you guys discuss payment of the invoices?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  No.  And yes.  I was told not to worry about it.  The appeals were going to be fixed.  We were going to be able to get reimbursed from Medicare.

BY MR. ESPOSITO:

Q.   Who told you not to worry about it?

A.   Brian and Rick.

Q.   Did they -- did Brian ever tell you that payment to Legacy was contingent on your reimbursement from Medicare for the products?

A.   Brian told me that we didn't need to worry about it.  That once the IFU was fixed, we would get paid.  And not to worry about it until then.

Q.   It's not really my question.  My question was, did he ever tell you that payment to Legacy was contingent on your reimbursement from Medicare?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Brian, no.

BY MR. ESPOSITO:

Q.   Your answer was I believe somebody did.  Who?

A.   Rick Logwood did.



APP_0020

Page 93

A.    Not that I am aware of.

Q.    What facts, or I guess documents, are you basing that on?

A.    Again, I did not ever have any communication with Legacy.  Everything I did was through Rick.  He was the direct contact for Legacy.  Nick worked for Rick.  So he was his, not to be demeaning, do-boy.  Whatever he needed.  But all of my documents, all of my communication was with Rick Logwood.

Q.    Did you rely on any kind of statements, or materials, that Nick provided you with regard to the Legacy, or the products?

A.    Only or brochures, again the flyers for the grafts.  I might have gotten a couple of those from him.  Because I use those in my own marketing.  But again those came from Rick.

Q.    So you don't recall actually getting e-mails I guess from Nick with brochures?

A.    Possibly.

Q.    Did you perform a search for those?

A.    No.

Q.    Would you perform a search?  We would request that you do.  So is it correct to say that Nick never provided any kind of statements about regulatory approvals, or FDA compliance, legal considerations, with



APP_0021

Page 97

would send back the authorizations.

Q.   And that wasn't my question.  I asked more date related.  Do you remember the dates of those communications?

A.   No.

Q.   So you said they were payment related and authorizations?

A.   Correct.

Q.   Were those strictly for Legacy products?

A.   Originally BioLab, and then Legacy.

Q.   So I guess walk me through the communication with them.  What would they entail?

A.   The authorization form went directly to him. He got it authorized, and sent back whether the patient was approved or not.

Q.   What authorization form are we speaking about?

A.   It is a patient authorization for skin subs that Apex provided me.

Q.   Did you complete that form?

A.   Either myself, or one of my office staff, based on the patient information I sent them.

Q.   Do you have a copy of that authorization form?

A.   I can get it.

MR. ESPOSITO:   I would ask for a copy.

MR. SHELOWITZ:   I think those were produced.



APP_0022

Page 98

MR. ESPOSITO:  I don't recall seeing them. But we can double-check.  Just for the record purpose if it was produced --

MR. SHELOWITZ:  You are talking about the Apex insurance verification form?

MR. ESPOSITO:  Yes.

MR. SHELOWITZ:  I am pretty sure that was produced, but I will double check.

MR. ESPOSITO:  Fine.

BY MR. ESPOSITO:

Q.  And can you explain the purpose of the authorization form one more time?

A.  Authorization is for them to authorize the patient being accepted to get a skin graft.

Q.  Your office would complete the form?

A.  And sent it to Apex.

Q.  And then typically by Fitzgerald.  Then do you know what he would do at that point?

A.  I do not.

Q.  What would you get back in response?

A.  Whether it was authorized, or not, and whether we were going to get a Legacy graft.

Q.  What would he provide you to indicate that it was authorized?

A.  The form would have that it was approved, or


MAGNA
LEGAL SERVICES

Page 100

THE DEPONENT:  I can't really answer that.

BY MR. ESPOSITO:

Q.   Why can't you?

A.   Well if the IFU is correct, then yes.  If it wasn't experimental graft, then I probably would have gotten paid.

Q.   So is the only reason any of your claims were denied for the Legacy products, because they were experimental?

A.   Not 100 percent.

Q.   Can you elaborate?

A.   No.  I would have to look at all the records. There is a lot them.

Q.   So there were other -- beyond this experimental aspect of the products that allegedly --

A.   Minor things that could have been corrected in the appeal.

Q.   Again, did you search for e-mail for what you had with Brian?

A.   I didn't.

Q.   Do you have the capability to search?

A.   I can search.  I don't know what it would produce these years later.

MR. ESPOSITO:  I am going to make a request for her to perform that search.



Page 102

A.   No.

Q.   So then there is nothing memorializing this guarantee.  Right?

A.   There is nothing what?

Q.   Memorializing.  Nothing in writing that says you are guaranteed you do not have to pay?

A.   No.

Q.   And so then it's correct to say that you haven't produced any writings in this lawsuit, that state that.  Right, that Legacy --

A.   Correct.

Q.   Is it your position that Rick Logwood had authority to make this guarantee on behalf of Legacy?

A.   Yes.

MR. SHELOWITZ:  Object to form.

BY MR. ESPOSITO:

Q.   What makes you think, or what made you think that Rick had that authority to bind Legacy?

MR. SHELOWITZ:  Object to form.  You can answer.

THE DEPONENT:  My only communication was with Rick.  No one from Legacy every reached out, ever spoke to me.  I was under the belief that he had 100 percent authority to make these decisions.  He is the one that provided the grafts.



APP_0025

Page 104

Q.   And does it indicate -- I am looking on page 2.   Does it indicate that the provider name is Cristi Leeberg?

A.   It does.

Q.   And that office address 1900 South Harbor City Boulevard.   Is that the former location?

A.   Yes.

Q.   You guys no longer provide through that location whatsoever?

A.   I no longer lease that.

Q.   And looking at the next page, does that indicate that you signed as the customer?

A.   I did.

Q.   And that is your name and signature?

A.   It's my stamp.   But yes.

Q.   Turning really quickly to the first page.   The document is titled Customer Onboarding Document?

A.   Mm-hmm.

Q.   Do you see the box at the very top at the right hand side?

A.   Yes.

Q.   Does it indicate who the distributor is?

A.   Yes, it does.

Q.   And who is that?

A.   Apex Medical, Rick Logwood.



Page 105

Q.    And what is the e-mail address it has for?

A.    Rick@apexmdcl.com.

Q.    And the cellphone number, are you familiar with that cellphone number?  (702)285-0587?

A.    I don't know it off the top of my head.  But sure.

Q.    Do you think that is the number you would have contacted Rick on?

A.    Possibly.

Q.    And would that have been the e-mail you would have utilized for Rick?

A.    Possibly.

Q.    Again the domain for the e-mail is Rick@apexmdcl.com.  Correct?

A.    Correct.

Q.    Does anything on that e-mail indicate that he is involved with Legacy?

        MR. ESPOSITO:  Object to form.

        THE DEPONENT:  Honestly it's on a Legacy document.

BY MR. ESPOSITO:

Q.    I am asking about the e-mail address, though?

A.    It's Apex.

Q.    And just walking through it quickly.  The provider name is yourself, Cristi Leeberg on behalf of



APP_0027

Page 110

Q.    Did anybody else assist you?

A.    No.

Q.    We can go ahead and turn back to the page 2, which is the first page of the actual agreement. Paragraph 2, does it indicate that the customer, which we have already discussed was yourself.  Agrees to utilize the Legacy Medical Consultants Insurance Fabrication Request Form prior to ordering and using products?

A.    Yes.

MR. SHELOWITZ:  Object to form.

BY MR. ESPOSITO:

Q.    Did you guys utilize that form?

A.    Yes.

Q.    Was it not your testimony earlier that you utilize an Apex Insurance Verification Form?

A.    Again, Rick Logwood was with Legacy.  I used what they sent me, and I received Legacy grafts.  I am assuming the form that I used was from Legacy.

Q.    Prior to executing those agreements, this agreement, in particular.  Did you read these documents?

A.    I did.

Q.    Going back to paragraph 2.  Does it state that you were to use an Apex Insurance Verification Form?

MR. SHELOWITZ:  Object to form.



APP_0028

Page 113

statement and the terms of the purchase?

MR. ESPOSITO:  Object to form.

THE DEPONENT:  Yes.

BY MR. ESPOSITO:

Q.    Does it indicate that your acceptance to the purchase is contingent on any approvals by any third party?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  No.

BY MR. ESPOSITO:

Q.    Was there any dispute that Legacy did not ship all the products you requested?

A.    No.

Q.    Was there any issues with any of the products you received from Legacy?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Other than IFU being incorrect no.

BY MR. ESPOSITO:

Q.    What was, in your practice what was your impression of the products?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I liked the products.

BY MR. ESPOSITO:

Q.    Would you say they worked?



Page 114

A.    Yes.

Q.    Do you recall receiving delivery status information from Legacy?

A.    Apex.

Q.    Do you know what e-mails would have been utilized -- strike that.  Do you recall what e-mails the invoices, or delivery confirmations, would have been sent to, or received by on your end?

A.    I don't.  I am assuming the one on the front.

Q.    The gmail account that is no longer in use?

A.    Correct.

Q.    Who had access to that e-mail account?

A.    Myself, Gidgette.  That is pretty much it.

Q.    And remind me again, who would have placed -- it was your testimony that insurance verification form would have been submitted to Apex.  Apex would have done whatever they did with it.  Send it back and said you guys had authority.  Correct?

Were there any other steps that you would have to take in order to order the products?

A.    I would request the size.

Q.    How would you guys request that?

A.    Either through Nick Petrillo or through Brian.

Q.    Through Brian Fitzpatrick?

A.    Honestly I don't know.  Through Nick or Rick



Page 115

possibly.

Q.    And how were those communicated?  E-mail?

A.    Probably yes.

Q.    Do you have access to those e-mails?

A.    Not if they are through Practitioners In Motion.

Q.    Looking at paragraph 4.  The first sentence. Does it indicate after receiving the products, customer being, yourself, will treat the patient as medically necessary?

A.    Correct.

Q.    What exactly does, what does that mean medically necessary?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Are you talking about any particular patient, or in general?

BY MR. ESPOSITO:

Q.    In general?

A.    They have the appropriate wound.

Q.    What would make a wound appropriate versus inappropriate?

A.    After you read the LCD's and what the -- basically if you have a good clean wound that is a chronic wound over 30-days old.  That hasn't heal 50 percent, you are justifiably can use an advance dressing



APP_0031

Page 120

pay Legacy Medical Consultants the balance due, amounts

statement in each within 45 days of the date of the

invoice.  Correct?

    A.  Yes.

       MR. SHELOWITZ:  Object to form.

BY MR. ESPOSITO:

    Q.  Did you pay all invoices from Legacy within 45 days?

    A.  No.

    Q.  Does it indicate anywhere in there that you didn't have to pay the invoices.  And that they are contingent on approval, and payment by Medicare?

       MR. SHELOWITZ:  Object to form.

       THE DEPONENT:  In writing no.

BY MR. ESPOSITO:

    Q.  Where?  So not in writing.  Where?  Then where?  Beyond your discussions with Rick Logwood is there anywhere else?

    A.  Just Rick Logwood who represented Legacy for me for years.

    Q.  Paragraph 7, if you don't mind looking at that.  Are you able to read the first sentence?

    A.  This agreement contains the entire agreement between the parties concerning the subject matter hereof and is governed by Texas law.



Page 121

Q.   Does that indicate at any point in time -- well, let me ask you this.  Was this agreement ever modified after it was signed by you?

A.   No.

Q.   Did you ever ask to have any amendment done of these agreements to reflect this alleged guarantee that Rick offered you?

A.   No

Q.   Does this paragraph 7, lead you to believe that this is the entire agreement you had with Legacy?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I don't know how to answer that.

BY MR. ESPOSITO:

Q.   Did anybody at Legacy ever said that this agreement was modified verbally?

A.   No.  Other than being told not to worry about it.  That they were going to fix the issue.

Q.   By Rick.  Right?

A.   And Brian.  That was the call we had.

Q.   Just to confirm.  You are not able to point to any written document in regard to this particular agreement, that says there is no collection guarantee?

MR. SHELOWITZ:  Object to form.  Asked and answered.



Page 122

THE DEPONENT:  No.

BY MR. ESPOSITO:

Q.  Would you agree that the payment obligations under this agreement, are dictated and governed by this document?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I don't know how to answer that really.

BY MR. ESPOSITO:

Q.  I know we just read paragraph 6.  It did not state that you agreed to pay them within 45 days of all invoices?

A.  Yes.

MR. SHELOWITZ:  Object to form.

MR. ESPOSITO:  I am giving you what is identified as 7.

MR. SHELOWITZ:  Yes, 7.

(Thereupon, Plaintiff's Exhibit Number 7, was marked for identification.)

BY MR. ESPOSITO:

Q.  Do you recognize this document?

A.  Yes.

Q.  Turn to page -- I guess can you tell me what it is?

A.  It's Customer Agreement Purchase Agreement.



Q.   Is that with Legacy Medical Consultants?

A.   Yes.

Q.   And what is the date of the Purchase Agreement?

A.   May 15, 2023.

Q.   And does it state the provider is PIM and yourself?

A.   It does.

Q.   And is it your understanding that PIM is Practitioners In Motion?

A.   Correct.

Q.   And on the subsequent page, is that what appears to be your signature?

A.   Yes.

Q.   And your name handwritten below it?

A.   Yes.

Q.   Is there any dispute that that is your signature?

A.   It is.

Q.   There is a dispute that that is your signature?

A.   Oh, no, no.  There is none.  Sorry.  It is my signature.

Q.   And then again, going to the first page.  That again is a Customer Onboarding Document.  And there is a



Page 124

box on the right hand side.  Does that indicate that the
distributor is Apex Medical?

A.    Yes.

Q.    And that Rick Logwood is the individual with
Apex medical?

A.    Yes.

Q.    At the same address we discussed before,
e-mail address?  Excuse me?

A.    Yes.

Q.    And telephone number?

A.    Yes.

Q.    And in this particular form, though, under the
contact name, there was no contact name provided.  Do
you know why that would be?  Was Gidgette there at that
point in time?

A.    Yes.

Q.    Do you think it was just omitted, or was
omitted for any purpose other than --

A.    No.

MR. ESPOSITO:  Object to form.

BY MR. ESPOSITO:

Q.    And then the e-mail address was still the
Practitionersinmotion@gmail.com?

A.    Correct.

Q.    At the bottom it says, claims processer



Page 127

Q.    Does paragraph 2, as with the other agreement also indicate that the customer agrees to utilize Legacy's Insurance Verification Request Form?

A.    Yes.

Q.    And paragraph 3, again states that the customer submits an IVR, and receives confirmation of a patient's benefits?

MR. SHELOWITZ:  Object to form.  And along the last question too.

MR. ESPOSITO:  You can answer?

MR. SHELOWITZ:  Sorry, Cristi.  You can answer.

THE DEPONENT:  Yes.

BY MR. ESPOSITO:

Q.    And that after you submit an order, Legacy will accept it and generate a invoice.  Which reflects that you agree to pay the purchase price on the invoice?

A.    Yes.

Q.    And within the terms of those purchases.  And paragraph 6, does paragraph 6 indicate that you agree, the customer agrees to pay Legacy the balance due on each of those invoices within 45 days?

A.    Yes.

MR. SHELOWITZ:  Object to form.

BY MR. ESPOSITO:



Page 128

Q.   Does Section 4, again indicate that the customer, yourself, being yourself or PIM, would treat the patient as medically necessary?

MR. ESPOSITO:  Object to form.

THE DEPONENT:  Yes.

MR. SHELOWITZ:  Just for the record, I am just going to have a standing objection.  The agreement states what it says.  So I don't have to keep saying that after every question.

MR. ESPOSITO:  I understand.

MR. SHELOWITZ:  For all of these contracts.

MR. ESPOSITO:  I get it.  Yes, thank you.

BY MR. ESPOSITO:

Q.   And that does it also state that you as a customer, acknowledge that the use of those product are were within your sole authority as the treating provider?

A.   Yes.

Q.   And again, at no point do those agreements indicate that any aspect of that medical necessary decision was to be done by anybody else beyond yourself?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Yes.

BY MR. ESPOSITO:

Q.   Does this agreement in paragraph 7, also state



Page 129

that this was the entire agreement?

A.  Yes.

Q.  Was there any written modification of this agreement between you and Legacy Medial?

A.  No.

Q.  Does this indicate -- does this agreement indicate that payment by you was contingent upon approval by Medicare?

A.  No.

Q.  And, again, this agreement going back to the Exhibit 7.  You had never sought any kind of amendment on it, or deviation from the terms.  Right?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  No.

MR. ESPOSITO:  What we will identify as 8.

(Thereupon, Plaintiff's Exhibit Number 8, was marked for identification.)

BY MR. ESPOSITO:

Q.  If you would just take a minute to look it over.  Do you recognize this document?

A.  Yes.

Q.  Can you for the record indicate what it is?

A.  It's the Purchase Agreement Onboarding statement.

Q.  And what is the date of this Purchase



Page 130

Agreement?

A.    September 27, 2023.

Q.    And does it indicate that the provider's name is Cristi Leeberg -- Cristi Leeberg?

A.    Yes.

Q.    And that you are defined as the customer?

A.    Yes.

Q.    On the next page, does it appear to indicate that you executed this through Docu Sign?

A.    Yes.

Q.    And does this contract also on paragraph 1, indicate that the products meaning the human cell and tissue products offered by Legacy as described in Schedule A?

A.    Yes.

Q.    And on Schedule A, what were those products?

A.    Impax.  No, it's not.  This one I never used.

Q.    What were those products?

A.    InnovaMatrix AC.  I never used these.

Q.    It also has the invoice prices, though?

A.    Yes.

Q.    And going to paragraph 2.  Does this agreement like the other ones, also indicate that you were to utilize Legacy's Insurance Verification Request Form prior to ordering?



APP_0040

Page 136

Q.    Can you for the record identify what the document is?

A.    Purchase Agreement.

Q.    With?

A.    Legacy Medical.

Q.    For?

A.    For Impax.

Q.    And does it indicate that you are the provider Cristi Leeberg?

A.    Yes.

Q.    And are you identified as the customer?

A.    Yes.

Q.    And looking to the next page.  Again, is that your Docu Sign signature there?

A.    Yes.

Q.    And going back to paragraph 1, of this agreement.  Does it also indicate that the product is the mean of human cell and tissue products offered by Legacy as described in Schedule A.  Which I believe you already testified was an Impax.  Correct?

A.    Yes.

Q.    And that the price is as reflected on Schedule A, are what would be voiced?

A.    Yes.

Q.    Does this agreement also indicate that you



APP_0041

would agree to utilize Legacy's IVR, prior to ordering the products?

A.  Yes.

Q.  Did you utilize their IVR?

A.  I utilized what the Legacy representative gave me.  Yes.

Q.  Is it not your testimony that would have been an actual Apex form?

A.  I would have to look.  Go back and look at exactly what was on there.

Q.  And it wasn't you, or anybody at your operation, or your business that submitted the IVR's. Right?

A.  It could have been my medical assistant that submitted the IVR's.  Yes.

Q.  To Apex, though.  Right?

A.  Correct.

Q.  And then you are not sure what they did at that point in time upon receipt?

A.  Correct.

Q.  And Apex would then send it back to you and say it was approved or denied.  Correct?

A.  Correct.

Q.  And based on that information you would determine whether you were moving forward with the



Page 146

Q.   And he never worked for PIM?

A.   No.

Q.   Going back to Logwood really quick.  What representations did he make to you about his authority to negotiate on behalf of Legacy, or buying them in any way?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  When Rick Logwood came to me, he came to me as a Legacy representative.  And he spoke for Legacy.  He took care of everything. Everything went through him for Legacy.

BY MR. ESPOSITO:

Q.   But at the same time your initial interaction with him was for other products though.  Right?

A.   BioLab.

Q.   So what made you think that he was a direct representative of Legacy, if he was also offering, and distributing, products for BioLab?

A.   Because after BioLab, he brought Legacy to me. Everything went through Rick.  With the authorization, Legacy gave me the grafts through Rick.  Everything went through Apex.

Q.   And if you look back at the contracts. Mr. Logwood's information is in the top in the box on the right hand side as distributor.  What is your



Page 147

understanding of what a distributor is?

A.   I am not legal, so I don't know the legal definition.  But for me, he was the speaker for Legacy. He was Legacy to me.

Q.   But there was never any correspond -- any documents that show he had direct authority for Legacy. Right?

A.   All of my contracts have Apex Medical and Rick's name on them.  So to me yes.  That was a direct connection.

Q.   Sorry.  Beyond those contracts, there was no other documentation provided to you, showing that he had any kind of role?

A.   Documentation?

Q.   Yes.

A.   No.

Q.   Did he ever discuss compensation, or commission, or any other kind of financial arrangements, that he had with Legacy?

A.   No.

Q.   What about, did he discuss how he was compensated at all through Apex?

A.   No.

Q.   Did he disclose to you that he was the owner of Apex?



APP_0044

Page 148

A.    Yes.

Q.    Did he ever discuss if anybody else was involved in the ownership?

A.    No.

Q.    Do you believe anybody else was involved in the ownership with Apex?

A.    I wouldn't have a clue.

Q.    How did he explain to you how as distributor for Legacy things worked?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Everything went through Apex. Rick spoke to Legacy.  Rick took care of the authorization, per the form.  It went to Legacy. We received Legacy grafts.  Everything went through Rick with Legacy.

Again for years I never spoke with anyone other than Rick with Legacy.  He had full disclosure of what was going on.

BY MR. ESPOSITO:

Q.    So what is your understanding of Apex then?

A.    Apex is Rick.

Q.    So what we are saying it is a business, kind of like what you have PIM?

A.    Correct.

Q.    Did you ever verify whether it's a corporate



Page 149

legal entity that was filed?

A. No.

Q. And did you do -- you didn't do any kind of due diligence into his representations about Apex, or the products, or Legacy, beyond what he told you. Right?

MR. SHELOWITZ: Object to form.

THE DEPONENT: I assumed that I was getting the grafts from Legacy. That everything was approved by Legacy, or I wouldn't receive their grafts.

BY MR. ESPOSITO:

Q. I understand. But my question was more, did you do any kind of independent investigation?

A. No.

MR. SHELOWITZ: Same objection.

BY MR. ESPOSITO:

Q. Going back to the agreements that we looked at before our break. I believe it was your testimony that nobody at Legacy ever said payment of the invoices by you were contingent upon Medicare approval. Correct?

MR. ESPOSITO: Object to form.

THE DEPONENT: Rick Logwood told me multiple times, before every time I signed one of these, on multiple occasions, before and after. That it was



APP_0046

Page 155

MR. ESPOSITO:  We would request that it be produced.  It was my understanding it hasn't been produced.

MR. SHELOWITZ:  Request an inventory of products?

MR. ESPOSITO:  Yes, that she received.

BY MR. ESPOSITO:

Q.   Is there any dispute -- and I think, correct me if I am wrong.  Your testimony earlier was that you never -- you are not speaking that you didn't ever receive any products.  You didn't ever receive products that you ordered from Legacy.  Right?

A.   Correct.

Q.   So you received all the products?

A.   Correct.

Q.   Was there ever -- did you use all the products you received from them?

A.   Yes.

Q.   Was there any issue with the products after being used?  During the application, and after the fact.  Were there any issues with their functionality?

A.   No.  And if I didn't use them, I would send them back right away.

Q.   Did you ever send any back?

A.   Yes.



Page 157

Q.    Would you receive -- do you recall ever receiving any kind of tracking information for shipments?

A.    I do believe so.

Q.    Do you know how you got them?

A.    I do not.

Q.    You don't know who sent them to you?

A.    I don't.

Q.    Or to what e-mail?

A.    No.

Q.    Did you search for those before, as part of the discovery process here?

A.    No.

Q.    Is there a reason why?

A.    I didn't know it was important.

Q.    So is it safe to say that you received invoices then from Apex?

A.    They came with the grafts.

Q.    They were never e-mailed to you?

A.    They were not e-mailed to me.

Q.    Then how would you get the, at month end if there was a rebate involved?

A.    Legacy says that -- I am sorry.   Go ahead.

Q.    No.   How would you receive those invoice that reflect the rebate?



APP_0048

Page 158

A.   Legacy says that they were due at the end of the month.  I never received anything ever from them.  Ever.

Q.   Did you ever question Legacy, or Rick, as to why you were not receiving invoices?

A.   Other than the original invoices no.  It isn't like I needed a duplicate.

Q.   Did you ever reconcile invoices that you did receive, with the products that you used?

A.   Explain what you mean?

Q.   Did you ever -- I mean did you ever receive an invoice, and it showed you received 50 units?  Did you ever reconcile and say yes I have.  My inventory shows I have got 50 here?

A.   Every single one.

Q.   Did you ever reconcile the rebates that you were due to you?

A.   I mean, I knew what the invoice price was.  So I knew if it was right or not.  If it would have been different, I would have questioned it.

Q.   But you don't recall receiving rebated invoices at the end of any month?

A.   No.

Q.   Going back to the agreements again.  We had looked at the terms, and the five agreements have



Page 159

varying between 45 day payment or 60 day payment.

Is it your understanding that based on those terms, based on those agreements that you were bound to pay Legacy within those timeframes?

MR. ESPOSITO:   Object to form.   You can answer.

THE DEPONENT:   Kind of.

BY MR. ESPOSITO:

Q.   What do you mean kind of?

A.   I mean no one every pays in that amount of time.   You pay when Medicare pays you.   So if you don't get paid in 45 days, you don't pay it.   Most of my invoices were not paid in 45 days, even all the original ones.

I got paid -- they got paid when Medicare got paid.   No one ever questioned it.

Q.   They got paid when you got paid by Medicare, you said?

A.   They got paid when I got paid by Medicare. Yes.   And it was never questioned.

Q.   Is that how you handle all payments of invoices?

A.   With Legacy?

Q.   With anybody?   With any carrier, with any provider of yours?



MAGNA
LEGAL SERVICES

APP_0050

Page 162

BY MR. ESPOSITO:

Q.    And is it true that you failed to make payments in full to Legacy for products that you received from July 25, 2022 through May 17th of 2024 totaling $7,335.902.32?

MR. SHELOWITZ:    Object to form.

THE DEPONENT:    There is some discrepancy in that number.

BY MR. ESPOSITO:

Q.    Whether there is discrepancy, or not, you failed to make those full payments, though.  Correct?

A.    Some of them yes.

Q.    Why would that be?

A.    Why was that?  Because they didn't fulfill their obligation.  Give me the product that they told me, and taught me how to use.

Q.    Can you elaborate?

A.    They being Legacy, Rick Logwood.  This product was used exactly the way Rick Logwood, Legacy, told me to use this product on patients wounds.  And my patients were deemed not medically necessary for it based on Legacy's IFU.  So based on their IFU, I didn't get paid.

Q.    But the alleged discrepancy the IFU is not the only reason that you didn't get reimbursed.  Correct?

A.    Oh, that is the reason I didn't get



reimbursed.

Q.   We will go through the denials in a minute. But going back to the payments.  Legacy did inform you at some point in time that your payments were past due. Right?

A.   Yes.

Q.   And that they were demanding payment of those invoices?

A.   They sent me an invoice.

Q.   And did you just choose to ignore it?

A.   I got representation.

Q.   Did you ever remit the request of payments in full to Legacy?

A.   No.

Q.   Doesn't your nonpayment of those invoices directly conflict with the agreement that you signed?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  No.  I felt that they didn't follow through on their agreement that they were giving me the appropriate product.

BY MR. ESPOSITO:

Q.   It was your testimony earlier that the product -- you liked the product.  The product worked.  There were no issues with the product?

A.   Mm-hmm.



Page 164

Q.    So where in these agreements did they not comply with it?

A.    The IFU is incorrect.  They said they were fixing it.  They didn't fix it in time to help me.

Q.    But does it say anywhere in those agreements, that your payment was contingent on an IFU, or approval?

A.    No.

MR. SHELOWITZ:  Object to form.

BY MR. ESPOSITO:

Q.    Did any of your patients ever complain about the products?

A.    No.

Q.    A minute ago you said that the figure that I quoted the $7,335,930.32 is wrong, or there is some discrepancies.  Can you elaborate?  What do you mean?

A.    It's crossover between the relationship that Rick Logwood and Legacy -- when Rick quit working with Legacy, I don't know.  There is some issues with payments.

Q.    What do you mean issues?

A.    It means all of my payments always went through Apex and Rick Logwood.  When Rick quit working with Legacy, I had to start directly paying Legacy.  But there was payments made to Rick and Apex that should have gone to Legacy.  That Legacy never got.



APP_0053

Page 165

Q.    So I guess lets step back for a minute.  How would you pay?  I guess, why would you pay Rick or Apex and not Legacy directly initially?

A.    That is how the whole account with Legacy was set up.  It was always through Rick Logwood and Apex from the get go.

Q.    Do any of the agreements say that in there that you should pay Apex?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  No.

BY MR. ESPOSITO:

Q.    How do you know what Apex said you were required to pay?

A.    The invoice that came with the graft.

Q.    Was that on an Apex letterhead, or no?

A.    I would have to go back and look.

Q.    So you had received that invoice.  It was submitted with your claim.  Let's say you got approval.  And then you wait for reimbursement, and then pay Apex?

A.    Correct.

Q.    Did anybody at Legacy ever tell you to pay in that fashion?

A.    Legacy never spoke with me except through Rick Logwood.  So yes.  Rick Logwood told me how to pay Legacy.



APP_0054

Page 171

believe is Exhibit 10, or 11?  Excuse me.

COURT REPORTER:  11.

(Thereupon, Plaintiff's Exhibit Number 11 was marked for identification.)

BY MR. ESPOSITO:

Q.   Do you recognize this document that I handed you?

A.   I recognize it as an invoice from Legacy.  I don't know that I have seen this particular one.

Q.   At the very bottom it says Leeburg000978?

A.   Mm-hmm.

Q.   This was part of your production to us?

A.   Okay.

Q.   So is it correct to assume that you actually received these invoices, this invoice?

A.   If it was in my stack, yes.

Q.   And how would you have received this?

A.   Most likely it was sent with the graft.

Q.   Can you tell for certain that is how it was delivered?

A.   No.

MR. SHELOWITZ:   Object to form.

THE DEPONENT:   I don't know.

BY MR. ESPOSITO:

Q.   So this was in your possession, but you don't



APP_0055

recall how you received it?

A.    From February of '24, I do not remember how I received this.

Q.    Do you recall at any point in time how you received invoices?

A.    Again I said, I may have gotten e-mails from them, but I don't recall.  I would have to look.

Q.    Is there anything that stands out to you on this particular invoice of being inaccurate, or incorrect?

A.    No.

Q.    Are there any invoices that you can point to that you feel were inaccurate, or contains some kind of inaccuracy on it?

A.    No.

Q.    Was there a time that you ever made partial payments to Legacy?

A.    Can you -- I don't understand what partial payment means?

Q.    Sure.  For example, this invoice indicates that the amount was $2,576.09.  Would there ever have been a reason for you to pay a lesser amount than that, a partial amount?

A.    Only if multiple grafts were on the same invoice.



my head right now.  But after Medicare takes the 20 percent off, and then I give Legacy back their 60 percent.  It's pennies on the dollar to me.  And after the biller gets their cut.  So basically 16 percent.

Q.  And all your claims were submitted and controlled by Debbie?

MR. SHELOWITZ:  Object to form.  Asked and answered.

THE DEPONENT:  Again, I told you I had a biller right before Debbie.  And then it went to Debbie.  And I don't where that --

BY MR. ESPOSITO:

Q.  Did anybody ever -- sorry.  Did anybody ever review her submissions before or after?

A.  Other than me?

Q.  Yes?

A.  No.

Q.  Did you review them ever?

A.  Yes.

Q.  How often?

A.  I would go through the CMS reports on a weekly basis.

Q.  And where would you look when you were going through CMS Reports?  What were you looking at?

A.  Approvals, denials.  They were denied.  Why



Page 176

were they denied.

Q.    And who generated those reports?

A.    Me.

Q.    Where would you get the information from?

A.    CMS.

MR. ESPOSITO:  What will be Exhibit 12.

(Thereupon, Plaintiff's Exhibit Number 12, was marked for identification.)

BY MR. ESPOSITO:

Q.    Are you familiar with this form?

A.    1500 Form, yes.

Q.    And would this be the form that Debbie would utilize when submitting claims?

MR. SHELOWITZ:   Object to form.

THE DEPONENT:   Yes.

BY MR. ESPOSITO:

Q.    Would there be any other form that she would use?

A.    Sometimes billers can send them in electronically.  They don't have to use the 1500 Form.

Q.    The electronic version is similar, but just computer based?

A.    I can't answer to that.  I have not seen that myself.

Q.    What reimbursements did you receive for claims



Page 177

involving Legacy products?

A.    I don't understand the question?

Q.    What percent do you think of claims you submitted for Legacy products to Medicare.   How many did you get approved?

A.    Originally before the clawback's?

Q.    Sure?

A.    95 percent.

Q.    And then what changed after?

A.    UPIC started reviewing the Legacy grafts, and seen the IFU was incorrect.  And quit approving them. And started doing audits and clawback's.

Q.    Can you explain what a clawback is?

A.    Yes.  Its where they say they overpaid you, and they start keeping all the money that is coming into your business.

Q.    And by they, do you mean Medicare?

A.    Medicare, sorry.

Q.    Are you able to -- strike that.  After you started receiving these clawback's.  What percentage of your claims were approved for Legacy products?

A.    I can't answer that.  I don't know.

Q.    Do you know how much in total you were reimbursed for Legacy products?

A.    No.



Page 193

THE DEPONENT: And my only answer is again, if they would have given me the product, and the information correctly, and I would have gotten paid, they would have gotten paid. I can't pay someone money I don't have.

BY MR. ESPOSITO:

Q. But there was never an agreement that is how it was going to function?

A. Verbally there was.

MR. SHELOWITZ: Object to form.

BY MR. ESPOSITO:

Q. So by submitting this claim, the claim forms for the products. Are you not representing to Medicare that you either pay for those products, or you are obligated to pay for them?

A. I am going to be honest, I don't know. I don't know that Medicare has a play into that.

Q. So are you saying that you could write down any amount you want on this form?

A. I am saying no matter what you write down on this form, Medicare is only going to give you back what they want to give you back. They are going to give you what their LCD is for that graft. They are not going to give you -- I can put a million dollars for a 2 by 2. They are not going to give it. They are going



Page 197

Yes.  And what the price of that graft would be if it gets covered.

Q.   Is Medicare normally reimbursed for products that the provider hasn't paid for already?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I don't really understand your question.  Because Medicare doesn't work that way.  So I don't know how medical you are.  But Medicare doesn't work that way.  If I use a roll of gauze they didn't reimburse me for it.  They don't care.

BY MR. ESPOSITO:

Q.   So you can't just put anything down on the forms.  Right?

A.   No.

Q.   Technically speaking, you are supposed to put down products, or procedures, or whatever else that were used, or performed.  Right?

A.   Correct.

Q.   So do you not think by putting those down, that you are communicating to Medicare that you incurred those costs and charges?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I do not do those charges to get back unless Medicare pays for it, under verbal agreement.  So.



MAGNA
LEGAL SERVICES

Page 199

A.    No.

Q.    So then you never disclosed to any contractor, or Medicare auditor, reviewer, that you have no financial risk in these products?

A.    Not to my awareness.

Q.    Did you ever inform your patients that you didn't have any kind of obligation to pay for the products that you used on them?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  It wasn't disclosed with any patients.  I didn't.

BY MR. ESPOSITO:

Q.    So no, you didn't?

A.    No.

Q.    Did your patients ever consent at all, that the payment for these products were contingent?

A.    Again, not discussed.

Q.    With the patients?

A.    No, not discussed with my patients.

Q.    Was any -- did any kind of -- at any point was there any kind of documentation that you submitted to Medicare, that indicated that you had this arrangements with Logwood, where he agreed that he guaranteed that the payments were contingent?

MR. SHELOWITZ:  Object to form.



Page 204

MR. ESPOSITO: That is fine. If you want, you can take it now.

MR. SHELOWITZ: You want to do it now?

MR. ESPOSITO: Yes, that is fine.

MR. SHELOWITZ: Take 10 minutes?

MR. ESPOSITO: Yes, that is fine.

*****

(Thereupon, a brief recess was had, after which the following proceedings were held)

BY MR. ESPOSITO:

Q. So we are going to shift our, I guess our attention back to this medically necessary concept now.

You agree that as the provider that it's your responsibility to determine what is medically necessary, and not a biller when they are making the form submission. Correct?

A. Yes.

Q. And are you familiar with the Medicare standard that covers the services that are reasonably necessary?

A. Yes.

Q. And is it your understanding that that reasonably necessary -- reasonable and necessary included services that are safe and effective. Not experimental, or investigational, inappropriate in



Page 205

duration, frequency and setting?

A.   Yes.

Q.   And just so we are all on the same page, I am going to hand you what will be Exhibit 13.

(Thereupon, Plaintiff's Exhibit Number 13, was marked for identification.)

BY MR. ESPOSITO:

Q.   So this is Section 3.6.22 Medicare program of the Medicare program integrity manual.

Have you seen this before?

A.   I have.

Q.   You have?

A.   Mm-hmm.

Q.   And are you familiar with how they define medically necessary?

A.   I am.

Q.   And can you read through this document, and explain exactly what is the criteria for medically necessary for to us?

A.   As far as like what it says?

Q.   Yes?

A.   It's safe and effective.  It is not experimental or investigational.  It's appropriate including the duration and frequency in the terms of whether the service for item is, one, furnished in



Page 209

A.    Under product use, the last sentence.   The graft is anchored based on a physician's choice of fixation, including staples, or sutures, and surgical procedures when medically necessary.

Q.    And your concern was just because that last sentence with physician's in there?

A.    That was my biggest concern that I saw.  Yes. I wanted to make sure it was something that Nurse Practitioners, PA's, could use.

Q.    Have you ever seen a similar IFU before? Similar in the sense that it said physician's, or it could be utilized by a Nurse Practitioner provider?

A.    My other one says physicians, MP's, or PA's?

Q.    What other one do you mean?

A.    Other products.

Q.    Okay.

A.    There are other products that have different IFU's.

Q.    And the denials that you received for these products.  Did any of them raise any issue about the fact that it said physicians only?

A.    I did not.  What I said was that it had to be surgically applied.  And it had to be sutured, or stapled in place.  That is the medical denials.

Q.    And are you referring to the same sentence we



APP_0065

were just reading a minute ago?

A.   Same sentence.

Q.   The grafts is anchored based on the physician's choice of fixation, including staples or sutures, in surgical procedures when medically necessary?

A.   Yes.

Q.   Do you not think that the caveat of when medically necessary means that doesn't always have to be?

A.   I can't speak for CMS.

MR. SHELOWITZ:   Object to the form.

BY MR. ESPOSITO:

Q.   How do you interpret that?

A.   How do I interpret that?  It's irrelevant.

Q.   I am just asking.  When you initially read it?

A.   I can't remember when I initially read it. But now that I have CMS denials on every single one because of that sentence.  I read it as it has to be surgically placed, and sutured or stapled, based on the physician's choice.

Which originally is how these grafts were used in a surgical procedure.

Q.   So you are saying is that the inaccuracy in the IFU that needed to be corrected?



Page 212

Q.    Going down to the product use section. Doesn't that say that the Impax Membrane is intended for use of a human cell tissue, cellular tissue base product for repair, reconstruction, replacement, and or, some limitation by providing tissue in the form of scaffolding, and a partial or full thickness acute chronic wounds?

A.    Correct.

Q.    Is that how you utilized these products?

A.    Yes.

Q.    And in your utilization of the products you have good results.  Right?

A.    Yes.

Q.    And you never had an issue with the product itself, doing and performing what it is supposed to?

A.    Correct.

Q.    And continuing on it said, that the graft was intended to remain on the recipient and be absorbed in the wound bed?

A.    Correct.

Q.    Is that how you utilize it with your patients?

A.    Yes, it was.

Q.    And again, never had any problem with that?

A.    Correct.

Q.    So where -- you said Brian Rowan said that



this had a typographical error.  And you are saying the typographical error is what again?

A.    That it needed to be surgically used, and sutured or stapled into place.

Q.    But doesn't it say when medically necessary.  So would that then lead you to believe that it is not always the case, and has to be sutured?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  I can't answer that.

BY MR. ESPOSITO:

Q.    You can't give your own opinion?

A.    My own opinion is it says, that it is made for surgical procedures, and can be sutured or stapled, when medically necessary.  Every surgical procedure doesn't have to be sutured or stapled.  But it can still be a surgical procedure.

Q.    Where does it say used for surgical procedures only, though?

A.    Sutured and surgical procedures.

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Right before.  It says when medically necessary.

BY MR. ESPOSITO:

Q.    But doesn't it say that it is used as a human cell tissue in the first sentence, though?



Page 215

Q.   And you are claiming that Medicare denied all your claims, because it wasn't used in accordance with the IFU.  Right?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Correct.

BY MR. ESPOSITO:

Q.   And if I am not mistaken, in your counterclaim you stated that the Impax product couldn't be stapled or sutured?  Is that right?

A.   Correct.

Q.   Why do you say that?

A.   Have you seen these products?

Q.   I have?

A.   They are like cellophane.  If you put them on a wound, you would not ever suture or staple one of them into a diabetic ulcer, or a decubitus ulcer, a venous ulcer.  It would be completely inappropriate.

Q.   Have you ever seen, or researched, the application of those for staple or suture?

A.   Only in like a major surgical procedure.  Like a orthopedic surgeon, or trauma, where they originally were used.

Q.   So that is possible though, is what you are saying?

A.   What?  To surgically place them?



Q.   And why was the determination that they weren't relevant?

A.   That they weren't what?

Q.   Relevant or necessary to produce in response?

A.   It's my patients medical records.  It's a HIPAA violation.

MR. SHELOWITZ:  Yes.  Allow me too step in. You may be aware that there is a confidentiality order that is being circulated.  And there is HIPAA protections.  There is also privileges.  I don't think it's a relevance question.  It's more of a proper procedures in place.

MR. ESPOSITO:  I understand.  I got you.

MR. SHELOWITZ:  And we reserve any objections to relevancy.

MR. ESPOSITO:  I got you.

BY MR. ESPOSITO:

Q.   And would you agree that Medicare determines coverage by the LCD's that were placed, or any other coverage policies.  Correct?

A.   The IFU's.  Yes.

Q.   What about, but they would also review the claims based on the documentation that you provide, to demonstrate that it was medically necessary too.  Right?

A.   Yes.



Page 238

Welcher.

BY MR. ESPOSITO:

Q.    And who is he?

A.    He is an attorney.

Q.    And where are, where are you in that process for those appeals?

A.    Multiple different stages.

Q.    How many of those have been approved?  How many of them have you won?

A.    I have not.

Q.    You haven't won a single one?

A.    Correct.  Because they are all medically -- I will never win it.

Q.    So they have come back every single appeal so far, and denied?

A.    Correct.  My patients were never medically --

Q.    So then you have gotten some ALJ instances?

A.    We had one ALJ hearing, and it got kicked back to the U-PIC.

Q.    For what purpose?

A.    The U-PIC made a mistake, so it went back to the U-PIC.

Q.    What is that?  What is the status of that one?

A.    They still have it.

Q.    And what was the -- what was the mistake they



Page 258

A.    Yes.

Q.    And does it indicate that the appeal decision is unfavorable?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Unfavorable is that what you said?

BY MR. ESPOSITO:

Q.    Yes, I am looking at the second paragraph on the first page?

A.    Yes.

Q.    Going into the explanation of decision. Doesn't that indicate that the documentation received was determined to be insufficient to support the Zenith Amniotic Membrane?  And again I am paraphrasing?

A.    Which part did you go now?

Q.    Still going to the first section, the Explanation of Decision.  Does it not indicate that the decision received for this appeal -- the documentation excuse me, received was determined insufficient to support.

And it goes on to say that Zenith Amniotic Membrane per square centimeter with Q-Code as reasonable necessary?

A.    Yes, I see it.

Q.    And the next sentence it's going to say,



Page 259

according to the LCD services must include an operative note, or procedure note, for debridement service?

A.    Mm-hmm.  Yes.

Q.    And then it goes on to describe what the note should include?

A.    Yes.

Q.    And then following that sentence all the way on, the next sentence says the documentation did not support the character of the wound before and after debridement?

In addition, the documentation does not support the evaluation and management visit was separately identifiable for the procedures performed on the date of service?

A.    Right.

Q.    Therefore the service would be included in this procedure?

A.    Yes, I see that.

Q.    The next paragraph says, Zenith is a human Amniotic Membrane allograft.  The services provided in this instance were know reasonable and necessary because the skin substitute graft was applied for the wound healing and treatment, not merely as a covering or barrier for the wound?

A.    Yes.



APP_0073

Page 261

Q. Going to the explanation of decision, on the third page. Does this one indicate that the documentation received was determined insufficient to support the application of a substitute graft to a wound and the application of a skin substitute graft wound, trunk and arms or the application to Zenith Amniotic Membrane as reasonably necessary and necessary?

A. Yes.

Q. And does it continue as the last one just did. That the services provided in this instance were not reasonable and necessary, because the skin substitute graft was applied for wound healing and treatment. Not merely as a cover or barrier for the wound?

A. Yes.

Q. And I asked the same question. Where does this one indicate that the IFU had any bearing on this denial?

A. It does not.

MR. SHELOWITZ: Object to form.

BY MR. ESPOSITO:

Q. I am sorry. What was that answer?

A. This particular one does not.

Q. Thank you.

MR. ESPOSITO: 22.

(Thereupon, Plaintiff's Exhibit Number 22 was



APP_0074

Page 262

marked for identification also marked

Confidential.)

MR. SHELOWITZ:  Same designation for Exhibit

22.

BY MR. ESPOSITO:

Q.  Now, have you seen this document before?

A.  Yes.

Q.  And this is a same separate claim that was

filed?

A.  Yes.

Q.  And does this one also indicate that the

appeal decision was unfavorable?

A.  It does.

Q.  And as we did with the other ones, going to

the explanation of decision.  Does this one not seem to

indicate that documentation received was determined to

be insufficient for the application of a skin substitute

graft and the Zenith Amniotic Membrane as reasonable and

necessary?

A.  Yes.

Q.  And does it not go on to the next paragraph,

as with the others ones, that the service provided in

this instance was not reasonable and necessary because

the skin substitute was again applied for wound healing

and treatment.  Not merely as a cover or barrier for the



Page 263

wound?

A.    Yes.

Q.    I will pose the same question again.  Where does it indicate that the IFU had any ramifications on this denial?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  At this time it doesn't.

MR. ESPOSITO:  So, 22?

MR. SHELOWITZ:  23.

MR. ESPOSITO:  23, sorry.

(Thereupon, Plaintiff's Exhibit Number 23 was marked for identification also marked Confidential.)

BY MR. ESPOSITO:

Q.    Ma'am, are you familiar with this document?

A.    Yes.

Q.    And what is this?

A.    Intent to refer Treasury Department.

Q.    So can you explain this document for us, please?

A.    I am sorry.  What?

Q.    Can you explain this document to me?

A.    Basically I was told it was never supposed to go out because the attorneys had put it on hold.  So there shouldn't have been an intent to recover.  But



Page 274

A.    The e-mails?

Q.    Yes?

A.    I looked for them.  I didn't find them.

MR. ESPOSITO:  I would obviously make a request for those e-mails as well.

MR. SHELOWITZ:  Those and the e-mails regarding the credits?

MR. ESPOSITO:  I am sorry.  What was that?

MR. SHELOWITZ:  For the record, the e-mails regarding the credits you are saying with Logwood.

MR. ESPOSITO:

Q.    The dispute.  She is saying there is a discrepancy between payments that Logwood I guess were made to Logwood.  Right.  That were not credited by Legacy.

A.    Correct.

Q.    I don't know what payments those are.  And you said those were separate to Logwood or Debbie?

A.    Yes, Debbie tried to help me track down Rick Logwood.

Q.    Did you ever reach out to anybody at Legacy after the fact, about reconciling the discrepancy note?

A.    Once they advised me to get counsel.  I got counsel, and left it at that.

Q.    No problem.  Do you recall where you billed on



Page 276

Q.   And can you point to a specific term in the contracts, that Legacy failed to meet?

MR. SHELOWITZ:  Object to form.

THE DEPONENT:  Yes, their IFU.

BY MR. ESPOSITO:

Q.   Is that a part of the contract, though?

A.   Of the contract, no.

Q.   Can you identify manufacturing notice, field corrections, or FDA communications, stating that those labels.  Any labels were erroneous in the period that you used them?

A.   The actual grafts?

Q.   Yes?

A.   No.

Q.   So based on a prior discussion, you said that you didn't -- your utilization of the grafts didn't require staples or sutures.  Correct?

A.   Correct.

Q.   But the IFU seems to indicate, and your impression requires sutures or staples.  Right?

A.   CMS impression, yes.

Q.   Did you seek any guidance, any manufacturer guidance about that aspect?

A.   Through Rick Logwood.  Yes.

Q.   Okay.  Just Rick Logwood, though?



APP_0078

Page 286

And whether you had submitted any?

A.  Right.

Q.  Do you remember talking about that.

And do you remember what your testimony was about that?

A.  Yes.  That I submitted them through Apex.

Q.  Right.  Do you remember whether those forms were labelled with Legacy's marks, or Apex's marks.

Do you remember that?

A.  I don't remember.

Q.  I will mark this as.  I think we are on Exhibit 26.

(Thereupon, Plaintiff' Exhibit Number 26, was marked for identification.)

BY MR. SHELOWITZ:

Q.  Have you seen this document before?

A.  Yes.

Q.  What is this document?

A.  The Insurance Verification Form Apex Medical.

Q.  Per the record, I don't know why it didn't print.  But this was marked Leeberg1751 for whatever reason on the printout.  Just for the record.

MR. SHELOWITZ:  So you can see, Mike.  I had my assistant print the PDF, but it's marked.  I just don't know why this version isn't.  Leeberg



APP_0079

Page 290

CERTIFICATE

STATE OF FLORIDA          )

                         )

COUNTY OF MIAMI-DADE      )

I, NIALANI A. JACKSON, Court Reporter and Notary Public, duly qualified in and for the State of Florida at large, do hereby certify that the foregoing deposition was taken before me at the place therein designated; and the foregoing pages 1 through 290, inclusive, are a true and correct record of the testimony given by the deponent.

I FURTHER CERTIFY that I am not a relative or employee of any of the parties, nor relative or employee of such attorney or counsel, or financially interested in the foregoing action.

WITNESS MY HAND and SEAL this 17th day of December, 2025, in the City of Miami, County of Miami-Dade, State of Florida.

Nialani A. Jackson

Nialani A. Jackson

Commission No.  HH440069

Expiration date is 9/4/2027.

State of Florida at Large

