# EXHIBIT 13



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Albuquerque, NM

| | |
|---|---|
| Appeal of:  GATEWAY FOOT AND ANKLE CENTER, PLC | OMHA Appeal No.:  3-14566262021 |
| Beneficiary: ████████ | Medicare Part: B |
| Medicare No.: ███████ | Before:  Dennis S. Scott<br>Administrative Law Judge |

## DECISION

After a careful and thorough review of the arguments and documentation contained in the instant record, the undersigned Administrative Law Judge (ALJ) enters a **FULLY FAVORABLE** decision. The skin substitute (Q4262: Dual Layer Impax Membrane, per sq cm) (items at issue), that the Appellant provided to the Beneficiary on November 29, 2023 (date of service), are covered by Medicare Part B.

## PROCEDURAL HISTORY

The Appellant submitted a Medicare claim for the items at issue provided to the Beneficiary on the date of service at issue. Payment for the claim was initially allowed. However, a post-payment reviewed identified an overpayment occurred. File 11, pp. 21-22. On redetermination, Palmetto GBA, the Medicare Administrative Contractor issued an unfavorable decision. File 11, pp. 11-15. On reconsideration, C2C Innovative Solutions, Inc, the Quality Improvement Contractor (QIC), also issued an unfavorable decision. File 5.

The Appellant timely filed a request for an ALJ Hearing. File 4. The amount in controversy satisfies the applicable jurisdictional requirement. 42 C.F.R. § 405.1006. My office sent the Appellant a notice of filing defect due to failure to copy all parties on the request for hearing. File 12. The Appellant responded with documentation to correct the filing defect. File 23. I held a telephonic hearing on March 27, 2025. David Smith, DPM, and the Beneficiary appeared and provided testimony on behalf of the Appellant. Dr. Micheal Hopkins appeared as a non-party participant on behalf of the MAC. Both C2C Innovative Solutions and Palmetto GBA were notified of the hearing. Palmetto GBA responded and submitted a position paper that I reviewed. File 26; File 27.

The Appellant submitted additional documentation for the first time at the ALJ hearing. File 21; File 28. Given that certain issues were raised for the first time in the QIC decision and since the evidence relates to the issues before the undersigned on appeal, I found good cause for admission of the post-hearing submission. The post-hearing submission documentation is admitted into the record in its entirety and was considered in rendering this determination. All other exhibits were also entered into the administrative record without objection. The record closed at the conclusion of the record open period, as outlined at hearing.

## ISSUE

Whether the items at issue furnished to the beneficiary on the dates of service are covered by Medicare as billed. If the items are not covered, whether liability may be limited under the limitation of liability provisions of Title XVIII § 1879 of the Social Security Act (Act).

## APPLICABLE LAW AND POLICY

The Medicare program, Title XVIII of the Social Security Act (Act), is administered through the Centers for Medicare and Medicaid Services (CMS), and Title 42 of the Code of Federal Regulations (C.F.R.) contains the implementing regulations.

Section 1832 of the Act describes the scope of the benefits provided to beneficiaries under Medicare Part B. Under Section 1832(a)(2)(B) of the Act, an individual is entitled to have payment made on his/her behalf for medical and other health services furnished by a provider of services or by others under arrangement with them made by a provider of services. *See also* 42 C.F.R. § 410.3(a)(1). Section 1861(s)(2)(A) of the Act provides that Medicare pays for "medical and other health services" including drugs and biologicals incident to physicians' services rendered to outpatients.

Section 1862(a)(1)(A) of the Act bars coverage of items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Section 1833(e) of the Act, in turn, provides that no claim for Medicare coverage may be paid unless "there has been furnished such information as may be necessary to determine the amounts due such provider."

ALJs are bound by statutes, regulations, National Coverage Determinations (NCDs), and CMS Rulings. 42 C.F.R. § 405.1060(a)(4), 405.1063. ALJs are not bound by program guidance such as Local Coverage Determinations (LCDs), program memoranda, or manual instructions. However, an ALJ must give such policies substantial deference if applicable in a particular case. 42 C.F.R. § 405.1062(a). If an ALJ declines to follow a policy in a particular case, the rationale for not following that policy must be explained. 42 C.F.R. § 405.1062(b).

CMS issues NCDs that specifically address whether certain items, services, procedures, or technologies are reasonable and necessary under Section 1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. In the absence of an applicable NCD or LCD, CMS provides general guidance to assist in determining medical necessity. The MACs, CERT, Recovery Auditors, and UPICs shall deny an item or service if the item or service does not fall into a Medicare benefit category; the item or service is statutorily excluded on grounds other than §1862(a)(1)(A) of the Act; the item or service is not reasonable and necessary under §1862(a)(1)(A) of the Act; or the item or service does not meet other Medicare program requirements for payment. *Medicare Program Integrity Manual (MPIM)*, Pub. 100-08, ch. 3, § 3.6.2.1.

Further, according to the CMS, *Medicare Program Integrity Manual (MPIM)*, Pub. 100-08, ch. 3, § 3.6.2.2, if no NCD or LCD exists for a particular item or service, Medicare contractors shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- it is safe and effective.

- it is not experimental or investigational; and

- it is appropriate, including the duration and frequency in terms of whether the service or item is:

    - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

    - Furnished in a setting appropriate to the patient's medical needs and condition;

    - Ordered and furnished by qualified personnel;

    - One that meets, but does not exceed, the patient's medical need.

*Id.*

Also relevant here, the federal Food and Drug Administration (FDA) has determined that human cells, tissues, and cellular and tissue-based products (HCT/Ps) are unique, and it has implemented a tiered, risk-based approach to their regulation. *See* Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use, Guidance of Industry and Food and Drug Administration Staff, *https://www.fda.gov/media/109176/download* (July 2020). Under this tiered regulatory framework, those HCT/Ps that meet specific criteria or fall within detailed exceptions do not require premarket review and approval. *Id.* Instead, another option for electronic registration and listing was developed for HCT/Ps under section 361 of the Public Health Services Act (PHSA). This registration option allows a supplier to directly sell their HCT/P to the public while foregoing the usual five-to-ten-year approval method that requires clinical trials. The implementing regulations at 21 C.F.R. § 1271 require that the product be registered on the FDA HCT/P website and meet the following four criteria:

1) The HCT/P is minimally manipulated;

2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;

3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and

4) Either:

    a. The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or

b. The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:

      i. Is for autologous use;

      ii. Is for allogenic use in a first-degree or second-degree blood relative; or

      iii. Is for reproductive use.

Section 1879(a) of the Act sets forth the limitation on liability provisions applicable to non-covered Medicare items and services. Suppliers and providers participating in the Medicare program are considered to have constructive knowledge of published Medicare statutes and regulations, CMS manual instructions, bulletins, and contractors' written guides and directives, and standards of practice in conjunction with Medicare reimbursement policies. 42 C.F.R. § 411.406; *Medicare Claims Processing Manual* (*MCPM*), Pub. 100-04, ch. 30, §§ 30.2, 40.1, and 40.1.1. Beneficiaries are presumed to lack knowledge that items and services are not covered unless the evidence indicates that written notice was given to the beneficiary. *MCPM*, ch. 30, § 30.1 see also, 42 C.F.R. §§ 411.404 and 411.406(d); *MCPM*, ch. 30, §§ 40-80. Limitation on liability protections do not apply to categorical or technical denials. *MCPM*, ch. 20, § 20.2.

## FINDINGS OF FACT AND ANALYSIS

### Finding of Fact

The Appellant submitted a claim for items at issue provided to the Beneficiary on the date of service at issue. The claim was denied. On redetermination, the MAC found the skin substitutes were investigational, the literature does not support additional use of skin substitutes beyond four treatments, and the record does not support conservative therapy was trialed. File 11, pp. 12-13.

On reconsideration, the QIC noted that the Appellant argues that the services were medically necessary. After review, it concluded there is insufficient peer-reviewed, evidence-based literature to support the use of items at issue for the Beneficiary's specific condition. These services are therefore not reasonable and necessary, as set forth in Section 1862(a)(1)(A) of the Act. File 5, pp. 4-5, 13-14.

In its response and during hearing testimony, as is outlined in more detail below, the Appellant argues generally that Medicare requirements for medical necessity have been met, the items at issue are FDA approved and has received HCPCS authorization. Further, there are several LCDs that, while not issued by the jurisdiction at issue, offer support for coverage, including a recently developed LCD that is expected to be released in April 2025. The Appellant contends that coverage is appropriate under Medicare manual guidance and the multiple LCDs, all of which provide for coverage of HCT/Ps to treat wounds. File 21; File 28; Hearing Recording.

The Appellant argued coverage has previously been granted through the appeals process because the items at issue have received FDA clearance/approval or designated 351 CHT/P exemption when used in accordance with the product's individualized application guidelines and may be considered reasonable and necessary. Further, the Appellant notes the LCDs previously issued for the items at issue contain significant bibliographies of peer-reviewed articles detailing the used of same or similar products as defined by the FDA. *Id.* Finally, the Appellant argued the

wounds were located on an anatomical body part that is within the scope of practice of a podiatrist, as defined by the state of the Appellant's practice. *Id.*

At the hearing, the Beneficiary testified that prior to receiving treatment from the Appellant, he was at risk for amputation, and had been struggling with the wounds for over two years. The Beneficiary testified the wound care received from his prior wound care provider was painful, the wounds were very slow to heal, and prior treatment included debridement and compression wraps. Hearing Recording.

Dr. Smith testified the Beneficiary received care at another wound care clinic and his practice assumed the Beneficiary's care in the winter of 2023, after the Beneficiary was admitted into the hospital. Additionally, Dr. Smith testified conservative therapy was trialed before deciding to use the items at issue, and the Appellant consulted with other physicians regarding appropriate treatment for the Beneficiary's large and complex wounds. The treatment plan for the Beneficiary was complex, and Dr. Smith testified treatment for each wound was performed on a separate day, resulting in complicated billing issue. Dr. Smith argued that the use of the wound covering met industry standards, including FDA guidance under Section 351, has the item at issue has been approved when used in a homologous use. Dr. Smith testified the retired LCD provided coverage for products with Section 361 approval, and other MAC jurisdictions also have applicable LCDs that provide coverage guidance. Dr. Smith testified the wound location was below the beginning of the distal tibial metaphysis flare, which is withing the scope of practice of a podiatrist. Hearing Recording.

Dr. Hopkins argued that when there is no LCD, the item must be reasonable and necessary, which indicates the item at issue is not experimental or investigational. Dr. Hopkins argued there is not sufficient medical literature to indicate the item at issue is not experimental or investigational. Dr. Hopkins argued since the initial approval of the product category, the industry has developed a wide variety of the wound coverings under this category and there is not sufficient literature that specifically analyzes the individual products. Dr. Hopkins testified the wound extended above the scope of practice for a podiatrist. Hearing Recording.

The Appellant opined that the contractors here appear to be indicating that skin substitutes for use on venous ulcers are simply not covered by Medicare. The Appellant argued Medicare can and routinely does cover such skin substitutes. Further, the Appellant noted that the alleged non-coverage for venous wounds was not raised until the second level of appeal and this why the Appellant's counsel submitted the additional documentation with his ALJ hearing request.

The physician noted the Beneficiary resides in a nursing home and ulcer #2 stalled healing on April 19, 2023. File 20, p. 31. The wounds were debrided in April 2023. File 20, p. 28. The physician provided education on elevation, edema, and compression wraps, and the Beneficiary had chronic venous insufficiency. File 20, p. 32. The May 10, 2023, plan documented the Beneficiary has been under conservative care and the wound has failed to progress, and the physician recommended more aggressive treatment. File 20, p. 41. The physician advised the Beneficiary in increased protein intake and vitamin use. *Id.* The record contained a nutrition assessment that included wound healing goals performed on August 6, 2023. File 20, pp. 151-153. An operative report listed the Beneficiary's diagnosis as venous stasis ulceration to the bilateral legs. File 20, p. 199.

The November 8, 2023, follow up progress note indicated the Beneficiary was not diabetic, ulcer #1 measured 10.5 x 11.0 x 0.1 cm, and had light serous drainage. File 20, p. 209. Ulcer #2 measured 14.5 x 12.5 x 0.1 cm, with light serous drainage. *Id.* On November 8, 2023, the

physician noted ulcer #1 had improved, and the Beneficiary's left leg had notable swelling that impacted measurements. File 20, p. 210. On November 29, 2023, the physician noted both ulcers improved. File 11, p. 25. Ulcer #1 measured 11.7 x 11.7 x 0.1 cm after debridement, and ulcer #2 measured 13.0 x 11.9 x 0.1 cm after debridement. File 11, p. 24. From this, Dr. Smith argued the Impax graft was clinically necessary given the duration of the wound and given that Impax would best meet the Beneficiary's complex medical need. He argued that the peer-reviewed literature supports the use of the biografts like Impax on wounds. Hearing Recording.

### Analysis

After careful review of the evidence and testimony at issue in this appeal, I find that the Medicare requirements were met in this case, as is more fully explained below.

The product at issue, Impax, is a dual layered human amniotic membrane allograft developed as a treatment for acute and chronic wounds. Impax is one of now more than 100 products referred to as Cellular, Acellular, Matrix-like Products or "CAMPs". In reviewing the use of the same here, we look to applicable guidelines to determine whether an item or procedure is reasonable and necessary. These guidelines are frequently set out in NCDs and/or LCDs. Here, however, the record reflects, and the Appellant conceded at hearing, that there is no specific NCD or LCD in effect at the relevant time in the jurisdiction at issue. The Appellant argued, however, LCDs from other jurisdictions, both active and retired, as well as a newly promulgated LCD supports coverage.

When there are no NCDs or LCDs that cover a service, CMS provides general guidance in the MPIM to assist in determining medical necessity. An item or service must be reasonable and necessary based on the factors outlined in the *Medicare Program Integrity Manual (MPIM)*, CMS Pub. 100-08, ch. 3, § 3.6.2.2 and ch. 13, § 13.5.4. As noted above, an item or procedure is considered to be reasonable and necessary if:

- it is safe and effective.

- it is not experimental or investigational; and

- it is appropriate, including the duration and frequency in terms of whether the service or item is:

    - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;
    - Furnished in a setting appropriate to the patient's medical needs and condition;
    - Ordered and furnished by qualified personnel;
    - One that meets, but does not exceed, the patient's medical need.

*MPIM, supra* ch. 3, § 3.6.2.2.

In the absence of a current LCD within Palmetto GBA's jurisdiction, I find *Medicare Program Integrity Manual (MPIM)*, ch. 3, § 3.6.2.2 controlling. Under the factors articulated in the *MPIM*, and as noted by Palmetto GBA, items that are experimental and investigational are not covered by Medicare *MPIM*, ch. 3, § 3.6.2.2. The usage must also be safe and effective, furnished in accordance with accepted standards of medical practice, in a setting appropriate to the patient's

medical needs and condition, and ordered and furnished by qualified personnel, and be one that meets, but does not exceed, the patient's medical need.

In essence, the Appellant argues that the first two criteria have been met as evidenced by the FDA approval under the 501k pre-market submission process, which is approved as safe an effective if it is demonstrated that item or product if it is used for a homologous use. The Appellant asserts that FDA approval affirms Impax's safety and efficacy specifically for wound treatment purposes and serves as a factor for the application of the criteria outlined in section 3.6.2.2 of the *MPIM*. As to the QIC's finding that there was insufficient peer-reviewed, evidence-based literature to support the use of Impax, the Appellant argues that there is no requirement for peer-reviewed literature. The product is not experimental and investigational because CMS has recognized skin substitute products, such as Impax, as the standard of care for chronic, non-healing wounds as long as used in compliance with FDA guidance under the 361 designation and the manufacturer's guidance.

The guidance clearly countenances that the ALJ will perform a step-by-step analysis to determine whether the grafts are safe and effective, not investigational or experimental, and appropriate for the treatment of the wound at issue in this case based on the available evidence of general acceptance by the medical community, including peer-reviewed literature, as required by Medicare authorities. *MPIM*, CMS pub. 100-08, ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2; *MPIM*, ch. 13, § 13.5.4. And, when the undersigned performs this analysis, I find that the record clearly supports that multiple CMS contractors have issued guidance, including LCDS and related Policy Articles, finding application of HCT/Ps appropriate in certain circumstances after conservative measures have failed. (*see* L36690 (CGS): "Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities;" L36377 (FCS): "Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers;" L35401 (Novitas): "Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds;" LCD L36466 (Palmetto-Retired): "Application of Skin Substitutes;" Article A56696 (CGS): "Billing and Coding: Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities;"[1] Article A55813 (Palmetto-Retired): "Response to Comments: Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities." There is also a new, as yet effective LCD, L39806 (Palmetto-Effective 2/12/2025): "Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers."

The existence of this number and such varied and comprehensive LCDs runs counter to a finding that HCT/Ps, such as the Impax at issue herein, are experimental and investigational or not safe and effective for external, homologous, use as a wound cover to treat chronic wounds. Again, while not controlling, the language in LCD L36466 is instructive. "Therefore, all products with FDA clearance/approval or designated 361 HCT/P exemption used in accordance with that product's individualized application guidelines will be equally considered for the purpose of this LCD and may be considered reasonable and necessary." Further, the above-referenced Article A56696 specifically includes the (Q4262) Dual Layer Impax Membrane in its list of covered codes and provides, "HCPCS codes included in this list are FDA approved / meeting necessary regulatory requirements for CTPs for chronic ulcer treatment as of publication." This hardly supports a conclusion that such HCT/Ps are properly considered experimental and investigational or are not generally safe and effective when used in accordance with manufacturer and FDA guidance.

---

[1] This LCD specifically addresses skin substitutes and, while now retired and thus does not control in this case, it is worth noting that it allowed coverage for the use of skin substitutes and/or cellular/tissue-based treatment of chronic wounds that previously failed conservative treatment.

I am persuaded that the forgoing supports coverage. Impax was approved by the FDA as an HCT/P under the 361 process. This essentially bypasses the formal FDA drug/biological device approval process. A product designated as an HCT/P does not require animal and clinical trials to prove safety for use in humans and to prove the effectiveness of the product in treating the condition the manufacturer intends to seek as an indication (i.e., a homologous use). 21 C.F.R. §§ 1271.10(a), 1271.20. Additionally, while not binding in this case, I note that the Novitas LCD L35041 makes clear that skin substitute products such as Impax are considered the standard of care for chronic non-healing wounds. Thus, as of the date of service, peer-reviewed, evidence-based literature was not required. I am persuaded that Impax was not experimental and investigational and was safe and effective when used for chronic non-healing wounds in accordance with the manufacturer's guidelines and section 361 homologous use.

As to use on venous ulcers specifically, I find nothing in the record limits use of the (Q4262) Dual Layer Impax Membrane to only pressure ulcers. There is nothing on this record to counter that assertion from either reviewing contractor that the Beneficiary's condition was not an approved use. Indeed, review of the studies and articles of record supports this finding.

On review, I further find the Impax used here was furnished in accordance with accepted standards of medical practice for the treatment of the Beneficiary's condition. No dispute was offered by the contractors on this score. Nor was there any challenge to it having been furnished in a setting appropriate to the Beneficiary's medical needs and condition. I find that it was. I am not persuaded by the MACs arguments the location of the Beneficiary's wound was outside of the scope of practice of the Appellant. After a thorough review of all of the forgoing, I am persuaded that the use of Impax meets, but does not exceed, the Beneficiary's medical need. I note that comments 7 and 92 in Article A59945 (Palmetto) indicate that wounds outside foot and venous leg ulcers are not the only uses contemplated, other uses may be considered on a case-by-case basis and approved as long as reasonable and necessary. Having done exactly that here, I find ample support for use of the Impax as a wound covering consistent with manufacturer and FDA guidelines on the wound at issue herein.

Furthermore, the record supports a finding that application of Impax was a safe and effective treatment for this specific Beneficiary as the record demonstrates a trial of conservative treatment measures for this non-healing, stalled, subcutaneous ulcer and the wound remained non-healing for over two months. The record documented the wound was considered a stalled wound. The wound failed to respond to standard management including mitigation of contributing factors, pressure reduction, and any needed compression therapy. The wound had no signs of infection or osteomyelitis. The Beneficiary was not taking any medications expected to impact wound healing and did not suffer from uncontrolled autoimmune disease.

Based upon these facts and following a thorough review of the entire record, I find Appellant's application of the Impax membrane to the Beneficiary's non-healing external wound on the date of service is consistent with the persuasive guidance found within LCD and coverage articles as outlined above. Accordingly, I find these services were medically necessary and reasonable for the treatment of the Beneficiary's condition; were provided in compliance with applicable coverage guidance; and are covered under Medicare Part B.

Having found the services at issue are covered under Medicare Part B, it is not necessary to address the additional issues in this case.

From:HHS OMHA DENVER     3032315153    04/08/2025 09:23    #750 P.015/019

OMHA Appeal No. 3-14566262021

## CONCLUSIONS OF LAW

Appellant's provision of the Impax membrane (HCPCS code Q4262) to treat the Beneficiary's chronic wound on the date of service is covered under Medicare Part B. The MAC is directed to process Appellant's claim in accordance with this decision.

## ORDER

For the reasons discussed above, this decision is **FULLY FAVORABLE**. The Appellant's provision of the Impax membrane and related services to treat the Beneficiary's chronic wound on the date of service are covered under Medicare Part B. I direct the MAC to process the claims in accordance with this decision.

SO ORDERED

Dennis S. Scott
Administrative Law Judge

APP_0261