**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **No. 4:25-cv-00319-P** |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** | § § § | |
| **Defendant.** | § § | |
| **and** | § § | |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** | § § § | |
| *Counter-Plaintiff,* | § § | |
| **v.** | § § | |
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** | § § § § | |
| *Counter- Defendant.* | § § | |

**DEFENDANT/COUNTER-PLAINTIFF'S BRIEF IN OPPOSITION TO
PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[ECF 46 & 47]**

i

## TABLE OF CONTENTS

I.     INTRODUCTION…..…………………………………………………….... 2

II.    STATEMENT OF DISPUTED FACTS…….…..…………………………4

III.   MEMORANDUM OF LAW………………………………………………..6

      A.     STANDARD OF REVIEW……………………………………………6

      B.     LEGACY FAILS TO ESTABLISH ENTITLEMENT TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM BECAUSE THE AGREEMENTS ARE NOT FULLY INTEGRATED…..…..………7

      C.     LOGWOOD POSSESSED APPARENT AUTHORITY TO BIND LEGACY WHEN MAKING "NO PAYMENT" GUARANTEE REPRESENTATIONS TO LEEBERG…..………..………………10

          i.     Legacy Fails To Identify Facts Which Disclaim An Apparent Authority Relationship……………………………………………13

          ii.    Oral Modification(s) Not Barred By Statute Of Frauds Or UCC……………………………………………………………16

      D.     GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT IN LEGACY'S FAVOR UPON LEEBERG'S CLAIMS FOR BREACH OF CONTRACT …………………………........................18

          (i)     Legacy Sold Leeberg Non-Conforming Skin Substitute Products…..………………………………………………………18

          (ii)    Legacy Fails to Establish an Absence of Causation……………..22

      E.     LEGACY FAILS TO ESTABLISH ENTITLEMENT TO SUMMARY JUDGMENT UPON LEEBERG'S FRAUDULENT MISREPRESENTATION CLAIMS ……………………………........23

          i.     Legacy Did Not Possess An Intent To Perform Under Its Representations At The Time They Were Made……………………23

          ii.    Leeberg's Reliance Upon Legacy's Fraudulent Misrepresentations Was Justified……………………………………………………25

          iii.   The Economic Loss Rule Does Not Bar Leeberg's Right to Recover Damages Under Count V……………………………………………29

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

F.    LEGACY IS NOT ENTITLED TO RECOVERY OF PREVAILING PARTY ATTORNEYS FEES UNDER AGREEMENTS OR STATUTE............................................................................. 32

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                         **Pages**

*AKB Hendrick, LP v. Musgrave Enters., Inc.,*
    380 S.W.3d 221 (Tex. App. 2012)……………………………………………25, 26

*Altec Integrated Sols., Ltd. v. Poseidon Productions, Inc.*,
    No. 6:24-CV-347-JDK, 2025 WL 3096494 (E.D. Tex. May 27, 2025)……………….28

*Anderson v. Liberty Lobby, Inc*.,
    477 U.S. 242 (1986)……………………………………………………………..7

*Ashford Partners, Ltd. v. ECO Res., Inc.*,
    401 S.W.3d 35 (Tex. 2012)…………………………………………….………..32

*Baker Botts LLP v. ASARCO LLC,*
    ⸺ U.S. ⸺, 135 S.Ct. 2158, 192 L.Ed.2d 208 (2015)………………………………32

*Baptist Mem. Hosp. Sys. v. Sampson*,
    969 S.W.2d 945 (Tex. 1998)……………………………………………………11, 16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)……………………………………………………………….7

*Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*,
    445 S.W.3d 716 (Tex. 2014)……………………………………………………..29

*Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*,
    88 F.3d 347 (5th Cir. 1996)…………………………………………….....26

*Dallas Farm Mach. Co. v. Reaves*,
    158 Tex. 1, 307 S.W.2d 233 (1957)……………………………………………..30

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir. 1986)……………………………………………………7

*Formosa Plastics Corp. United States v. Presidio Eng'rs & Contractors*,
    960 S.W.2d 41 (Tex. 1998)……………………………………………..…30, 31

*Gaines v. Kelly*,
    235 S.W.3d 179 (Tex. 2007)………………………………………….....10, 11

*Garcia v. Karam*,
    276 S.W.2d. 255 (1955)……………………………………………………16

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

*Hardt v. Reliance Standard Life Ins. Co.*,
    560 U.S. 242, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)………………………....…32

*In re Nat'l Lloyds Ins. Co.*,
    532 S.W.3d 794 (Tex. 2017)……………………………………………………….32

*Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*,
    573 S.W.3d 224 (Tex. 2019)……………………………………………………….29

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co of Am.*,
    341 S.W.3d 323 (Tex. 2011)…………………………………………………….8, 28

*LAN/STV v. Martin K. Eby Constr. Co.*,
    435 S.W.3d 234 (Tex. 2014)……………………………………………………….29

*LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*,
    659 F.3d 450 (5th Cir. 2011)………………………………………………………..9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)………………………………………………………………..7

*Mobu Enterprises Pty Ltd v. John Galt Solutions, Inc.*,
    2024 WL 5080249 (N.D. Tex. Dec. 10, 2024)……………………………………..8

*Natarajan v. Alpha Thought Global, Inc.*,
    2005 WL 8158160 (N.D. Tex. 2005)……………………………………………..11

*Nat'l Prop. Holdings, L.P. v. Westergren*,
    453 S.W.3d 419 (Tex. 2015)……………………………………………………..25

*Noble Cap. Fund Mgmt., LLC v. US Cap. Glob. Inv. Mgmt. LLC*,
    No. 1:20-CV-1247-RP, 2023 WL 5814390 (W.D. Tex. Sept. 7, 2023)………………..9

*Olabisiomotosho v. City of Houston*,
    185 F.3d 521 (5th Cir. 1999)……………………………………………..………7

*Overseas Carriers, Inc. v. Team Ocean Servs.-Dallas, Inc.*,
    2013 WL 76300 (S.D. Tex. 2013)……………………………………………....11, 14

*Pante Tech. Corp. v. Austin Concrete Sols., Inc.*,
    2010 WL 3927598 (Tex.App.—Austin Oct. 7 2010)……………………....…10, 14

*Perdue v. Kenny A. ex rel. Winn*,
    559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010)…………………………..32

v

*Prudential Ins. Co. of Am. v. Jefferson Assocs.*,
    896 S.W.2d 156 (Tex. 1995)……………………………………………………………….30

*Ross v. Texas One P'ship*,
    796 S.W.2d 206 (Tex.App.-Dallas 1990, writ denied)…………………………………12

*RSR Corp. v. Int'l Ins. Co.*,
    612 F.3d 851 (5th Cir. 2010)……………………………………………………………….7

*Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*,
    81 F.3d 606 (5th Cir. 1996)……………………………………………………………….. 26

*Sharyland Water Supply Corp. v. City of Alton*,
    354 S.W.3d 407 (Tex. 2011)……………………………………………………………29, 30

*Skaria v. Abbott Laboratories, Inc.*,
    2021 WL 3772389 (N.D. Tex. Aug. 25, 2021)………………………………..………..9

*Schlumberger Tech. Corp. v. Swanson*,
    959 S.W.2d 171 (Tex.1997)……………………………………………………………..8, 9

*Sysco Merch. & Supply Chain Services, Inc. v. Remcoda, LLC*,
    No. 4:22-CV-02075, 2023 WL 1781810 (S.D. Tex. Feb. 6, 2023)……………………..28

*Texas Capital Bank, N.A., v. Ameriprise Fin. Servs, Inc.*,
    2011 WL 6189494 (N.D. Tex. May 20, 2011)…………………………………………11

*Thigpen v. Locke*,
    363 S.W.2d 247 (Tex. 1962)……………………………………………………………..25

*Thomas Reg. Dir., Co. v. Dragon Products, Ltd.*,
    196 S.W.3d 424 (Tex.App.—March 9, 2006)……………………………….…………15

*Town N. Nat'l Bank v. Broaddus*,
    569 S.W.2d 489 (Tex. 1978)……………………………………………………………..30

*Triton Commercial Properties, Ltd. v. Norwest Bank Texas, N.A.*,
    1 S.W.3d 814 (App.Tex—August 26, 1999)……………………………………………16

*Weitzel v. Barnes*,
    691 S.W.2d 598 (Tex. 1985)……………………………………………………………..30

*Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*,
    489 S.W.3d 448 (Tex. 2016)……………………………………………………………..32

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

*United States v. Diebold, Inc*.,
    369 U.S. 654 (1962)……………………………………………………………………………..7


**Rules:**
Fed. R. Civ. P. 56(a)……………………………………………………………………….7


**Restatements:**
Restatement (Third) of Agency § 1.03 cmt. b, d (Am. L. Inst. 2006)…………………..10, 11

Restatement (Third) of Agency § 2.03 cmt. c. (Am. L. Inst. 2006)………………………10, 11

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** §§§§§ | |
| **Plaintiff,** §§ | |
| **v.** § | **No. 4:25-cv-00319-P** |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** §§§ | |
| **Defendant.** §§ | |
| **and** § | |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** §§§§ | |
| **Counter-Plaintiff,** §§ | |
| **v.** § | |
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** §§§§§ | |
| **Counter- Defendant.** §§ | |

**DEFENDANT/COUNTER-PLAINTIFF'S BRIEF IN IN OPPOSITION TO PLAINTIFF/COUNTER-DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT [ECF 47]**

Defendant/Counter-Plaintiff, CRISTI LEEBERG d/b/a PRACTIONERS IN MOTION, PLLC ("Leeberg"), by and through undersigned counsel and pursuant to Northern District of Texas Local Rule 56.5(a), hereby files her Brief in Opposition to Plaintiff/Counter-Defendant, LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

CONSULTANTS, LLC ("Legacy") its Motion For Summary Judgment [ECF 46 &47], and as states as follows:

**I. Introduction.**

This action is anything but straightforward. This action involves Legacy's sale of highly inflated and experimental skin substitute graft products—Zenith Amniotic Membranes and IMPAX Amniotic Membranes—to Leeberg for the purpose of treating patients with acute and chronic wounds. Legacy acts as a distributor for these products and yet, seeks to avoid any accountability for their safety, efficacy, method of proper application, or its sales representatives' aggressive sales tactics. Medical providers, like Leeberg, utilized Legacy's products with the express understanding that the costs associated with the use and application of such products would be reimbursable by Medicare. However, under the Trump Administration, Medicare began heavily scrutinizing medical providers compensation claims and is endeavoring to recover—i.e., claw back—millions of dollars it paid to providers across the country, including Leeberg, because it has determined that such products lack evidence of being safe and effective. Medicare has asserted that Legacy's products are investigational and experimental and that they are not properly utilized for wound treatment. This lawsuit is a complicated affair involving numerous fraudulent representations tendered by Legacy's authorized sales agent, Rick Logwood, and Legacy's unrelenting sale of its products to Leeberg—notwithstanding the fact that her accounts receivable balance ballooned into the seven (7) figures. Legacy was well aware that Leeberg was reliant on Medicare reimbursements in order to ever pay such amounts to Legacy.

In particular, Legacy and Leeberg entered into five (5) distinct but nearly identical Agreements relating to Legacy's sale of skin substitute products to Leeberg. From inception, Leeberg dealt exclusively with Legacy's Independent Sales Representative—Rick Logwood

("Logwood")—who Legacy clothed with an indicia of authority to bind it to an oral agreement that Leeberg would not be required to pay Legacy under any invoices if Medicare failed to pay Leeberg upon her claims for compensation. Indeed, Legacy did nothing to disclaim Logwood's authority to act on its behalf towards Leeberg—over the course of entering into each Agreement—and its silence justified Leeberg's reliance upon his representations. At no point did Legacy furnish Leeberg with a copy of Logwood's Independent Sales Representative Agreement or otherwise communicate the scope of his authority to her. Legacy created an apparent authority agency relationship with Logwood such that it is bound by his representations as a matter of law. To find otherwise would permit Legacy to have committed an egregious fraud upon Leeberg, without consequence, and thereby receive a $7 Million windfall.

Legacy spends much of its Brief [ECF 47] focusing on applicable Medicare billing procedures and regulations, and Leeberg's purported failures regarding same, articulated by its expert—Charlotte L. Kohler. Legacy's entire argument and presentation of evidence in this regard should be summarily disregarded as its expert's written report is the subject of Leeberg's pending Motion to Strike [ECF 49] for being non-compliant with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure as well as this Court Scheduling Order [ECF 11].

In short, Legacy fails to establish summary judgment because its Agreements are not fully integrated due to their absence of "disclaimer of reliance" language and Leeberg has established that Logwood possessed apparent authority to modify the Agreements. Further, such modifications are not barred by the Statute of Frauds or Article 2 of the UCC. As to Leeberg's breach of contract claims, genuine issues of material fact exist concerning the non-conforming nature of Legacy's products. Further, the issue of causation is not resolved in the absence of full and final adjudication of Leeberg's Medicare appeals. Finally, as to Leeberg's fraud claims, the record evidence

3

establishes Legacy never possessed an intent to perform upon its future promises as Legacy consistently issued Leeberg invoices and pursued collection notwithstanding its "no payment" guarantee representation. Finally, Leeberg's reliance upon Logwood's representations was justified and the economic loss rule is inapplicable to bar such fraud claims.

As set forth in detail below, Legacy fails to establish entitlement to summary judgment such that its entire Motion must be denied.

## II. STATEMENT OF DISPUTED FACTS

1.      Prior to meeting Logwood, Leeberg had never heard of or otherwise interacted with Legacy. (Ex. A at App. 0004, at 56:20-22).

2.      Leeberg first interacted with Logwood over the telephone. He explained to her that he was a doctor that specialized in advance wound care. Logwood explained to Leeberg during their initial conversation that he possessed a "great product" that was being utilized out west by mobile wound care providers. Logwood indicated that these unidentified skin substitute products would work well within Leeberg's elderly community in Melbourne, FL. (Ex. A at App. 0005, 65:2-23).

3.      In March 2022, Logwood convinced Leeberg to procure Zenith skin substitute products from Legacy because, in his opinion, they were superior products and easier to procure. (Ex. A at App. 0003. at 55:17 - 56:22).

4.      Everything Leeberg came to know and understand about skin substitute products was through Logwood. Indeed, Leeberg questioned Logwood about the products, how to apply them upon patients, as well as how to bill Medicare for them. (Ex. A at App. 0004, at, 58:5-21).

5.      Leeberg understood that Logwood acted as Legacy's distributor and therefore that he educated customers, like her, about their products, spoke for Legacy and was paid by Legacy

for his distribution services. Logwood explicitly told her that he was working with Legacy. (Ex. A at App. 0004, at, 59:9-23).

6.    From the beginning of Leeberg's relationship with Legacy, she exclusively dealt with and interacted with Logwood, who held himself out as Legacy's authorized representative. (Ex. A at App. 0004, at, 60:12-25 & 61:1-9).

7.    Leeberg acquired Legacy's products through Logwood, Leeberg occasionally paid Logwood for Legacy's products, and received Legacy's Agreements from Logwood. (Ex. A at App. 0004, at 60:12-61:2).

8.    Logwood is a doctor and educated Leeberg about Legacy's products. Leeberg was led to believe that Logwood would not possess and/or sell Legacy's products unless he was authorized to work on their behalf. (Ex. A. at App. 0005, at 62:17-25 & 63:1-7); *see also* (Ex. H at App. 0036).

9.    Leeberg has never acknowledged or agreed that any of the five (5) Agreements with Legacy are "fully integrated." Rather, when requested to read Paragraph 7 into the record, she complied with Legacy's counsel's request and read the corresponding Paragraph verbatim. (Legacy Ex. 1 at App. 0032-33, at 120:21-121:4).

10.    When placing orders for Legacy's products, Leeberg would submit Apex Insurance Verification Forms, and once her patient became "authorized and qualified" she would call Logwood to place her order for Legacy's products. Legacy never objected to Leeberg's use of non-Legacy Insurance Verification Forms, notwithstanding Paragraph 2 of the Agreements and notwithstanding the absence of any written modification of the Agreements. (Ex. A, at App. 0009 & 0017, at 153:15-24 & 285:9-288:9); *see also* (Ex. I at App. 0042).

11.    Legacy frequently permitted Leeberg to tender payment under its invoices beyond

5

the 45-60 days as expressly provided in Paragraph 1 of each of the Agreements in the absence of any written modifications. (Ex. B. at App. 0022, at, 140:13-141:20).

12.     Medicare permitted companies, such as Legacy, to set arbitrarily high prices for their skin substitute products. (Ex. J, at App. 0049). Under Medicare's rules, for the first six months of a new skin substitute's life, Medicare will set the reimbursement rate "at whatever price a company chooses." (Ex. J, at App. 0049).

13.     After the initial six-month period, Medicare adjusts its reimbursement price to reflect the actual price paid by doctors, after any discounts. (Ex. J, at App. 0049).

14.     To circumvent price drops, companies, like Legacy, roll out new and nearly identical skin substitute products to continue billing Medicare at the products inflated rates. (Ex. J, at App. 0049).

15.     For example, in April 2023, Medicare reimbursed providers, like Leeberg, $6,497 per square inch of Zenith bandage applied upon patients. (Ex. J, at App. 0049).

16.     When the reimbursement amount for Zenith products fell to $2,746 six months later, Legacy created a new and nearly identical product, a "dual layer" bandage called IMPAX. (Ex. J, at App. 0049-0050).

17.     Legacy's marketing materials for both products use identical photographs and similar language. Further, Legacy describes both products as providing "optimal wound covering and protection during the treatment of wounds." (Ex. J, at App. 0050).

## III. MEMORANDUM OF LAW

### A. STANDARD OF REVIEW.

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, he "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) showing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322-25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[C]onclusory statements, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). The Court resolves factual controversies in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

### B. LEGACY FAILS TO ESTABLISH ENTITLEMENT TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM BECAUSE THE AGREEMENTS ARE NOT FULLY INTEGRATED.

Legacy fails to establish entitlement to the entry of summary judgment in its favor upon its breach of contract claims because none of the Agreements are fully integrated which would

7

preclude Leeberg's reliance upon Logwood's pre-contractual "no payment" guarantee representations. Legacy's argument that its Agreements with Leeberg are "fully integrated" is factually and legally inaccurate. In fact, none of the Agreements are fully integrated because such provisions lack express language prohibiting either party from relying upon representations made *prior* to entering into the Agreements. Such clauses are commonly referred to as a "disclaimer of reliance" clauses in Texas. Each of the Agreements' integration clauses provide:

> **7. Miscellaneous**. This Agreement contains the entire agreement between the Parties concerning the subject matter hereof and is governed by Texas law. This agreement may be amended or modified only by written agreement signed by both parties.
>
> *See* (Ex. D, E, & F, at App. 0026, 0027, & 0030 at ¶ 7); *see also* [ECF 21-1, -2, & -3].

The absence of any disclaimer-of-reliance language is fatal to Legacy's contention that its Agreements are fully integrated. The Agreements' integration clauses do not include the word "rely" in any form, nor do they otherwise clearly and unequivocally disclaim Leeberg's reliance upon any prior representations tendered by Legacy's authorized representative(s). *Compare Mobu Enterprises Pty Ltd v. John Galt Solutions, Inc.*, 2024 WL 5080249, at *2 (N.D. Tex. Dec. 10, 2024) ("A disclaimer of reliance clause in a contract defeats the plaintiff's ability to establish the reliance element [for a fraudulent inducement claim] so long as the clause is 'clear and specific'") (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co of Am.*, 341 S.W.3d 323, 321 (Tex. 2011). As such, the Agreements' integration clauses do not preclude Leeberg from relying upon Logwood's pre-contractual "no-payment" guarantees when entering into the Agreements and thereafter adhering to same when furnished with Legacy's invoices. The Texas Supreme Court in *Schlumberger Tech. Corp. v. Swanson*, held that "[p]arties should be able to bargain for and execute a release barring all further dispute," and to that end, "parties may disclaim reliance on

representations[, a]nd such a disclaimer, **where the parties' intent is clear and specific**, should be effective to negate a fraudulent inducement claim." *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex.1997) (Emphasis Added). The Court in *Schlumberger* ultimately determined that the disclaimer-of-reliance clause in the party's settlement agreement had the "requisite clear and unequivocal intent necessary to disclaim reliance….on specific representations by Schlumberger," and therefore the clause effectively precluded a claim for fraudulent inducement. *Id.* 179-180.

Court's examining more robust integration clauses than the ones at issue here have concluded that even they do not negate a party's reliance. *See LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 460 (5th Cir. 2011) (holding that a merger clause stating that the agreement "supersedes all prior agreements and understandings" and constitutes the "entire agreement" did not preclude a fraudulent inducement claim); *Noble Cap. Fund Mgmt., LLC v. US Cap. Glob. Inv. Mgmt. LLC*, No. 1:20-CV-1247-RP, 2023 WL 5814390, at *6 (W.D. Tex. Sept. 7, 2023) (finding no disclaimer of reliance where merger clause stated that "[t]his Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, superseding all prior understandings and agreements whether written or oral"); *Skaria v. Abbott Laboratories, Inc*., 2021 WL 3772389, at *9 (N.D. Tex. Aug. 25, 2021) (finding no disclaimer of reliance where merger clause stated that "[t]his Agreement constitutes the entire agreement between [the parties] ... and supersedes all prior agreements and any representations whether oral or written").

Unlike the disclaimer-of-reliance clause in *Schlumberger*, the bald integration clauses upon which Legacy heavily relies are not clear and unequivocal expressions of intent by Legacy and Leeberg to disclaim Leeberg's reliance on the specific pre-contractual representations made by

Logwood. Accordingly, Legacy cannot overcome Leeberg's Second and Fourth affirmative defenses to its breach of contract claims to secure summary judgment.

### C. LOGWOOD POSSESSED APPARENT AUTHORITY TO BIND LEGACY WHEN MAKING "NO PAYMENT" GUARANTEE REPRESENTATIONS TO LEEBERG.

Logwood possessed apparent authority to bind Legacy when he tendered each of his pre-contractual "no payment" guarantees to Leeberg. Logwood stated that Leeberg would not be obligated to pay Legacy under an invoice unless she received compensation from Medicare, first. (Ex. A., at App. 0004, at 58:5-21). In Texas, apparent authority is created by the words of or conduct by the principal to the third party. *See Pante Tech. Corp. v. Austin Concrete Sols., Inc.*, 2010 WL 3927598, at * 3 (Tex.App.—Austin Oct. 7 2010). To establish apparent authority, Leeberg must show that Legacy either knowingly permitted Logwood to hold himself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority. *Id*. Therefore, a party seeking to charge a principal through the apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe the agent had the authority it purported to exercise. *Id.*

It is well-established that one individual's actions may bind another if the principal's actions lead a third party to reasonably believe that the agent has authority to act on the principal's behalf. Restatement (Third) of Agency § 2.03 (Am. L. Inst. 2006); *see also Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). In assessing apparent authority, the agent's representations are largely immaterial; the relevant considerations are the actions taken by the principal toward the agent, *Gaines*, 235 S.W.3d at 182, and the state of mind of the person who observes or otherwise learns of and relies on the principal's conduct. Restatement (Third) of Agency § 1.03 cmt. b. A principal may manifest assent to an agent's authority by either: (1) knowingly permitting an agent

to hold himself out with authority or (2) acting without "such ordinary care as to clothe an agent with the indicia of authority." *Gaines*, 235 S.W.3d at 182 (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). "Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence." Restatement (Third) of Agency § 1.03 cmt. b. Voluntary manifestations are effective even if "made negligently or [ ] otherwise in error." *Id.* § 1.03 cmt. d.

The permissibility of a third party's assumptions about authority turn on whether "a reasonably prudent person" would have concluded the same from the principal's conduct. *Gaines*, 235 S.W.3d at 183. "A principal's conduct does not occur in a vacuum." Restatement (Third) of Agency § 2.03 cmt. c. "[G]eneral business custom as well as usage that is particular to the principal's industry" inform the reasonableness of the third party's belief. *Id.* And though the standard compares the third party to a reasonable person "using diligence and discretion to ascertain the agent's authority," *Gaines*, 235 S.W.3d at 182–83, "[a]bsent circumstances that should raise questions in the mind of a reasonable party, **as a general matter there is no requirement that the third party inquire into the scope of an agent's authority**." *Overseas Carriers, Inc. v. Team Ocean Servs.-Dallas, Inc.*, 2013 WL 76300, at *14 (S.D. Tex. 2013) (quoting Restatement (Third) of Agency § 2.03 cmt. d.) (internal quotations omitted) (Emphasis added). A third party need only investigate acts of "an unusual or extraordinary nature." *Natarajan v. Alpha Thought Global, Inc.*, 2005 WL 8158160, at *9 (N.D. Tex. 2005) (collecting cases).

Courts in this district have concluded that "[s]o long as facts remain in dispute, establishing the contours of an alleged agent or independent contractor's status and authority properly belongs to a trier of fact." *See Texas Capital Bank, N.A., v. Ameriprise Fin. Servs, Inc.*, 2011 WL 6189494

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

at *2 (N.D. Tex. May 20, 2011) (quoting *Ross v. Texas One P'ship*, 796 S.W.2d 206, 210 (Tex.App.-Dallas 1990, writ denied). The Court in *Ameriprise* declined to grant either party's motion for summary judgment because it could not ascertain the supposed agent's apparent authority to bind its principal. *Id.* There, the party asserting an agency relationship presented evidence and argued that the principal took steps "such as authorizing [the agent] to facilitate the processing of" certain contracts which suggested that the agent was authorized to execute those contracts on behalf of the principal. *Id.* Conversely, the principal argued that its agreement with the principal "specifically disavowed an agency relationship and forbade him from entering into contract on [the principal's] behalf." The principal also asserted it lacked "a sufficient right of control over the means and details of [the agent's] operations to create an agent relationship and took no actions suggesting that [the agent] had apparent authority to bind it" to the agreement at issue. *Id.*

The facts in dispute here closely align with those in *Ameriprise*. For example, Leeberg argues that Logwood possessed apparent authority on behalf of Legacy to tender the "no payment" guarantee on Legacy's behalf before entering into each of the five (5) agreements because she exclusively interacted with Logwood and Legacy identified him as its "Sales Rep" on each of its invoices. (Ex. G, at App. 0035). Additionally, Legacy copied Logwood within the e-mail communications it sent to Legacy enclosing each of its invoices, further illustrating that Logwood was an essential participant in the parties' relationship and that Logwood possessed some modicum of authority as Legacy's authorized agent. (Ex. H, at App. 0037-0038). Throughout the entire tenure of Leeberg's relationship with Legacy, Logwood was referred to as its "Sales Rep" upon its invoices without any qualifications or disclaimers concerning his relationship with Legacy. (Ex. G., at App. 0035). Critically, Leeberg was never furnished with a copy of Logwood's Independent

Contractor Services Agreement with Legacy such that Leeberg lacked any knowledge concerning the parameters if his relationship with Legacy and therefore the scope of his authority. (Ex. B, at App. 0024, at 187:11-18). At all material times, Legacy held Logwood out to Leeberg as its representative and it admittedly took no action(s) to disclaim Logwood's authority over the course of entering into five (5) Agreements with Leeberg. [ECF 47, at 15] ("But Legacy, from the inception of the relationship, made no other representation to Leeberg about Apex/Logwood: Legacy did not reach out to Leeberg about him…"). Legacy's actions towards Logwood, at all material times, created an indica of authority such as: (i) he was included an several e-mails to Leeberg concerning outstanding balances alleged owed; (ii) he was referenced as a "Distributor" on the Customer Onboarding Forms without any further distinctions or qualifications; and (iii) he was identified as the "Sales Rep" on each of Legacy's invoices. *See* (Ex. G. & H., at App. 0035, 0037-0041) and (Legacy MSJ Ex. 2., at App. 0081, 0085, 0089, 0093, 0097). Such conduct, in Leeberg's mind, led her to reasonably believe that Logwood possessed apparent authority to act on Legacy's behalf and bind it to the "no payment" guarantees. Accordingly, genuine issues of material fact exist surrounding whether Logwood possessed the apparent authority to bind Legacy to his repeated "no payment" guarantee representations.  Such issues of fact must be left to the trier of fact to resolve.

### i. Legacy Fails to Identify Facts Which Disclaim an Apparent Authority Relationship.

In its Brief, Legacy endeavors to disclaim Logwood's apparent authority by identifying a number of facts "Leeberg knew" which Legacy's contends "confirm separation." [ECF 47, at 21-22]. None of these facts substantiate Legacy's erroneous contention. Indeed, Legacy's argument that it never "represented that Logwood had any authority to negotiate terms or to modify payment provisions in the Agreements" actually highlights the fact that it clothed Logwood with authority.

[ECF 47, at 21]. Legacy's silence over the course of five (5) Agreements is far more indicative under Texas law that an apparent authority relationship existed, than a confirmation of separation. *See Pante Tech. Corp.*, 2010 WL 3927598, at * 3.

That Logwood "ran his own distributor business" is also of no consequence. [ECF 47, at 21]. Legacy does not cite to any authority establishing that apparent authority is absent merely because a purported agent is employed elsewhere—as its argument baldly suggests. The same is true of the fact that Logwood's email domain was "that of his own business." *Id.* Neither of these facts disclaim the existence of an apparent authority relationship between Legacy and Logwood. Nor does these facts alone disabuse Leeberg of the reasonable inference that Logwood acted as Legacy's authorized representative.

Next, that Logwood "was a distributor for multiple suppliers, beyond Legacy" is irrelevant. *Id.* at 22. Logwood interacted with Leeberg in connection with her five (5) Agreements with Legacy and Leeberg was under no obligation under Texas law to ascertain Logwood's scope of authority as to any third-party principal, including Legacy. *See Overseas Carriers, Inc.*, 2013 WL 76300, at *14.

Legacy's argument that no records reflect Logwood's employment with Legacy is misleading and disregards clear record evidence to the contrary. *Id.* As discussed above, every invoice Legacy served upon Leeberg referred to Logwood as its "Sales Rep." (Ex. G, App. 0035). Each invoice suggested a direct employment relationship under any reasonable interpretation. Legacy also fails to identify with any specificity or binding authority the employment "records" which it suggests refute Logwood's apparent authority. Legacy's entire argument here is toothless.

Legacy also erroneously argues that Leeberg "used Apex's Insurance Verification Forms –not Legacy's—to verify patients' eligibility." *Id.* This fact supports Leeberg's argument that an

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

apparent authority relationship existed. Critically, Leeberg's Agreements with Legacy *expressly* required Leeberg to use Legacy's forms and yet Legacy "relied on Apex medical" in verifying the patient's insurance benefits. [Ex. B, at App. 0020-0021, at, 95:6 – 96:17]; *see also* (Ex. C, D, & E, at ¶ 2) ("Customer agrees to utilize Legacy Medical Consultants' Insurance Verification form (IVR) prior to ordering and using Products.") Legacy's lack of protest in this regard and its reliance upon Apex is near concrete evidence of an apparent agency relationship in the reasonable mind of a customer like Leeberg.

    The same is true for Legacy's argument that Leeberg paid Apex and Logwood for its products. *Id.* This conduct reflects, not refutes, the existence of an apparent agency relationship. Permitting Apex to accept payment for Legacy's products is indicative of an apparent authority relationship. At best, genuine issues of material fact exists surrounding Logwood's apparent authority such that Legacy's Motion for Summary Judgment as to its Breach of Contract claim must be denied.

    Legacy also overstates the significance of the proposition that a party dealing with an agent who does not ascertain the fact and scope of the agent's authority, deals with the agent at their own risk. [ECF 47, at 23-24]. This is because "there is no element of apparent authority that requires proof the relying party ascertained the fact and scope of the agent's authority." *See Thomas Reg. Dir., Co. v. Dragon Products, Ltd.*, 196 S.W.3d 424, 428 (Tex.App.—March 9, 2006). The Court in *Dragon* concluded that "[t]o require a relying party to prove it ascertained the fact and scope of authority would require proof of actual authority, not apparent authority." *Id.* Here, Leeberg argues that Logwood possessed apparent, not actual, authority to bind Legacy to his pre-contractual "no payment" guarantees. *See Baptist Memorial Hosp. Sys.*, 969 S.W.2d at 949 (Apparent authority is based upon estoppel, and it intended "to prevent injustice and protected those who have been

15

misled"). Leeberg demonstrates that Legacy's conduct and its silence, caused it to clothe Logwood with an indica of authority and allowed her to be misled into believing that Logwood was its authorized agent. Based upon the foregoing, Leeberg's purported failure to conduct diligence into the scope of Logwood's authority is not dispositive of the issue of apparent authority. Based upon the foregoing, Legacy fails to disclaim Logwood's apparent authority such that its Motion for Summary Judgment as to its breach of contract claim must be denied.

### ii. Oral Modification(s) Not Barred by Statute of Frauds or UCC.

Legacy's argument that the Statute of Fraud's and Article 2 of the UCC precludes any oral modification of the Agreements erroneously commingles two separate and distinct agreements as between Leeberg and Legacy—(1) the Purchase Agreement(s) for the sale of products of Leeberg; and (2) an oral agreement providing for a limitation of liability and extension of time to make payment agreement repeatedly tendered by Legacy's agent—Logwood. An oral limitation of liability agreement and extension of time agreement to make payment is an agreement which is not for the sale of goods of any value and can each be performed within one (1) year. As such, Legacy fails to establish that the Statute of Frauds or Article 2 of the UCC bars such an oral agreement.

Courts in Texas have determined that, [n]ot every oral modification of the terms of a written contract falls within the statute of frauds." *See Garcia v. Karam*, 276 S.W.2d. 255 (1955). Such an oral modification is enforceable so long as it does not materially alter the underlying written contract. *See Triton Commercial Properties, Ltd. v. Norwest Bank Texas, N.A.*, 1 S.W.3d 814, 815-819 (App.Tex—August 26, 1999). Here, Legacy's agent repeatedly assured Leeberg orally that she would not have to pay Legacy under any Legacy invoice if Medicare denied her claims for compensation. Indeed, Leeberg testified:

> I never had any communication with anyone other than Rick Logwood with Legacy. And again, when I didn't understand. He verbally told me the same thing over and over again. Don't worry about it. Don't worry about it. This is the way it is. This is the way the organization runs. If you don't get paid, you are not going to be liable for it.

(Ex. A, at App. 0016, at, 281:12-22).

The effect of this representation and Leeberg's acceptance was intended to be two-fold: (i) induce Leeberg into acquiring Legacy's products; and (ii) assure Leeberg that sufficient time would be provided to tender payment in the event Medicare denied any claim for compensation and Leeberg was compelled to appeal such decisions—which she is undertaking. (Ex. A, at App. 0013, at, 236:8 – 239:8). Because this representation did not materially alter the terms of the underlying agreements, the oral modifications are enforceable, particularly in the absence of "disclaimer of reliance" language in the Agreements' integration clauses as discussed herein. Additionally, the Agreements' bald integration clauses do not preclude the admission of parol evidence to determine the enforceability of the parties' oral agreement.

While arguing out of one side of its mouth that its Agreements are unmodifiable, Legacy routinely acquiesced to modifying Leeberg's payment obligations under Paragraph 2 without memorializing such modification(s) and/or executing the same. Legacy cannot have it both ways. Legacy's Corporate Representative acknowledged that Legacy exhibited "leniency" in pursuing collection of outstanding amounts from Leeberg and that it was "not aggressive" in pursuing its collection efforts—notwithstanding Paragraph 6's language and the absence of any written modification(s). (Ex. B, at App. 0022-0023 at, 140:13-141:20). Legacy also agreed to deviate from Paragraph 2's requirement that Leeberg utilize Legacy's Insurance Verification Forms, in the absence of any written modifications. Thus, Legacy agreed to modify its Agreements, at its

convenience, despite the integration clauses it now seeks to enforce. Legacy's inconsistent positions are on full display.

Based upon the foregoing, the Statute of Frauds and the UCC do not bar the enforcement of Legacy's authorized agent's pre-contractual "no payment" guarantees and summary judgment on such basis must be denied.

### D. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT IN LEGACY'S FAVOR UPON LEEBERG'S CLAIMS FOR BREACH OF CONTRACT.

Summary judgment upon Leeberg's breach of contract claims must be denied because genuine issues of material fact exist surrounding: (i) whether Legacy's products were non-conforming—they were; (ii) whether Legacy's Instruction for Use ("IFU") as to Legacy's Zenith and Impax products accurately informed Leeberg as to its products proper application—they did not; and (iii) whether Medicare's denials are a full and final disposition of each appellate claim—they are not. As explained in greater detail below, Legacy's products were non-conforming because they were sold to Leeberg for wound treatment purposes and were explicitly rejected for compensation by Medicare when used that purpose. Second, Legacy's website currently provides for download an IFU for its Zenith and IMPAX Amniotic products which contain substantially different directions than what was within the IFU originally provided to Leeberg. Finally, Legacy's entire causation argument is premised upon the notion that the Medicare appeal documents referenced in its Motion [ECF 48-9] are full and final dispositions of those claims, and others. In fact, Legacy fails to establish that Leeberg exhausted her appellate rights as to those claims, or any others, leaving the factual question of causation still in dispute.

### i. Legacy Sold Leeberg Non-Conforming Skin Substitute Products.

Legacy's skin substitute products did not conform to their intended use because they were

sold to Leeberg for the purpose of wound treatment and yet, at such time, were not approved by the Food and Drug Administration ("FDA") as being safe and effective for wound treatment. Indeed, Legacy's products were investigational and experimental and yet Legacy sold them to Leeberg as though they were safe and effective for application upon her patients and that they qualified for reimbursement by Medicare. However, Medicare has denied several of Leeberg's claims for compensation and its "Explanation of Decision" in many of its decisions state, in pertinent part:

> The documentation indicates that the Zenith (dehydrated, sterilized cellular amniotic membrane allograft) was used as a dressing. The Zenith amniotic membrane was placed as a covering, and was not anchored surgically to the wound, to support the billing of the Zenith amniotic membrane, per square centimeter (Q4253 x 32). Human placental tissue provides covering and protection to the fetus. When used as a skin substitute graft for wound treatment, it is considered a non-homologous use in the recipient. **This use is investigational and not approved by the Food and Drug Administration (FDA), since it lacks evidence of being safe and effective for wound treatment**.

> (Legacy MSJ Ex. 9, App. at 000175, 184, 193) (Emphasis added).

Similarly, Medicare's decisions as to the IMPAX Amniotic products proffered a similar rationale. In one such example, Medicare's "Explanation of Decision" in decisions relating to the IMPAX products provides, in pertinent part:

> This product, Dual Layer Impax Membrane, has insufficient peer reviewed, evidence-based literature to support its use for ulcer or wound treatment or healing. It is investigational and experimental and has insufficient peer-reviewed, published evidence or any evidence-based recommendations by a specialty society or organization to support its safety, efficacy, or clinical utility, or frequency as an ulcer or wound healing product. Without such evidence, it does not meet the standards of medical practice to treat such a wound. This product is not reasonable or necessary for ulcer or wound treatment…

> (Ex. K., at App. 0060).

These appellate decisions make abundantly clear that Leeberg's claims for compensation upon Legacy's skin substitute products were being denied because the products were deemed

19

investigational and lacked any data to substantiate their use was safe and effective for treating wounds—the precise purpose Leeberg sought to acquire them. Legacy has failed to tender any documentary evidence, despite a self-serving ALJ Opinion (Legacy MSJ Ex. 13., at App. 0253-0261), that its Zenith and/or IMPAX products were safe and effective for wound treatment at the time they were sold to Leeberg. Accordingly, a genuine issue of material fact exists regarding the safety, efficacy and clinical utility of Legacy's products for wound treatment, precluding the entry of summary judgment in Legacy's favor on Leeberg's breach of contract claims.

Leeberg determined each of her patients possessed a medical necessity for utilizing skin substitute products for the purpose of treating their wounds and applied Legacy's products in accordance with Logwood's directives. (Ex. A, at App. 0011, at 206:16-19 & 212:9-24). Leeberg exclusively ordered Legacy's products for the purpose of providing patients with wound treatment care. (Ex. A, at App. 0002, at. 26:8-19). Leeberg testified that she used Legacy's products precisely in the manner Logwood—Legacy's Sales Representative—prescribed and yet her Medicare claims for compensation were denied despite following those directives. (Ex. A, at App. 0010, at 162:10 – 163:1.) As set forth above, Medicare denied Leeberg's claims for compensation, in large part, because it determined that Legacy's products were neither safe nor effective for their intended use—wound treatment.

The products' non-conformance is also exemplified by recent updates performed to their IFUs. When Leeberg initially received Legacy's IMPAX Amniotic products, for example, the IFU stated under "Product Use":

**PRODUCT USE**
**IMPAX Membrane** grafts are in sheet form. **IMPAX Membrane** is intended for use as a Human Cell, Tissue, and Cellular and Tissue-Based Product (HCT/P) for repair, reconstruction, replacement and/or supplementation by providing tissue in the form of scaffolding in partial and full-thickness acute and chronic wounds. The IMPAX Membrane graft is intended to remain on the recipient and is absorbed into

the wound bed. The grant is anchored based on the physician's choice of fixation including staples or sutures in surgical procedures when medically necessary.

(Ex. F, at App. 0033).

However, a subsequent version of the IMPAX Membrane IFU, which is readily available for download on Legacy's publicly available website (https://legacymedicalconsultants.com/) contains a drastically different application method—a method which aligns with the instructions Leeberg was originally provided by Logwood—to apply the products without using sutures. (Ex. A, at App. 0015, at, 244:19-25). Indeed, the new IFU provides under "Product Use":

> **PRODUCT USE**
> **IMPAX Membrane** is intended for use as a protective wound covering in partial- and full-thickness acute and chronic wounds. Acute and chronic wounds may include wounds with or without muscle, tendon, or bone exposure when a protective barrier is medically necessary. **IMPAX Membrane** can be applied for the duration of the wound, weekly or at the discretion of the health care practitioner.

(Ex. L, App. 0069) (Emphasis in original).

Absent from that IFU's "Product Use" description is any reference to suturing the product.

Similarly, the IFU for Zenith Membrane, which is IMPAX's predecessor product, provides a nearly identical explanation for its proper application. That IFU, which is also publicly available on Legacy's website, provides:

> **PRODUCT USE**
> **ZENITH AMNIOTIC MEMBRANE** is intended for use as a protective wound covering in partial- and full-thickness acute and chronic wounds. Acute and chronic wounds include diabetic foot ulcers, venous leg ulcers, surgical wounds, dehisced wounds and tunneling wounds with or without muscle, tendon, or bone exposure when a protective barrier is medically necessary. Zenith Amniotic Membrane can be applied for the duration of the wound, weekly or at the discretion of the health care clinician.

(Ex. M, App. 0071) (Emphasis in original).

These updated "Product Use" descriptions for Legacy's products align with Logwood's instructions to Leeberg that they did not require application via sutures. (Ex. A, at App. 0015s, at,

244:19-25). Leeberg complied with Logwood's directives, to disregard the original IFU's directives to her detriment, and yet the latest versions of the IFU comport with those same instructions. At minimum, there is a genuine issue of material fact surrounding whether or not Legacy sold Leeberg conforming goods in accordance with the Agreement. As such, Legacy is not entitled to summary judgment in its favor upon Leeberg's claims for selling a product which allegedly performed as intended.

### ii. Legacy Fails to Establish An Absence of Causation.

Legacy's argument as to an absence of causation is heavily, and erroneously, reliant upon the Medicare Appeal Decisions (Legacy MSJ Ex. 9 at App._0173-0214)—which are non-final decisions. Indeed, Legacy relies upon these appealable determinations as the basis to extricate itself from being the cause in fact of Leeberg's damages. Its efforts in this regard are without merit. Where the underlying Medicare decisions are not final, causation cannot be resolved as a matter of fact and summary judgment cannot be granted.

On November 14, 2023, First Coast Service Options Inc., a Medicare contractor, issued a Medicare Appeals Decision (the "Decision") concerning services provided on September 20, 2022; September 27, 2022; October 4, 2022; November 16, 2022; and November 30, 2022. Critically, the Decision expressly provides that it is not final and may be challenged through further administrative review. The Decision states:

> If you do not agree with this decision, you may file a reconsideration. When submitting your reconsideration you will need to provide a Tissue Reference Group (TRG) letter supporting approval for the use of the product for wound treatment and/or healing or peer-reviewed literature supporting the use of the product for wound treatment and/or healing to be an accepted standard of medical practice.

> *See* (Legacy Exhibit 9 at App. 0177, 0186, 0194-0195, 0202, 0210).

> Leeberg's ability to seek reconsideration establishes that Medicare's determinations are not

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

final or conclusive. Legacy has not submitted any evidence, nor can it, that Leeberg has exhausted any of her appellate rights and that Medicare's decisions are final determinations that she remains liable for any overpayment she received from Medicare. Since receiving these decisions, Leeberg engaged counsel who are endeavoring to appeal the Decision(s). (Ex. A., at App. 0013, 237:20 – 238:7). As a result, there have been zero final administrative determinations from Medicare regarding medical necessity, billing propriety, or the ultimate basis for any denial of reimbursement. Leeberg is not conclusively and exclusively at fault for Medicare's denials. The outcome of Leeberg's ongoing appellate efforts bears directly upon the causation element of Leeberg's breach of contract claims such that summary judgment cannot be entered in Legacy's favor. Based upon the foregoing, Leeberg's breach of contract claims survive summary judgment as genuine issues of material fact exist surrounding the non-conformance of Legacy's products and the causation of Leeberg's damages.

### E. LEGACY FAILS TO ESTABLISH ENTITMENT TO SUMMARY JUDGMENT UPON LEEBERG'S FRAUDULENT MISREPRESENTATION CLAIMS.

Summary Judgment in Legacy's favor must be denied upon Leeberg's Fraudulent Misrepresentation claims (Counts IV and V) because Logwood repeatedly tendered promises of future performance to Leeberg which Legacy possessed zero intention of performing. Leeberg's reliance upon Logwood's representations was justified and the economic loss rule does not bar Leeberg's right to recovery damages under such claims. As set forth in greater detail below, Legacy fails to establish an entitlement to summary judgment in its favor.

### i. Legacy Did Not Possess an Intent to Perform Under Its Representations at the Times They Were Made to Leeberg.

Legacy argues entitlement to summary judgment upon Leeberg's fraudulent misrepresentation claim in Count IV because it boldly contends that Leeberg fails to identify

evidence that Apex, Logwood and/or Legacy never intended to write off denied claims at the time such representation was made. [ECF 47, at 41]. Legacy's argument in this regard fails because Legacy consistently sought to collect payment from Leeberg upon its outstanding invoices throughout the entire duration of the parties relationship—evidencing a clear intention not to perform consistent with Logwood's prior representations. (Legacy MSJ Ex. 6, at App._0138-0169). Legacy knew or should have known that Logwood was making these repeated assurances to Leeberg and it failed to disabuse her of such notion over the course of five (5) Agreements—during which time it served Leeberg with numerous invoices and pursued collection upon such amounts. Accordingly, record evidence clearly exists which demonstrates that Legacy never possessed an intention, at the time each of the guarantee representations were made, of performing. Based upon the foregoing evidence and testimony, Legacy's fraudulent misrepresentations were made with knowledge of their falsity at the time they were made such that summary judgment cannot be entered into its favor as to Counts IV of Leeberg's counterclaims.

As to Count V, the record evidence reveals that Logwood's directives to disregard Legacy's products IFU's was knowingly false when it was made as the IFU expressly contradicted his representations. When Leeberg complied with the same and submitted her documentation to Medicare, it denied her claims, opining that:

> The documentation indicates that the Zenith (dehydrated, sterilized cellular amniotic membrane allograft) was used as a dressing. The Zenith Amniotic membrane was placed as a covering, **and was not anchored surgically to the wound**, to support the billing of the Zenith amniotic membrane, per square centimeter (Q4253 x 32).

(*See* Legacy MSJ. Ex. 9, at App_0175) (Emphasis added).

Logwood's directives to disregard the IFU's "Product Use" instructions were intended to deceive Leeberg in utilizing the products in an inconsistent manner under a claim that Legacy was

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

correcting Medicare's misinterpretation of the IFUs. Leeberg's claims for compensation have been denied by Medicare because Medicare has concluded that her documentation did not comport with the products' "Product Use" instructions as set forth in their IFUs, and therefore her use was "non-homologous." *Id.* Logwood therefore intended to deceive Leeberg to disregard the IFU's "Product Use" instructions, with knowledge of the falsity of his statements, which Leeberg relied upon to her detriment.  Leeberg therefore establishes falsity as to Count V such that summary judgment cannot be entered in Legacy's favor.

### ii. Leeberg's Reliance upon Legacy's Fraudulent Misrepresentations Was Justified.

Legacy argues that Leeberg could not have justifiably relied on the oral representations made by Legacy or its agents because those representations allegedly "directly contradict" the express terms of the Agreements. That argument fails as a matter of law and fact as it rests on a distorted reading of the Agreements, ignores Legacy's own course of conduct, and improperly asks this Court to resolve disputed factual issues on summary judgment.

Legacy's reliance argument is flawed because: (i) the oral representations at issue do not directly contradict any express term of the Agreements and (ii) Legacy repeatedly modified or departed from the Agreements through oral representations and conduct, undermining any claim that reliance was unjustified as a matter of law. In determining whether justifiable reliance is negated as a matter of law, courts "must consider the nature of the [parties'] relationship and the contract." *AKB Hendrick, LP v. Musgrave Enters., Inc.,* 380 S.W.3d 221, 232 (Tex. App. 2012). "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests. ... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v. Westergren,* 453 S.W.3d 419, 425 (Tex. 2015) (quoting *Thigpen v. Locke,* 363 S.W.2d 247, 251

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

(Tex. 1962) ). And when a party fails to exercise such diligence, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *See AKB*, 380 S.W.3d at 232. "The justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience." *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 358 (5th Cir. 1996) (Texas law) (citing *Scottish Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir. 1996)). "A plaintiff's reliance is unjustified when the reliance is in effect an act of negligence on the plaintiff's part." *Id.* (citing *Scottish Heritable Tr.*, 81 F.3d at 615).

Legacy relies on a line of cases holding that a party cannot justifiably rely on oral representations that are squarely and expressly contradicted by written contract terms. [ECF 47, at 42-43]. That principle, however, has no application here because there is no such contradiction. Legacy contends that "alleged ["no payment"] guarantee to write off denied claims is contradicted by the five written Agreements Leeberg signed over two years." [ECF 47 at 43]. That assertion is belied by an absence of language in the Agreements expressly disclaiming those representations. Legacy points generally to the Agreements' payment provisions but identifies no language that expressly states that Leeberg would remain liable for claims denied by Medicare. Legacy asks this Court to infer a contradiction where none exists. The payment provisions of the Agreements state, in relevant part:

> Legacy Medical Consultants will develop and deliver an Invoice to Customer that identifies the Products ordered are shipped. Customer agrees to pay Legacy Medical Consultants the balance due amount stated in each Invoice within forty-five (45) days after product shipment. Customer will access Invoices and make payments through the LMC Payments Portal.

> [Ex. C, D, & E at App. 0026, 0027, 0030, at ¶6].

Nothing in this provision, or anywhere else, directly contradicts Legacy's oral

representations that payment would not be owed if Medicare denied Leeberg's compensation claims. The Agreements are silent regarding how Medicare denials would be resolved. Legacy's argument improperly conflates the existence of general payment terms with an express disclaimer about payor liability. Because no such express contradiction exists here, Leeberg was not reliant upon representations which contradicted any of the Agreements' express terms.

Second, Legacy's conduct undermines its contention that Leeberg's reliance upon its agent's representations was unjustified as a matter of law. Legacy refers to the Agreements' integration clause, yet as shown above, those clauses lack "disclaimer of reliance" language and Legacy routinely modified the Agreements without written amendments. Based upon these indisputable facts, Leeberg's reliance upon Legacy's agent's representations were wholly justified.

Next, Legacy's reference to its Insurance Verification Forms is irrelevant as Legacy never mandated their use. (Ex. B, at App. 0020-0021, at 95:6- 96:23). Leeberg cannot be charged with failing to exercise justifiable reliance by disregarding language in document that the parties never utilized. Thus, Leeberg's reliance upon Logwood's representations remains justified as a matter of law.

Legacy also argues an absence of justifiable reliance because Leeberg "continued to order products for six months after receiving her first denial in November 2023, knowing that some of her denials were based upon her lack of use of sutures or staples." [ECF 47, at 45]. Leeberg continued to order Legacy's products in justifiable reliance upon Legacy's representations that the products IFU's were inaccurate and that steps were being undertaken with Medicare to address the discrepancies. (Ex. A., at App. 0008, at 83:6-85:17). Leeberg was led to believe by Legacy's representative, Brian Rowan, that Legacy was undertaking measures to correct Medicare misinterpretation of the IFU and that she "had nothing to worry about." *Id.* Thus, Leeberg's

continued acquisition of Legacy's products was in reliance upon Legacy's representations and not the result of her purported disregard of the Agreements' payment terms. Accordingly, this fact weighs in Leeberg's favor that her reliance was substantially justified.

The evidence in the record also reveals that Leeberg exercised diligence in acquiring Legacy's products and that Legacy's own conduct fortified her reliance upon its agent's repeated representations that she would not have to pay Legacy's invoices if Medicare denied her claims for compensation. To the extent Legacy disputes Leeberg's diligence, a genuine issue of material fact exists concerning the same precluding Legacy's entitlement to summary judgment.

Finally, the Agreements' integration clauses do not bar Leeberg's justifiable reliance as such provisions lack "disclaimer of reliance" language, as set forth above. The Supreme Court of Texas has confirmed that fraudulent inducement claims cannot be set aside absent a clear and specific disclaimer of reliance within the parties' agreement. *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 332 (holding that the language contained in the lease agreement does not negate the reliance element of a fraud claim due to a lack of clear and unequivocal language). The Southern District of Texas determined that it "located no case postdating *Italian Cowboy* in which either the Texas Supreme Court or Fifth Circuit has held that a party disclaimed reliance absent a contract that used the term 'rely' or 'reliance.'" *Sysco Merch. & Supply Chain Services, Inc. v. Remcoda, LLC*, No. 4:22-CV-02075, 2023 WL 1781810, at *7 (S.D. Tex. Feb. 6, 2023).

Reliance must be specifically and unequivocally disclaimed for an integration clause to bar any fraud claims. *See Altec Integrated Sols., Ltd. v. Poseidon Productions, Inc.*, No. 6:24-CV-347-JDK, 2025 WL 3096494 (E.D. Tex. May 27, 2025). In *Altec Integrated Sols., Ltd.,* the contract stated, "The Parties do not rely on any promise, representation, warranty, or covenant that is not contained in this Agreement or an Exhibit to this Agreement that is expressly incorporated into the

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

Agreement by reference." The District Court found that this specific disclaimer of reliance provision expressly disclaims reliance and was enough to preclude fraud claims based on any external representations. *Id*; *see also Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (parties disclaimed reliance based on language that "neither party is *relying* upon any representation that is not specified in this [agreement]") (emphasis added). This specific and express language is found nowhere in the Agreements at hand. Thus, Legacy cannot invoke the integration clause in the Agreements to preclude Leeberg's fraud claims and thereby seek the entry of summary judgment in its favor.

### iii. The Economic Loss Rule Does Not Bar Leeberg's Right to Recover Damages Under Count V.

Legacy's reliance upon the Economic Loss Rule to bar Leeberg's right to recover damages under Count V is fundamentally flawed as it conflates contractual non-conformance with fraudulent misrepresentations. Count V articulates a separate and distinct legal duty from Leeberg's breach of contract claims because it exclusively concerns representations made by Logwood to disregard the original IFU which accompanied Legacy's products. Leeberg agrees with Legacy that the IFU's are not incorporated into any of the Agreements. [ECF 47, at 34]. Because the IFUs are not incorporated into any of the Agreements, Leeberg's fraud claims in Count V cannot arise out of the parties' contractual relationship.

Generally, the economic loss rule precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy. *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716 (Tex. 2014) (citing *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234 (Tex. 2014)). However, this rule does not bar all tort claims arising out of a contractual setting. *Id* at 718; *see also Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011). Texas courts

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

have insisted that "a party [cannot] avoid tort liability to the world simply by entering into a contract with one party [otherwise the] economic loss rule [would] swallow all claims between contractual and commercial strangers." *Id. (quoting Sharyland*, 354 S.W.3d at 419).

When addressing fraudulent inducement claims, the Texas Supreme Court has consistently upheld rejecting the application of the economic loss rule to bar claims of fraudulent inducement. *See Formosa Plastics Corp. United States v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41 (Tex. 1998) ("Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. As a rule, a party is not bound by a contract procured by fraud."); *see also Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156 (Tex. 1995); *Weitzel v. Barnes*, 691 S.W.2d 598 (Tex. 1985); *Town N. Nat'l Bank v. Broaddus*, 569 S.W.2d 489 (Tex. 1978); *Dallas Farm Mach. Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957). Further, it has been established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself. *Id*.

The Court in *Formosa* concluded that if a plaintiff presents legally sufficient evidence of a fraudulent inducement claim, "any damages suffered as a result of the fraud sound in tort." *Id*. Here, Legacy's argument that the economic loss rule bars the fraudulent misrepresentation claim ignores that the claim is premised upon misrepresentations concerning the accuracy of the original IFU and the proper application of its products—which gives rise to a separate and distinct legal duty. ECF 21, ¶¶ 81-85*]*.  The governing question is whether the conduct at issue violates a duty imposed by law independent of the contract.

Count V is not simply a repackaged claim that Legacy did not perform as required under the Agreements. It alleges that Legacy, through its agents, made false representations and gave misleading instructions about how its products should be used, and that those representations were

made to induce reliance and were relied on, leading to denials of reimbursement and resulting damages. *Id.* Those allegations trigger an independent legal duty outside of the Agreements. *See Formosa Plastics Corp. USA*, 960 S.W.2d at 46. Under *Formosa*, that duty is separate from any contractual duties and is precisely why fraud claims remain actionable even when the dispute arises in a contractual setting. *Id.*

With respect to the errors with the IFU's, updated versions are readily available on Legacy's website which are markedly different than the versions provided to Leeberg. (Ex. L & M, at App. 0069 & 0071); *See also* (Ex. A. at App. 0012, at 212:25-213:4). Legacy's reference to the Local Coverage Determination (ECF 48-10) as being consistent with the IFU is misleading as the LCD's language imposing any recommendation to anchor the skin graft using the provider's "choice of fixation" is related to skin replacement surgery—not wound care. [ECF 47, at 42]; (Legacy MSJ Ex. 10 App. 0219). There is no evidence in the record that substantiates the accuracy of the original IFU's Legacy furnished to Leeberg for its IMPAX or Zenith skin substitute products. There is also a genuine issue of material fact in dispute whether Legacy's Chief Revenue Officer, Brian Rowan, conceded to Leeberg during their March 12, 2024, remote meeting that the IFU's were inaccurate and that efforts were being undertaken to correct them with Medicare. (Ex. A, at App. 0008, at 82:19 - 85:17); *compare* (Bini depo; 189:9 - 190:8). The existence of updated IFU's for Legacy's products, which removes language about anchoring and surgical application substantiates Leeberg's testimony concerning the IFU's inaccuracy and Rowan's statements to her on March 12, 2024. (Ex. A, at App. 0012, at 210:24 – 211:4).

Accordingly, summary judgment should be denied because the Economic Loss Rule is inapplicable to Count V as set forth above. Where, as here, the claim is grounded in an independent legal duty and alleges damages caused by Leeberg's reliance on knowingly fraudulent

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

misrepresentations rather than mere nonperformance, the economic loss rule does not bar the claim, and Legacy's therefore cannot secure summary judgment in its favor.

### F. LEGACY IS NOT ENTITLED TO RECOVERY OF PREVAILING PARTY ATTORNEYS' FEES UNDER AGREEMENTS OR STATUTE.

Even if summary judgment is entered in Legacy's favor upon its claim or Leeberg's counterclaims, Legacy is not entitled to the recovery of its prevailing party attorneys' fees or costs under any circumstance as neither the Agreements, nor any statutes, permit Legacy's recovery of the same. In Texas, as in the federal courts, each party generally must pay its own way in attorney's fees. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010) ("The general rule in our legal system is that each party must pay its own attorney's fees and expenses."); *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 41 (Tex. 2012) ("As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation."). But there are certain circumstances in which the prevailing party can recover fees from the opposing party. *See Baker Botts LLP v. ASARCO LLC*, —— U.S. ——, 135 S.Ct. 2158, 2164, 192 L.Ed.2d 208 (2015) ("Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010))); *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding) ("Texas follows the American rule on attorney's fees, which provides that, generally, 'a party may not recover attorney's fees unless authorized by statute or contract.' " (quoting *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 453 n.4 (Tex. 2016))). In the absence of any contract or statutory claim authorizing Legacy's recovery of its attorneys' fees and costs, Legacy is not entitled to the recovery of the same. As such, should

Legacy earn summary judgment upon any claim, it must not also be awarded its prevailing party attorneys' fees and costs.

WHEREFORE, Counter-Plaintiff/Defendant, CRISTI LEEBERG d/b/a PRACTITIONERS IN MOTION, PLLC, respectfully requests the entry of an Order denying Plaintiff/Counter-Defendant, LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC, Motion to for Summary Judgment [ECF 46], reject Legacy's prayer for recovery of its attorneys' fees and costs, and grant such other and further relief deemed just and proper.

Dated: February 23, 2026                Respectfully submitted,

**THE LEAL LAW FIRM, LLC**
14180 N Dallas Pky, Suite 300
Dallas, Texas 75254
Telephone: (214) 395-5325

**ABEL A. LEAL**
Texas Bar No. 24026989
E-mail: abel@leal.law
Telephone: (214) 395-5325

*/s/ Alec R. Shelowitz*
**ZARCO EINHORN SALKOWSKI, P.A.**
2 S. Biscayne Blvd., Suite 3400
Miami, Florida 33131
**ROBERT M. EINHORN** (*seeking admission to NDTX*)
E-mail: reinhorn@zarcolaw.com
Secondary: imorfi@zarcolaw.com
**ALEC R. SHELOWITZ** (*admitting pro hac vice*)
Email: ashelowitz@zarcolaw.com
Secondary: agarcia@zarcolaw.com

**ATTORNEYS FOR CRISTI LEEBERG**

**Zarco Einhorn Salkowski, P.A.**
2. S. Biscayne Blvd., 34th Floor | Miami, FL 33131 | T: (305)374-5418 | F: (305) 374-5428

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this filing was served upon the below identified counsel of record through the Court's CM/ECF electronic filing system:

**BLANK ROME, LLP**
200 Crescent Ct #1000
Dallas, Texas 75201
717 Texas Avenue, Suite 1400 Houston, Texas 77002-2727
Audrey F. Momanaee (audrey.momanaee@blankrome.com)
Gregory J. Moore (greg.moore@blankrome.com)
Christopher McNeill (chris.mcneill@blankrome.com)
**ATTORNEYS FOR LEGACY MEDICAL**
**CONSULTANTS, L.P.**

By: *s/ Alec R. Shelowitz*
　　　　**Alec R. Shelowitz**