# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

                          No. 4:25-cv-00319-P

LEGACY MEDICAL CONSULTANTS,
LP, SUCCESSOR IN INTEREST TO
LEGACY MEDICAL CONSULTANTS,
LLC,

             Plaintiff,

v.

CRISTI LEEBERG D/B/A
PRACTITIONERS IN MOTION, PLLC,

             Defendant.

_____/


          DEPONENT:   CRISTI LEEBERG

          DATE:       December 5, 2025

          LOCATION:   Zarco Einhorn Salkowski & Brito, P.A
                      One Biscayne Tower
                      2 South Biscayne Boulevard
                      34th Floor
                      Miami, FL 33131
                      Phone: (305) 374-5418

          TIME:       10 a.m. to 5:05 p.m.



          M A G N A  L E G A L  S E R V I C E S
            ( 8 6 6 ) 6 2 4 - 6 2 2 1
          w w w . M a g n a l s . c o m



Appx_0001

Page 26

Q. Like a medical assistant?

A. She is not a medical assistant. She is an office assistant.

Q. And how did she assist with the wound care side of business?

A. Packs the bag. Carries the bag. Hands things to the practitioner.

Q. Did you, yourself, handle wound care?

A. I do.

Q. And have you always?

A. Yes.

Q. What employees are involved in ordering, receiving, billing, or applying, the Legacy products?

A. Myself, Robert Johnson, Pete Ciechanowski.

Q. So Robert Johnson does that as well, though?

A. Yes.

Q. So I guess, lets break this down. Who handles the ordering?

A. With Legacy me.

Q. None of the other employee handle any ordering at all. What about receiving of the product, and the intake of it? Who handles that?

A. Whoever was at the office to sign for it.

Q. So it could have been any employee?

A. That signed for it sure.

Page 27

Q. What about the billing of the grafts?

A. That was farmed out to Debra Barnes, or Debbie Barnes.

Q. So you said farmed out?

A. She wasn't one of my employees.

Q. Well, I guess could you explain who Debbie Barnes is then?

A. She has a company that does billing, and Rick Longwood recommended that I use her for wound care billing.

Q. What is the name of her company?

A. Physician Service Consulting. PCS. Physician Consulting Services. That is it. PCS.

Q. And you said Rick Longwood introduced you two?

A. Correct.

Q. How long ago was that introduction made?

A. Honestly, I don't want to guess. So I am not sure what year it was. You would have to look back in the records.

Q. How long has she been your biller?

A. She was my biller for a while.

Q. No longer your biller?

A. No.

Q. Do you know approximately for how long?

A. No.

Page 28

Q. Prior to engaging her as the biller. Did you do any kind of due diligence into her background abilities?

A. Sure. Yes.

Q. What does those efforts entail?

A. Looking at the Better Business Bureau. Doing background, you know.

Q. When you say background. What do you mean by background though?

A. Looking her up.

Q. Did you speak to anybody else?

A. I did not.

Q. Did she or Mr. Rick would offer any kind of references?

A. Yes. She had, and I can't remember his name, a physician reference.

Q. If you had to, would you be able to determine who that reference was?

A. I don't know.

Q. Do you know why Mr. Rick would recommended you use Ms. Barnes?

A. He told me she was an expert in billing. And she would be the best person to use.

MR. SHELOWITZ: Sorry, for the record. It is Rick Logwood.

Page 29

MR. ESPOSITO: Longwood.

MR. SHELOWITZ: Rick Logwood. Just for a clean record.

MR. ESPOSITO: My apologies. I misspoke.

BY MR. ESPOSITO:

Q. Why did you guys -- why did you part ways with her?

A. I don't believe she was billing appropriately.

Q. When you say you don't think she is billing appropriately. Can you elaborate a little bit further? What do you mean?

A. She provided invoices to me that I don't know were correct. And I couldn't get her on the phone a lot of the times. When the audit started, she just wasn't appropriate to handle it.

Q. When you say the audit started. Can you clarify a little bit?

A. When I started getting letters from Medicare with clawback's and audits. Debbie didn't handle them appropriately.

Q. And those audits and clawback's. Were they strictly to the grafts?

A. Correct.

Q. Did she only do your billing for grafts, or did she handle other aspects as well?

MAGNA
LEGAL SERVICES

Page 54

MR. SHELOWITZ: Object to form.

THE DEPONENT: Guardianship.

BY MR. ESPOSITO:

Q. When you say guardianship, was that for -- could you elaborate?

A. I was on an executive committee for guardianship. So I would do capacity evals on not just elderly on anyone that needed capacity evals. And attorneys would call me as an Expert witness based on my evaluations.

Q. And that would be the attorneys that would engage your services?

A. Yes.

Q. And then you would perform the evaluation of those individuals, whether it's a minor, or elder patient?

A. Correct.

Q. You would provide them with a written report?

A. Yes.

Q. And then they would utilize that report in their legal proceeding?

A. Yes.

Q. And then possibly call you up as a witness?

A. Yes.

Q. So have you provided testimony before a Court

Page 55

then before?

A. Yes.

Q. How many times?

A. Again, many. Handful. It's been over 10 years ago, I quit doing it.

Q. Were you ever deposed in that process?

A. No.

Q. But you were called to testify at trial, though?

A. Yes.

Q. Is there anything else in your professional background, education, or experience, that you believe is relevant to this lawsuit? That we haven't touched?

MR. SHELOWITZ: Object to form.

THE DEPONENT: No.

BY MR. ESPOSITO:

Q. Prior to the lawsuit being filed, were you aware of Legacy Medical Consultants?

A. I don't understand. What do you mean was I aware of them?

Q. That is what I am asking. So this lawsuit was filed -- before it was actually filed, were you aware? Did you know who Legacy Medical Consultants were?

A. I was using their grafts. So yes.

Q. And when did you become -- when did you learn

Page 56

about Legacy?

A. Through Rick Logwood. I want to say March of 2022.

Q. And what are you looking at right now?

A. I am looking at the counterclaim.

Q. And why do you say it's March of 2022?

A. Because that is when I started using the Zenith skin substitutes, that Rick Logwood brought to me from Legacy Consultants.

MR. SHELOWITZ: Hey, Mike. Just one second and stay on the record. But it looks like Cristi's version is highlight. Is that yours?

MR. ESPOSITO: Yes.

MR. SHELOWITZ: So we can substitute that?

MR. ESPOSITO: Yes.

MR. SHELOWITZ: So you can use this one, Cristi. Just so you know. It's all good. I just want to make sure.

BY MR. ESPOSITO:

Q. Prior to Mr. Logwood introducing you to Legacy. Had you heard of Legacy before that point?

A. No.

Q. And I believe you testified you were using other graft products before that? What were those names again?

Page 57

A. BioLab.

Q. And he had introduced you to those products as well?

A. Correct.

Q. Why did you make the transition from BioLab to Legacy?

A. Rick Logwood told me that he started working with Legacy, and they were superior products that were more -- what is the word I am looking for? Easier to get.

Q. And when you say easier to get, what do you mean?

A. BioLab quit producing, and Legacy produced more. So they were more -- sorry, I am drawing a blank. Available is the word I am looking for.

Q. And how did you know Rick?

A. Through Nick Petrillo, introduced me to Rick Longwood.

Q. Do you know at what point?

A. I think 2021. When he was our laboratory representative, he also worked with Rick at Apex. Were through a conversation we had, wound care came up. That I loved wound care.

And he said, I have someone for you to meet. And he introduced me to Rick Logwood.

MAGNA
LEGAL SERVICES

Page 58

Q. So Nick Petrillo introduced you to Rick?
A. He did.
Q. And how did you guys first meet?
A. On the phone.
Q. And what were the -- what was the initial discussion about?
A. The discussion was about the skin substitutes. He started introducing me to look into how they heal wounds. And the advanced products, and just the wonderful outcomes that they have.
And that is when our relationship started. And I started ordering grafts through Rick. I questioned him and questioned him about, you know, the product. How it worked. How to use it. How to bill it.
And everything came through, you know, Rick Logwood. How to use the product. How to bill the product. That by any means, at any given time, if we didn't get reimbursed for it. That I wouldn't be liable for it. With every conversation we had it was all positive.
Q. You had mentioned Apex?
A. Mm-hmm.
Q. Who is Apex?
A. Rick Logwood's business.

Page 59

Q. What business is that?
A. He was a distributor for Legacy and BioLab.
Q. I am sorry. What was that last part?
A. And BioLab.
Q. So you knew when you first met Rick that he was a distributor for Legacy?
A. No, not Legacy. At the time I just knew BioLab.
Q. Did you ever think that Rick was employed by Legacy?
A. Employed, he is distributor for the companies.
Q. So what does that means in your eyes?
A. That means he distributed their products. Educated on their products. Spoke for them. Got paid by them.
Q. But do you know if he is an employee?
A. W-2 or 1099. I didn't question that.
Q. Did he ever indicate to you that he was an employee of Legacy?
A. Employee. He told me he worked with Legacy. Excuse me. He told me he worked with BioLab. And then when he started working with Legacy, he said he was working with Legacy.
Q. So it was your understanding that -- or I guess is it your understanding that as a distributor,

Page 60

Mr. Logwood through Apex, was not employed directly by Legacy?
A. It was my understanding he was employed by Legacy.
Q. So do you believe that all distributors who operate under a separate entity such as Apex, are employed by the manufacturer distributor of those products?
MR. SHELOWITZ: Object to form.
THE DEPONENT: Yes.
BY MR. ESPOSITO:
Q. Do you have any records in this case that show he was employed directly by Legacy?
A. No.
Q. Do you have any records that indicate he has any authority to buy Legacy --
MR. SHELOWITZ: Object to form. Calls for legal conclusion.
THE DEPONENT: Records no.
BY MR. ESPOSITO:
Q. Then when you say records now, what do you think you have?
A. Verbal conversation. I mean he is the one who brought the product. He is the one that paid for the product. I paid him. He paid Legacy. In the

Page 61

beginning, everything went through Rick. All the contracts. Everything went through Rick Logwood.
Q. So how frequently did you interact with him?
A. In the beginning frequently. Then I didn't really need to a whole lot for a while. And then towards the end, more frequently.
Q. So how often do you think you guys communicated?
A. In the beginning weekly. The end monthly.
Q. And were those communications telephonically? In person?
A. Talked. We talked. We spoke.
Q. Were there ever -- was there ever any text communication, or e-mail communication between you guys?
A. I didn't text him. They were a few e-mails.
Q. Was there a reason you didn't text him?
A. No. He is not my friend. I didn't text him.
Q. So your relationship with him was strictly professional?
A. Yes.
Q. And strictly with regard to graft products?
A. No.
Q. What other products?
A. He also brought Ultra Mist to my company. He taught me how to use it. Did the education. And was



Page 62

the distributor for Sanuwave. So.

Q. So was it your understanding that he also worked -- was an employee of that entity?

A. A distributor. Yes. He worked for them. Spoke for them. Ordered through them. Yes.

Q. So you think he was a W-2 of them in addition to Legacy?

A. I am sorry. Could you repeat that?

Q. Is it your position that Rick was a W-2 employee of that entity, and Legacy at the same time?

A. I can't answer that. I don't know they paid him.

Q. Did he ever represent to you that he was an employee of those two entities?

A. He represented that he represented those two entities. Yes.

Q. So I guess really what is your understanding of his role, or position, or involvement, with Legacy then?

A. Now? Is that what you are asking?

Q. At that point in time, when you guys first starting addressing, or discussing, Legacy products?

A. Rick Logwood was a representative at Legacy Consultant.

Q. Did you do any kind of independent due

Page 63

diligence to confirm his representation of Legacy?

A. No. No.

Q. Why not?

A. He was a doctor that I was being educated on. Trusted. He had their products. I didn't figure he would have their products if he wasn't working with them.

Q. Did you speak with anybody directly at Legacy?

A. Eventually yes.

Q. Okay. So eventually when?

A. I don't know the dates.

Q. Are you able to determine those dates?

A. I don't know exactly when it started, but it was Brian Rowan, and it was when clawback's and audits started. And Rick reached out to Brian. And the three of us talked. And then it kind of went on from there. But he was always apart of Legacy's conversations.

Q. What exactly did he say his relationship was to Legacy?

A. I don't know his exact words. I am sorry.

Q. And in your communication there were no -- no written communications between the two of you. Correct?

A. No. No.

Q. Other than verbally. Did you guys meet in person usually?

Page 64

A. We have met in person. But usual no, no.

Q. How often did you guys meet in person?

A. I have only met him in person three times.

Q. Are there any records of the meetings?

A. No.

Q. Any calendar appointment entries?

A. Explain please?

Q. Do you maintain a calendar in your business?

A. Not for that. No.

Q. So there would be no records of your meetings with Rick?

A. No.

Q. Were there were any meetings conducted remotely through Zoom? Teams?

A. No.

Q. So beyond his words, there were no other documentation that you relied on to substantiate his claim that he was a representative, or employee, of Legacy?

A. Let me go back. There was a Zoom call after everything started with Brian Rowan. Rick was on. Rick Logwood was on there. A couple of other I don't know who they were. Legacy representatives. And Paul.

Q. That was after the couple of years of working with Rick?

Page 65

A. Rick.

Q. Can you describe your first interaction with Rick?

A. My first personal interaction?

Q. Sure.

A. No. I don't know how to describe it.

Q. What about your first contact with him. It was telephonic?

A. Telephonic yes.

Q. And could you explain the substance of the discussions?

A. He introduced himself. He was a medical professional. He was a doctor. He specialized in advanced wound care. Had a great product. That was now being utilized especially out west for mobile providers.

He thought it would be a great fit for our community. Especially our elderly community. Wanted me to have the information. Was going to have the information on the graft sent to me.

Q. What products was he talking about?

A. At the time he was just in general speaking about skin substitutes. I don't know that he said a name at that point.

Q. So it could have been the prior entities product?



17 (Pages 62 to 65)

Page 74

Rick Logwood?

A. Logwood.

Q. It's is our understanding it is L-O-G-W-O-O-D.

A. Okay.

Q. Yes. And it is the individual for Apex. Right?

A. Correct.

Q. Let me just double-check something really quick. Yes. So again just for the record, his name Logwood, L-O-G-W-O-O-D.

A. Okay. My pronunciation isn't always the best.

Q. No worries. So at any point in time when we were discussing Logwood, we were referring to Logwood, Rick Logwood for Apex. Correct?

A. Correct.

Q. I want to get back to our discussion a few minutes ago about Rick. You had indicated that he was a doctor. Is that correct?

A. Correct.

Q. How did you know he was a doctor?

A. He told me.

Q. Okay. Did you do any other investigation on that whatsoever?

A. On his social media. It is on his scrubs. It is on his card, I believe.

Page 75

Q. Did you look into any kind of, his accreditations at all?

A. No.

Q. So beyond the appearance that he gave you on his card, social media. You never confirmed independently whether he was a doctor or not?

A. No.

Q. Do you know whether he practiced medicine?

A. He did not.

Q. How do you know that?

A. He told me.

Q. What did he tell you?

A. He worked in research, and was a distributor. That is it.

Q. What research did he tell you he worked in?

A. He didn't.

Q. So you never kind of dove into his background further?

A. No.

Q. And If I am not mistaken, you testified you kind of did a search into him, into Rick. What did you search in particular?

A. Social media. Really that is it.

Q. And when you say social media, what do you mean?

Page 76

A. His Facebook. That is what I went on.

Q. And what did you locate, I guess, on Facebook?

A. Just some of his acquaintance. People he has done work with. It's been years. I don't recall everything.

Q. Was it the Facebook? I guess and correct me, is the only thing you located was the Facebook account?

A. Yes.

Q. And was it an individual account for him, or was it a professional account of some sort?

A. It was an individual, I believe.

Q. And did you perform any other searches on LinkedIn?

A. No.

Q. So strictly social media, though. And just to clarify again, he provided you a brochure for the Zenith product initially?

A. Yes.

Q. Did he provide any -- and you don't recall the date?

A. I don't.

Q. But it was probably in 2022?

A. Correct.

Q. And did he provide any other context, or information, beyond that as to those products, or

Page 77

Legacy?

A. The contract?

Q. Nothing. No other materials beyond that, that you recall?

A. Not that I am aware of.

Q. And you don't have any other materials somewhere that he provided you?

A. No.

Q. Have you produced all materials that he has given you in this case?

A. No.

Q. You have not produced them all?

A. I couldn't find the e-mail.

Q. What you able to locate has been produced, you are saying?

A. Correct.

Q. Okay. Is it your position, or claim, I guess that Rick made a representation to you that Legacy would waive payments for the products they sent?

A. If Medicare didn't pay, yes.

Q. How did he make that representation to you?

A. He said if the grafts are not paid by Medicare, you will not be held liable for them. Over and over and over.

Q. You are saying he said. Was that spoken?



Page 78

A. Spoken.

Q. Never written down anywhere?

A. We always spoke.

Q. So I guess the answer is no. It was never written down?

A. No.

Q. So if you were not reimbursed, you would not have to pay Legacy, is what his statements were?

A. Correct.

Q. Do you ever confirm that with anybody at Legacy?

A. The only communication I ever had from Legacy was through Rick Logwood. He was the only representation of the Legacy, first couple of years. No one from Legacy ever ever spoke to me, until issues down the road.

It was always through Rick. And then when Rick -- when there was issues, Rick was on there with them. They never said that he didn't represent them. Rick was always the person I spoke with that had anything to do with Legacy.

There was no other representation from Legacy to me. No one ever reached out from Legacy to me, other than Rick Logwood.

Q. And you never reached out to somebody at

Page 79

Legacy either?

A. No.

Q. Why was that?

A. I didn't need to. Rick was their representation.

Q. But besides his verbalization to you that he represented them. There was no other documentation, or anything provided that substantiated that claim, right, that he represented them?

A. No.

Q. You have referenced Brian Rowan?

A. Mm-hmm.

Q. Who is Brian Rowan?

A. I believe he is one of the VP's of Legacy. I know he works directly with Legacy.

Q. How do you know that?

A. Because I was on a call with him and Rick Logwood.

Q. Do you recall the date of that call?

A. No, I can find it. But no.

Q. What do you mean you can find it?

A. Well, there was two calls. One was originally with me, Rick, and Brian. And then we had the Zoom call later, which I believe is in here, the date of that one.

Q. So initially the telephone call?

Page 80

A. Yes.

Q. The second one Zoom Or?

A. Teams.

Q. Teams?

A. Yes.

Q. Why did you guys have the first -- I guess when was the date of the first call?

A. I don't recall. I don't know.

Q. 2023?

MR. SHELOWITZ: Object to form.

BY MR. ESPOSITO:

Q. Was it in 2024?

A. I don't know.

Q. How can you determine the date?

A. It was before the Zoom call. That is all I can tell you.

Q. And what was the date of the Zoom call? Do you need to look at your counterclaim?

A. Correct.

Q. Okay.

A. It is a lot of dates, and a lot of years.

Q. I understand. If you want to turn to page 7, of the counterclaim?

A. Okay.

Q. Paragraph 39, does your counterclaim indicate

Page 81

when that call was?

A. March 12. Okay. March 12, 2024.

Q. And that is Exhibit 5, that you are looking at. I am sorry. What was that date again?

A. March 12, 2024.

Q. And that was the?

A. Teams call.

Q. With. Who was present on that?

A. That was myself, Rick Logwood, Brian Rowan, Matthew Flescher (phonetic).

Q. And who is Matthew?

A. I don't know.

Q. Do you know if he was employed by Rick and Apex or Legacy?

A. I assuming Legacy, since he was on the Legacy call. I assume everyone that was on this call was Legacy.

Q. Did, do you have any e-mail correspondence with them about the call prior, to the call?

A. Not that I recall.

Q. How did you get the credential or I guess -- you know, how did you get the credentials for the call itself?

A. I guess an invite from Teams would have been sent to me.



Page 82

Q. Do you know who sent it?
A. No.
Q. Do you have the correspondence anymore?
A. No.
Q. Did you search for the correspondence?
A. I didn't.
Q. You did not search for it?
A. No.
MR. ESPOSITO: We would ask that you guys produce search for that as part of the production and produce records.
BY MR. ESPOSITO:
Q. Do you know the e-mail address of Rick?
A. I do not.
Q. What about Brian?
A. No.
Q. Or Matthew?
A. No.
Q. You testified you guys spoke before March 12, 2024. On the telephone. Correct?
A. Correct.
Q. But you are unable to recall the exact date of that conversation?
A. I don't recall.
Q. Okay. And you wouldn't have a calendar

Page 83

appointment for that?
A. No.
Q. Would you be able to confirm at all in any means whatsoever?
A. No.
Q. And who was on that call?
A. Myself, Rick Logwood, and Brian Rowan.
Q. So Matthew was not on there?
A. Not that I was told.
Q. And what was the -- I guess what brought on the call?
A. The appeals.
Q. The appeals from?
A. From Medicare.
Q. About?
A. About their grafts being experimental. And that we weren't -- we were going to get clawback all the money. Because their grafts were not approved, and experimental, for the way that they told me to use them.
Q. You are saying their grafts?
A. Legacy. I am sorry. Zenith and Impax.
Q. Okay. And what was the content of the conversation at that time?
A. At that time the content was that I was told from Brian Rowan, with Rick Logwood on there, that they

Page 84

knew that their IFU, their Information for Use, was being misinterpreted and not correct with CMS. And they had put a change in to change it. And not to worry about the clawback's, and the appeals. That it was going to be taken care of.
That we didn't do anything wrong. They had misinformation. CMS was reading it wrong, and it was going to be corrected.
Q. Now you referenced an IFU, Information for Use. Who provided that to you?
A. Legacy.
Q. Who at Legacy sent that to you?
A. It comes with the grafts.
Q. And then what necessitated the March 12, video conference?
A. I believe it was Brian, or Rick Logwood suggested I get legal counsel, to assist with the Medicare appeals, and clawback's.
Q. And who suggested that?
A. It was on a conference call. It was either Rick Logwood, or Brian Rowan. They were together. I don't know which one said it.
Q. Were there any -- are there any records of this two calls, and minutes taken? Notes?
A. No.

Page 85

Q. And what statements did Brian Rowan make on the initial call to you?
A. As far as his IFU being incorrect. And they were going to correct it with Medicare. And I had nothing to worry about.
Q. Those were directly from Brian Rowan?
A. Those were directly from yes.
Q. And did he articulate what was wrong?
A. Yes. Medicare was misinterpreting their verbiage of having to suture, and staple, the graft in place.
Q. Did he say why -- what he meant by misinterpret?
A. That their grafts were approved, and they didn't have to be sutured, or stapled, in place. And Medicare was misinterpreting their IFU. And a change had been put in to correct it.
Q. Did they provide -- were there any e-mails exchanged after these conversations with you guys?
A. No.
Q. Was anything done in writing?
A. No.
Q. About this misunderstanding in the IFU?
A. No.
Q. The misstatement?



Page 150

contingent on Medicare paying.

Brian Rowan when he said on the conversation on the phone never denied it. Never said it. Never denied it. Therefore, Rick speaking for Legacy with him, I assumed it was correct.

BY MR. ESPOSITO:

Q. But you read the agreements, right, before signing them?

A. I did.

Q. And at no point did the agreements indicate that payment of invoices were contingent upon verbally?

MR. SHELOWITZ: Object to form. Asked and answered.

BY MR. ESPOSITO:

Q. You can answer?

A. Correct.

Q. When you guys submitted your claims to Medicare. Were your claims submitted at the full invoice price that was charged by Legacy, or did you submit it at the, if you qualify for a rebate at that point?

A. So the claims are submitted at a standard rate. Anything that is submitted to Medicare, and I don't even know the reason why. But it's not the exact amount. So you always charged one and half-times the

Page 151

amount.

Medicare is going to pay what Medicare pays no matter what. The invoices originally were correct from Debbie. Well, they didn't actually have to go. You didn't have to submit your invoices. Later on the invoices were submitted incorrectly.

Q. What do you mean incorrectly?

A. The invoices that Debbie had from Legacy didn't show the discount.

Q. And is that every invoice that she had?

A. Every invoice that she produced.

Q. Is that Debbie's fault, though?

A. I can't answer to that.

Q. Did she ask Legacy for the correct invoices?

A. I can't answer --

MR. SHELOWITZ: Object to form.

BY MR. ESPOSITO:

Q. So just so I understand, when the time the claim was submitted. You are saying they were submitted at a standard rate, which is typically 1.5 times what the invoice rate is?

A. I believe so. I am not an expert, but there were submitted correctly.

Q. And Debbie would have been the one that submitted those claims. Right?

Page 152

A. Yes.

Q. And at any point in time did you -- were the rebated prices every disclosed to Medicare?

A. On appeal, yes.

Q. So then they would disclose that to MAC is what you are saying?

A. Who is MAC?

Q. The Medicare administrative contractor?

A. CMS?

Q. CMS, well --

A. Are you talking about the MAC?

Q. MAC.

A. Got you. Sorry.

Q. Sorry.

A. Honestly I would have to look back and see. There has been a lot of paperwork going back and forth.

Q. Let's go back through really quick, and walk through the ordering process again. Between July 2022 through 2024, what products did you order through Legacy?

A. Zenith and Impax.

Q. And you received Zenith and Impax shipments I guess through the entire time, or did you transition from the Zenith product to Impax at some date?

A. We went from Zenith, and then started using

Page 153

Impax.

Q. Do you recall the date around?

A. I can look, if you want me to.

Q. No, just off the top of your head?

A. I don't know off the top of my head. No.

Q. Why did you transition from the Zenith to the Impax?

A. Again, we were told that it was a superior product, and that the availability of it was going to be better, because that is what they were manufacturing.

Q. And were the products better in your view?

A. They were equal.

Q. Was there better availability?

A. We were able to get them. Yes.

Q. Who placed the orders?

A. I did.

Q. And when would you place them?

A. Once a patient was authorized and qualified.

Q. So after you got back the Apex insurance verification approval, you would then place the order?

A. Correct.

Q. How would you place the order?

A. I would call Rick, or e-mail, or Gidgette would do it. I don't know how she did it.

Q. And then at that point you would specify the

MAGNA
LEGAL SERVICES

Page 162

BY MR. ESPOSITO:

Q. And is it true that you failed to make payments in full to Legacy for products that you received from July 25, 2022 through May 17th of 2024 totaling $7,335.902.32?

MR. SHELOWITZ: Object to form.

THE DEPONENT: There is some discrepancy in that number.

BY MR. ESPOSITO:

Q. Whether there is discrepancy, or not, you failed to make those full payments, though. Correct?

A. Some of them yes.

Q. Why would that be?

A. Why was that? Because they didn't fulfill their obligation. Give me the product that they told me, and taught me how to use.

Q. Can you elaborate?

A. They being Legacy, Rick Logwood. This product was used exactly the way Rick Logwood, Legacy, told me to use this product on patients wounds. And my patients were deemed not medically necessary for it based on Legacy's IFU. So based on their IFU, I didn't get paid.

Q. But the alleged discrepancy the IFU is not the only reason that you didn't get reimbursed. Correct?

A. Oh, that is the reason I didn't get

Page 163

reimbursed.

Q. We will go through the denials in a minute. But going back to the payments. Legacy did inform you at some point in time that your payments were past due. Right?

A. Yes.

Q. And that they were demanding payment of those invoices?

A. They sent me an invoice.

Q. And did you just choose to ignore it?

A. I got representation.

Q. Did you ever remit the request of payments in full to Legacy?

A. No.

Q. Doesn't your nonpayment of those invoices directly conflict with the agreement that you signed?

MR. SHELOWITZ: Object to form.

THE DEPONENT: No. I felt that they didn't follow through on their agreement that they were giving me the appropriate product.

BY MR. ESPOSITO:

Q. It was your testimony earlier that the product -- you liked the product. The product worked. There were no issues with the product?

A. Mm-hmm.

Page 164

Q. So where in these agreements did they not comply with it?

A. The IFU is incorrect. They said they were fixing it. They didn't fix it in time to help me.

Q. But does it say anywhere in those agreements, that your payment was contingent on an IFU, or approval?

A. No.

MR. SHELOWITZ: Object to form.

BY MR. ESPOSITO:

Q. Did any of your patients ever complain about the products?

A. No.

Q. A minute ago you said that the figure that I quoted the $7,335,930.32 is wrong, or there is some discrepancies. Can you elaborate? What do you mean?

A. It's crossover between the relationship that Rick Logwood and Legacy -- when Rick quit working with Legacy, I don't know. There is some issues with payments.

Q. What do you mean issues?

A. It means all of my payments always went through Apex and Rick Logwood. When Rick quit working with Legacy, I had to start directly paying Legacy. But there was payments made to Rick and Apex that should have gone to Legacy. That Legacy never got.

Page 165

Q. So I guess lets step back for a minute. How would you pay? I guess, why would you pay Rick or Apex and not Legacy directly initially?

A. That is how the whole account with Legacy was set up. It was always through Rick Logwood and Apex from the get go.

Q. Do any of the agreements say that in there that you should pay Apex?

MR. SHELOWITZ: Object to form.

THE DEPONENT: No.

BY MR. ESPOSITO:

Q. How do you know what Apex said you were required to pay?

A. The invoice that came with the graft.

Q. Was that on an Apex letterhead, or no?

A. I would have to go back and look.

Q. So you had received that invoice. It was submitted with your claim. Let's say you got approval. And then you wait for reimbursement, and then pay Apex?

A. Correct.

Q. Did anybody at Legacy ever tell you to pay in that fashion?

A. Legacy never spoke with me except through Rick Logwood. So yes. Rick Logwood told me how to pay Legacy.

Page 206

accordance with the accepted standards of medical practice for the diagnosis, treatment, beneficiary condition, or to improve the function of the malformed body member.

Two, furnished and setting appropriate to the beneficiary's medical needs and condition. Ordered and furnished by qualified personnel. And one that meets, and does not exceed, the beneficiary medical need.

Q. Okay. Do you further understand that it must be that product such as these grafts that we are here for today. Have you to be furnished in accordance with the accepted standards and medical practice for the patient's condition by a qualified provider, such as yourself?

A. Yes.

Q. And at the time you used Legacy products, it was determined by you that each of the patients needed those grafts as medically necessary?

A. Yes.

Q. And for each patient that you used the grafts on, you documented that there were clinical indications for it. That there were prior treatments for 30 consecutive days, give or take, that failed.

And that was kind of your rational for choosing these particular products, to be used on your

Page 207

patients?

MR. SHELOWITZ: Object to form.

THE DEPONENT: Yes.

BY MR. ESPOSITO:

Q. And you have indicated that you reviewed the products IFU. Correct?

A. Yes.

Q. Which IFU -- what product did you review for the IFU? The IFU that you reviewed what product was it for?

A. Originally, Zenith and then Impax.

Q. And so you reviewed the IFU's for both of them?

A. Correct.

Q. And when you reviewed the IFU initially. Was there anything that stood out to you as being inaccurate or that wouldn't -- strike that.

Was there anything in the initial IFU reviewed for Zenith, that led you to believe that it wouldn't be applicable for your patients?

A. My first question is it says physician. So that was a concern to me. So it was questioned.

Q. And questioned to who?

A. Rick Logwood who worked with Legacy.

Q. And what was his response?

Page 208

A. Oh, that is just the lingo they used. It's any provider, it can be a Nurse Practitioner, a PA, or a doctor.

Q. What else was sent out to you? While we are doing this, I will go ahead and hand you what we will mark as 14.

(Thereupon, Plaintiff's Exhibit Number 14, was marked for identification.)

MR. SHELOWITZ: Thank you.

COURT REPORTER: Thank you.

THE DEPONENT: So originally --

BY MR. ESPOSITO:

Q. So I guess first of all, have you seen this document before?

A. Yes.

Q. And what is this document?

A. It's the Impax IFU.

Q. And where I guess to you, how did you read and interpret this initially?

A. Basically that it is for chronic wounds. It is intended to place on the wound bed and be absorbed. And what I was concerned about is because it says in here physician. But I didn't really have any other concerns at that time.

Q. Can you point to me where this physician?

Page 209

A. Under product use, the last sentence. The graft is anchored based on a physician's choice of fixation, including staples, or sutures, and surgical procedures when medically necessary.

Q. And your concern was just because that last sentence with physician's in there?

A. That was my biggest concern that I saw. Yes. I wanted to make sure it was something that Nurse Practitioners, PA's, could use.

Q. Have you ever seen a similar IFU before? Similar in the sense that it said physician's, or it could be utilized by a Nurse Practitioner provider?

A. My other one says physicians, MP's, or PA's?

Q. What other one do you mean?

A. Other products.

Q. Okay.

A. There are other products that have different IFU's.

Q. And the denials that you received for these products. Did any of them raise any issue about the fact that it said physicians only?

A. I did not. What I said was that it had to be surgically applied. And it had to be sutured, or stapled in place. That is the medical denials.

Q. And are you referring to the same sentence we



Page 210

were just reading a minute ago?

A. Same sentence.

Q. The grafts is anchored based on the physician's choice of fixation, including staples or sutures, in surgical procedures when medically necessary?

A. Yes.

Q. Do you not think that the caveat of when medically necessary means that doesn't always have to be?

A. I can't speak for CMS.

MR. SHELOWITZ: Object to the form.

BY MR. ESPOSITO:

Q. How do you interpret that?

A. How do I interpret that? It's irrelevant.

Q. I am just asking. When you initially read it?

A. I can't remember when I initially read it. But now that I have CMS denials on every single one because of that sentence. I read it as it has to be surgically placed, and sutured or stapled, based on the physician's choice.

Which originally is how these grafts were used in a surgical procedure.

Q. So you are saying is that the inaccuracy in the IFU that needed to be corrected?

Page 211

A. That is what Brian Rowan told me.

Q. And it was in that conversation with him on zoom?

A. It was on the verbal conversation first.

Q. And remind me. Was any written validation of that provided?

A. Provided to me no. We asked for it, because they said they put the correction in to Medicare. I don't have privy to that.

Q. Going up to the first paragraph, Impax Membrane. Can you read that for me really quick?

A. A human allograft tissue that is regulated as a human cell tissue and cellular tissue based products as defined by -- Impax Membrane receives written notification by the FDA's tissue reference group confirming Impax Membrane meets the criteria for the regulation solely under Section 361 of PHS Act as defined in 21 CFR, Part 1271.

Q. So in your words, what does that mean there?

MR. SHELOWITZ: Object to form.

THE DEPONENT: It means you would have to go back and read what the stipulations are here.

BY MR. ESPOSITO:

Q. So off the top of your head you are not sure?

A. Off the top of my head no.

Page 212

Q. Going down to the product use section. Doesn't that say that the Impax Membrane is intended for use of a human cell tissue, cellular tissue base product for repair, reconstruction, replacement, and or, some limitation by providing tissue in the form of scaffolding, and a partial or full thickness acute chronic wounds?

A. Correct.

Q. Is that how you utilized these products?

A. Yes.

Q. And in your utilization of the products you have good results. Right?

A. Yes.

Q. And you never had an issue with the product itself, doing and performing what it is supposed to?

A. Correct.

Q. And continuing on it said, that the graft was intended to remain on the recipient and be absorbed in the wound bed?

A. Correct.

Q. Is that how you utilize it with your patients?

A. Yes, it was.

Q. And again, never had any problem with that?

A. Correct.

Q. So where -- you said Brian Rowan said that

Page 213

this had a typographical error. And you are saying the typographical error is what again?

A. That it needed to be surgically used, and sutured or stapled into place.

Q. But doesn't it say when medically necessary. So would that then lead you to believe that it is not always the case, and has to be sutured?

MR. SHELOWITZ: Object to form.

THE DEPONENT: I can't answer that.

BY MR. ESPOSITO:

Q. You can't give your own opinion?

A. My own opinion is it says, that it is made for surgical procedures, and can be sutured or stapled, when medically necessary. Every surgical procedure doesn't have to be sutured or stapled. But it can still be a surgical procedure.

Q. Where does it say used for surgical procedures only, though?

A. Sutured and surgical procedures.

MR. SHELOWITZ: Object to form.

THE DEPONENT: Right before. It says when medically necessary.

BY MR. ESPOSITO:

Q. But doesn't it say that it is used as a human cell tissue in the first sentence, though?



MAGNA
LEGAL SERVICES

Page 234

Q. Gonzalez did?

A. Yes. It's a physician at the VA.

Q. And what is the status of this claim?

A. It just got dismissed.

Q. And you are saying -- did you say that this patient doesn't involve Legacy product?

A. It does involve a Legacy product, but I paid them back to Medicare. And this isn't part of the dispute. There is a separate case.

Q. And how do you know that, though?

A. How do I know that?

Q. Yes?

A. Well, because should we have gotten paid on it? Yes. But with the Complaint we just paid Medicare back and let it go. Because I am not going to go spend a ton of money disputing this son, for no reason.

We could have won it. He was ridiculous. And got fired from every other medical provider in town. So.

Q. Did anybody ever respond to this e-mail?

A. I don't know. I am sure. It could have been a phone call. There is nothing on here. Obviously it wasn't part of this thread.

Q. Does any thing in here involve payment to Legacy at all?

Page 235

A. No.

Q. Did they respond back, and tell you not to pay any portion of this?

A. No. This had to deal with Blue Cross and insurance. Not Legacy.

Q. But it was a Legacy product, though. Right?

A. I would have to look. But I assuming April 24. Yes.

Q. So it's safe to say that you actually paid for that product then to Legacy?

A. I believe so.

Q. And are these the only e-mail communications that you have had with them that you are able to locate?

A. I provided what I had.

Q. So was that a yes. These are the only ones you could locate?

A. At the time being yes.

Q. So your counterclaim states, that you notified Legacy of these denials. And there's clawback's. And then Legacy encouraged you to retain counsel. Correct?

A. Eventually yes.

Q. What do you mean eventually?

A. Well, on the first call I was told not to worry about it. That they were fixing the IFU. They had already put in for a correction of the IFU. And I

Page 236

can resubmit everything. And it wouldn't be denied for medical purposes. They knew that their IFU was incorrect.

Then, when that didn't happen, and I kept getting more, and more, and my bank got frozen. I went back. They said you need to get legal counsel. So then I got legal counsel.

Q. Can you identify every clawback that you claim was involved in this lawsuit?

A. Off the top of my head, no. It's all in writing.

Q. Do you have documentation though, for every one?

A. Yes.

Q. Have you guys produced documentation for every clawback? Because I don't believe so?

A. I don't know. Because it's an ongoing issue. So.

Q. What do you mean, it's an ongoing issue?

A. Well, Medicare does it and we have the first audit. And then we have the second audit. So it's been done in different stages of it, this process of having this lawsuit.

MR. ESPOSITO: So first I would say that we would make a request for these denial.

Page 237

MR. BASILE: The denials and the charge backs are separated.

MR. ESPOSITO: I understand.

THE DEPONENT: Yes.

MR. ESPOSITO: And the clawback's.

MR. BASILE: They do that cumulatively too.

MR. ESPOSITO: Yes.

BY MR. ESPOSITO:

Q. You said that you are at different stages. So that leads me believe, obviously you filed appeals. Right? Like you said?

A. Correct.

Q. How many appeals have you filed?

A. Multiple.

Q. Can you give a guesstimate?

A. 7 million dollars worth. No, I don't have a number.

Q. A significant amount of money?

A. Significant amount.

Q. I am just wondering, do you have any idea, or understanding of how many that was.

And who is handling those appeals?

A. Daniel, is it Welcher.

MR. BASILE: Andrew Wachler (phonetic.)

THE DEPONENT: Andrew Wachler. I call him

MAGNA
LEGAL SERVICES

Page 238

Welcher.

BY MR. ESPOSITO:

Q. And who is he?

A. He is an attorney.

Q. And where are, where are you in that process for those appeals?

A. Multiple different stages.

Q. How many of those have been approved? How many of them have you won?

A. I have not.

Q. You haven't won a single one?

A. Correct. Because they are all medically -- I will never win it.

Q. So they have come back every single appeal so far, and denied?

A. Correct. My patients were never medically --

Q. So then you have gotten some ALJ instances?

A. We had one ALJ hearing, and it got kicked back to the U-PIC.

Q. For what purpose?

A. The U-PIC made a mistake, so it went back to the U-PIC.

Q. What is that? What is the status of that one?

A. They still have it.

Q. And what was the -- what was the mistake they

Page 239

made?

A. I will be honest with you, I don't completely understand all the legal lingo of it. One area of it the ALJ said they didn't look at. So, therefore there was nothing appealed. So they sent it back to them. That is my understanding any way.

Q. So that one is still ongoing?

A. Correct.

MR. ESPOSITO: This will be 18.

(Thereupon, Plaintiff's Exhibit Number 18 was marked for identification also marked Confidential.)

BY MR. ESPOSITO:

Q. Do you recognize this document?

A. I am sure I do. Yes. It's one of many.

Q. Okay. What is this document?

A. This one is the appeals decision on November 14th.

Q. Of what year?

A. 2023. The service date is September 20, 2022.

MR. SHELOWITZ: Before we keep going, I am going to -- even though we had this confidentiality order. Being exchanged I am sure it will be entered. This needs to be marked as 21confidential. It discloses the patient's name,

Page 240

so does this part of the transcript.

MR. ESPOSITO: You want to mark it on there now or?

MR. SHELOWITZ: Yes. I will just write confidential on the top. So it's clear. And then just for the record, any testimony related to this just need to be deemed confidential.

MR. ESPOSITO: Sure.

MR. SHELOWITZ: Because the patient's name is inadvertently disclosed. So we will have to do some sort of redaction, and clawback in reproduction. I wasn't aware of that until this was produced.

COURT REPORTER: So do you keep this or?

MR. SHELOWITZ: No. You can keep it. But just want to make sure it's marked accordingly, and that the transcript is marked accordingly. Just to protect everyone's HIPAA rights.

COURT REPORTER: Okay.

BY MR. ESPOSITO:

Q. Looking at the bottom of the document, it does bear a stamp of Leeberg0001595 on it?

A. Yes.

Q. Was part of your production that was provided. Right?

Page 241

A. Right.

Q. And what is your understanding of this document? What does it say?

A. Basically my understanding is, it was denied because it was noncovered services. Because it was not deemed medically necessary by the payer. This was a Zenith graft.

Q. And how do you know it was a Zenith Graft?

A. Because it says right here.

Q. Where is right here?

A. Under decision. I am pretty sure that is where it says it. Yes, Zenith Graft Amniotic Membrane.

Q. So you are talking about the second to last sentence?

A. Correct.

Q. Now going back to the explanation of decision. Can you walk me through that. What does it say at the beginning?

A. The documentation received?

Q. Yes?

A. With the appeal request provided by Unified Program, the U-PIC, was reviewed by a clinician, and was determined insufficient to support the residents visit for established patient moderate level medical decision, per day, with the CPT code.

MAGNA
LEGAL SERVICES

Page 242

Removal of the skin tissue 20 square centimeters. How far do you want me to read it?

Q. Go down to the last part of that sentence, and it says that it was insufficient to support the use of the Zenith Amniotic Membrane?

A. Correct. Just because we didn't suture or staple it in place.

Q. Where does it say that?

A. On this particular one I would have to read through all of it and see. But that is what they deemed it medically -- let me see. I am looking for it.

MR. SHELOWITZ: Take your time, Cristi.

THE DEPONENT: I will. Okay. The Zenith amniotic membrane was placed as a covering, and was not anchored surgically to the wound to support the billing of Zenith Amniotic Membrane per square centimeter.

Right there. That is where it says it. Did you find it?

BY MR. ESPOSITO:

Q. Oh, I found it. I am familiar -- aware of this. Where does it say that the IFU is inaccurate, though?

A. Right there. It is saying that I didn't use the Zenith Graft appropriately. Because I didn't

Page 243

surgically place it.

Q. Does it not say the documentation received for the appeal is insufficient?

A. I couldn't say that I surgically placed it, and anchored it, if I didn't. So my documentation is, you are correct. It did not say that I did that. Because I didn't use it that way. But the Zenith Graft has to be used that way to be deemed medically necessary.

Q. As billed. It doesn't say that it has to be that way, though. Right?

A. You have to use it that way and bill it that way.

Q. Where does that say that, though?

A. Right here.

Q. It says you can bill that way. How you billed it. The documentation provided with the billing codes. Right?

A. I think you are confused on it.

Q. No, I am not.

A. You are, because the amniotic cells, according to the Zenith IFU. Have to be surgically anchored. Of course my documentation did not say that. Because that is not how I used it.

I used it, as a wound covering to absorb into

Page 244

the wound. So it was deemed not medically necessary because Zenith Graft you have to surgically anchor.

I can't write our document I surgically anchored something I didn't. That would be fraud.

Q. Now as a provider, is it not you are the one that deems it medically necessary. Right?

A. Correct.

Q. And as the provider, you should determine whether it has to be anchored or not. Right?

MR. SHELOWITZ: Object to form. You can answer.

THE DEPONENT: Yes.

BY MR. ESPOSITO:

Q. And who completed the documentation for this claim?

A. I would have to look to answer that.

Q. Would it not be somebody at your business?

A. It was either me or Robert Johnson.

Q. And at any point in time, was Legacy instructing you not to anchor these?

A. I was taught by Rick Logwood via Legacy, these were ment to be placed on the wound and absorbed. You do not have to surgically apply them, or anchor with them sutures or staples. That is not how they were meant to me.

Page 245

Q. But my question was, did anybody at Legacy specifically tell you this?

A. Yes, Rick.

Q. Rick Logwood?

A. Rick Logwood, Legacy. On all of my Legacy documents. Yes.

Q. Which it is your testimony he is with Apex though, right?

MR. SHELOWITZ: Object to form. Asked and answered. Argumentative.

THE DEPONENT: Working for Legacy. Yes.

BY MR. ESPOSITO:

Q. Going down to the last, on that first page, second to this section sentence. No payment was made under Part A or B of an expense -- expenses incurred for items, or services, which except for items, and services, described in a succeeding subparagraph, are not reasonable and necessary for a diagnosis, or treatment of illness, or injury, or to improve the functionality, or malformed body member.

Therefore, the service cannot be approved?

MR. SHELOWITZ: I am sorry. Let me just step in just for a second. Because I think you are interpreting a comma as a sentence. And it is quoting a section. Do you see that. Before it

Page 278

not the suture and staple. But you have to remember CMS changes their verbiage on how to use these grafts about every three months. That is why there is so many contracts also. They change the contract for you every time CMS changes their verbiage.

Q. In your counterclaim, you are obviously seeking damages. Are those damages not because your loss in reimbursements, and legal fees, that were incurred after the bulk of the appeals?

MR. SHELOWITZ: Object to form.

THE DEPONENT: And all of my expenses, materials. Yes.

BY MR. ESPOSITO:

Q. But those damages are not the result of defective product, though. Right?

MR. SHELOWITZ: Object to form.

THE DEPONENT: Just the incorrect IFU. Correct.

BY MR. ESPOSITO:

Q. And you are unable to identify any patient harm, or any kind of clinical complication, that was caused by these products?

A. By the products, no.

Q. Do you know if you guys produced all records of orders, any receipts, usage of payment, in response

Page 279

to discovery?

A. I produced everything I have had. Yes.

MR. SHELOWITZ: So subject to your latest requests.

MR. ESPOSITO: Yes.

BY MR. ESPOSITO:

Q. So you are not aware of any remaining documents that are outstanding, that haven't been produced. Besides what we have spoke about today?

A. Not that I am aware of.

Q. So there is no ongoing efforts, up until this point, to continue searching for records?

A. Other than what you have asked me for, no.

MR. SHELOWITZ: And what has been asked for recently over e-mail.

MR. ESPOSITO: Yes. Okay.

BY MR. ESPOSITO:

Q. Would you be willing to provide any kind of written authorization for Legacy to obtain records. The records from banks, or insurers, or third parties, if you are unable to produce them?

A. No.

Q. For any invoice that is outstanding, is there any information that you wish to explain, or clarify, at this point in time?

Page 280

MR. SHELOWITZ: Object to form.

THE DEPONENT: No.

BY MR. SHELOWITZ:

Q. Are you aware that Legacy has objected to your lack of production of these records multiple times?

A. Am I aware they objected?

Q. Yes?

A. To my what?

Q. Lack of production?

A. Yes, I guess. There is a lot of legal verbiage that I don't understand. I am a very clinician, but I am not a good business person. And I am not an attorney.

Q. Are you aware of any other third party that may have any records involving this case?

A. Outside of my biller, no. My old biller, no.

Q. What about Petrillo?

A. I doubt if he has anything.

Q. Twenty-won that is his entity?

A. Twenty-won with the e-mails that you have, that he is on with Rick he probably has.

Q. So really Deb, Logwood, Nick, is what you are saying. Nobody else?

A. No. Debbie, Debbie Barnes.

Q. Yes?

Page 281

A. Mainly Rick, and Debbie Barnes, and Brian Fitzpatrick.

Q. Is there any documents that exists, that show Legacy that you haven't produced. That show Legacy consented the payments being routed to Apex or Logwood?

A. I don't know what that means?

Q. Do you have any documents that Legacy said you paid Logwood or Apex versus them?

A. My whole communication for the first two years was all through Rick Logwood. Not Legacy. So everything went through Rick.

Q. At any time did you ever communicate to Legacy that you didn't understand the terms of any of these agreements?

A. I never had any communication with anyone other than Rick Logwood with Legacy. And again, when I didn't understand. He verbally told me the same thing over and over again.

Don't worry about it. Don't worry about it. This is the way it is. This is the way the organization runs. If you don't get paid, you are not going to be liable for it.

Q. Beyond Logwood, though? No?

MR. SHELOWITZ: Object to form. Asked and answered.

MAGNA
LEGAL SERVICES

Appx_0016

Page 282

BY MR. ESPOSITO:

Q. Other than the call with Rowan?

A. With Rowan that he assured me that they were going to fix their IFU, and I shouldn't worry about it.

Q. Did you ever request any kind of clarification of any of their contract provisions, or about payment, IVR rebate terms?

MR. SHELOWITZ: Object to form. Asked and answered.

THE DEPONENT: Requested them to show me produce what they sent to Medicare. Changing their IFU. Acknowledging that they were incorrect.

BY MR. ESPOSITO:

Q. Are you alleging that there is any -- that any of the agreements, Onboarding documents, the signatures, Docu Sign signatures. Invoices, wire instructions, or e-mails, were forged, or fraudulent in any regard?

MR. SHELOWITZ: Object to form.

THE DEPONENT: No.

BY MR. ESPOSITO:

Q. Are you claiming you were induced at all into signing any of these agreements?

MR. SHELOWITZ: Object to form.

THE DEPONENT: No.

BY MR. SHELOWITZ:

Page 283

Q. Are you claiming that you were induced into signing any of these agreements?

A. No.

MR. SHELOWITZ: Object to form.

BY MR. ESPOSITO:

Q. You have claimed for misrepresentation. What were those misrepresentations?

MR. SHELOWITZ: Object to form.

THE DEPONENT: Basically they instructed me how to use their product. Exactly how to document the product. How to bill the product. And then the product was denied based on their IFU. So they gave me incorrect information. Misrepresentation of how to use these grafts.

BY MR. ESPOSITO:

Q. Did you receive any kind of legal advice about, the validity, or the enforceability, of these agreements?

MR. SHELOWITZ: Object to form. Answer whether you received the legal advice. Not what the legal advice was.

THE DEPONENT: Back when I signed them?

BY MR. ESPOSITO:

Q. Yes. At the time you signed them?

A. No.

Page 284

Q. What about at any point?

A. Yes.

Q. So despite your misunderstanding I guess, about the misrepresentation excuse me. Strike that. I am sorry.

Despite the alleged misrepresentation about the use of the products. Did you continue to order them after the fact?

MR. SHELOWITZ: Object to the form.

THE DEPONENT: Once I knew the IFU was wrong for a very short time. Because I was in the middle of taking care of some patients.

BY MR. ESPOSITO:

Q. When you say short time, how long do you think?

A. I don't know. I would have to look. I don't know.

Q. So just lastly, do you affirm that all your answers today were truthful, and to the best of your knowledge?

A. Yes.

Q. Do you understand that failure to provide these complete, and truthful answers, or to produce all responsive documents, may affect the Court's assessments of this case, and the claims and defenses in it?

Page 285

A. Yes.

Q. And lastly, is there anything you wish to add regarding Legacy, or your dealings with them?

A. No.

MR. ESPOSITO: That is all I have.

MR. SHELOWITZ: I have a quick redirect.

CROSS EXAMINATION

BY MR. SHELOWITZ:

Q. Ms. Leeberg, do you remember going through -- I am sorry. Ms. Leeberg, do you remember going through the contracts with Mike today?

A. Yes.

Q. Can you look at Exhibit 6, because that is one of the contracts. It's the one dated July 22, 2025. I am just going to make it easy for you?

A. Okay. I got it here.

Q. You got it. Here I got it. Here use this. This is marked. All right. And can you turn to the second page of the contract.

Do you see paragraph 2, insurance verification?

A. Yes.

Q. Remember Mike was asking you about these insurance, Legacy's Medical Consultants Insurance Verification or Request Forms.

MAGNA
LEGAL SERVICES

Page 286

And whether you had submitted any?

A. Right.

Q. Do you remember talking about that.

And do you remember what your testimony was about that?

A. Yes. That I submitted them through Apex.

Q. Right. Do you remember whether those forms were labelled with Legacy's marks, or Apex's marks.

Do you remember that?

A. I don't remember.

Q. I will mark this as. I think we are on Exhibit 26.

(Thereupon, Plaintiff' Exhibit Number 26, was marked for identification.)

BY MR. SHELOWITZ:

Q. Have you seen this document before?

A. Yes.

Q. What is this document?

A. The Insurance Verification Form Apex Medical.

Q. Per the record, I don't know why it didn't print. But this was marked Leeberg1751 for whatever reason on the printout. Just for the record.

MR. SHELOWITZ: So you can see, Mike. I had my assistant print the PDF, but it's marked. I just don't know why this version isn't. Leeberg

Page 287

all the zeros 1751.

BY MR. ESPOSITO:

Q. What is this form, Ms. Leeberg?

A. This is the entrance verification form, or as they call it the IVR.

Q. And is this what you submitted to Apex, when you were seeking to procure Legacy's products?

A. Yes.

Q. Okay. And do you recognize -- I am sorry. We are going to mark this document confidential, because it has the patients name. And also this portion of the transcript is confidential.

BY MR. SHELOWITZ:

Q. With respect to this particular patient. Do you recognize that name?

A. Yes.

Q. Okay. Do you recall whether, or not, this patient was treated for wound care with Legacy's products?

A. She was.

Q. When you submitted this form to Apex, do you recall whether, or not, you received a Zenith membrane skin cell skin graft product from Legacy?

A. Yes.

Q. Okay. So even though you submitted an Apex

Page 288

form to Apex. Is it your understanding that Apex then provided that form to Legacy?

A. Yes.

Q. Okay. And is it your understanding that after Apex provided that form to Legacy. That Legacy then furnished you with its products?

A. Yes.

MR. SHELOWITZ: Okay. I have no further questions.

MR. ESPOSITO: No redirect.

MR. SHELOWITZ: No redirect.

MR. ESPOSITO: No.

MR. SHELOWITZ: Ms. Leeberg will read, and we are going to order.

COURT REPORTER: Do you need a copy?

MR. ESPOSITO: Yes.

(Thereupon, the deposition concluded.)

Page 289

CERTIFICATE OF OATH

STATE OF FLORIDA         )

COUNTY OF MIAMI-DADE       )

I, NIALANI JACKSON, Court Reporter and Notary Public, State of Florida, certify that, CRISTI LEEBERG, appeared via Zoom on the 5th day of December, 2025, and was duly sworn. Signed this 17th day of December, 2025.

Nialani A. Jackson
Commission No. HH440069
Expiration date is 9/4/2027.
State of Florida at Large

