**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** | § § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** | § § § | |
| *Defendant.* | § § | **Cause No. 4:25-cv-00319-P** |
| and | § | |
| **CRISTI LEEBERG D/B/A PRACTITIONERS IN MOTION, PLLC,** | § § § | |
| *Counter-Plaintiff,* | § § | |
| v. | § § | |
| **LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC,** | § § § § | |
| *Counter- Defendant.* | § | |

---

**LEGACY MEDICAL CONSULTANTS' REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

---

<u>**TABLE OF CONTENTS**</u>

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     ADDITIONAL SUMMARY JUDGMENT EVIDENCE ................................................. 2

III.    ARGUMENT .................................................................................................................. 2

      A.   LEEBERG'S RELIANCE UPON EXHIBIT J IN SUPPORT OF
          "DISPUTED FACTS" 12–17 IS PROCEDURALLY IMPROPER AND
          LEGALLY INSUFFICIENT TO DEFEAT SUMMARY JUDGMENT ............... 2

      B.   LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON ITS
          BREACH OF CONTRACT CLAIM (COUNT I) BECAUSE VALID
          CONTRACTS EXISTED, LEGACY PERFORMED, DEFENDANT
          BREACHED, LEGACY SUSTAINED DAMAGES, DEFENDANT
          NEVER PLEAD CONTRACT MODIFICATION AS AN
          AFFIRMATIVE DEFENSE, AND—EVEN IF SHE HAD—NO
          MATERIAL ISSUES OF FACT REMAIN AND SUCH DEFENSE
          FAILS AS A MATTER OF LAW ......................................................................... 3

          1.   Defendant Cannot Defeat Summary Judgment by Asserting an
               Affirmative Defense She Never Plead ....................................................... 4

          2.   Even if She is Not Precluded from Asserting This Defense, it Fails
               as a Matter of Law Because Logwood Lacked the Authority to
               Bind Legacy, No Material Issues of Fact Remain, and the Defense
               is Barred by the Statute of Frauds, the UCC, or Both ................................ 5

      C.   LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON
          DEFENDANT'S CLAIMS FOR BREACH OF CONTRACT BECAUSE
          LEGACY DID NOT BREACH ANY OF THE AGREEMENTS AND
          DEFENDANT CANNOT DEMONSTRATE CAUSATION AS A
          MATTER OF LAW ........................................................................................... 10

          1.   Legacy Did Not Breach Any of the Agreements ..................................... 10

          2.   Defendant Cannot Demonstrate Causation as a Matter of Law ............... 14

      D.   LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON
          DEFENDANT'S FRAUDULENT MISREPRESENTATION
          COUNTERCLAIM AT COUNT IV, BECAUSE DEFENDANT
          CANNOT ESTABLISH THE REQUISITE SCIENTER ELEMENT AS A
          MATTER OF LAW AND NO GENUINE ISSUES OF FACT REMAIN ......... 15

      E.   LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON BOTH OF
          DEFENDANT'S FRAUDULENT MISREPRESENTATION CLAIMS
          (COUNTS IV AND V), BECAUSE DEFENDANT CANNOT
          ESTABLISH JUSTIFIABLE RELIANCE AS A MATTER OF LAW
          AND NO GENUINE ISSUES OF MATERIAL FACT REMAIN ..................... 18

i

F.    THE ECONOMIC LOSS DOCTRINE PREVENTS DEFENDANT
FROM BRINGING COUNTERCLAIM V ............................................................ 22

G.    LEGACY IS ENTITLED TO ATTORNEYS' FEES ........................................... 23

IV.    CONCLUSION ................................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AHBP LLC v. Lynd Co.*,
    649 F.Supp.3d 371 (W.D. Tex. 2023) ..................................................................................16

*Atl. Richfield Co. v. ANR Pipeline Co.*,
    768 S.W.2d 777 (Tex. App.–Houston [14th Dist.] 1989, no writ) .........................................10

*Baptist Mem. Hosp. Sys. v. Sampson*,
    969 S.W.2d 945 (Tex. 1998) ..................................................................................................16

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
    590 S.W.3d 471 (Tex. 2019) .............................................................................................18-21

*Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*,
    525 S.W.3d 671 (Tex. 2017) ....................................................................................................5

*Coffey v. Fort Wayne Pools, Inc.*,
    24 F.Supp.2d 671 (N.D. Tex. 1998) .....................................................................................5-6

*Endurance Am. Ins. Co. v. Lloyd's Syndicate 3624*,
    No. 3:23-CV-0133-B, 2024 WL 3625671 (N.D. Tex. Jul. 31, 2024) .......................................4

*Fluorine on Call Ltd. v. Fluorogas Ltd.*,
    380 F.3d 849 (5th Cir. 2004) .................................................................................................16

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*,
    Inc., 960 S.W.2d 41, 46 (Tex. 1998) .................................................................................22-23

*Frost Nat'l Bank v. L & F Distribs., Ltd.*,
    165 S.W.3d 310 (Tex.2005) (per curiam) ...............................................................................9

*Gaines v. Kelly*,
    235 S.W.3d 179 (Tex. 2007) ....................................................................................................6

*Givens v. Dougherty*,
    671 S.W.2d 877 .....................................................................................................................10

*Grp. Hosp. Servs., Inc. v. One & Two Brookriver Ctr.*,
    704 S.W.2d 886 (Tex. App.–Dallas 1986, no writ) .................................................................9

*Haase v. Glazner*,
    62 S.W.3d 795 (Tex. 2001) ......................................................................................................9

*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*,
    295 S.W.3d 650 (Tex. 2009)..............................................................................23

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
    341 S.W.3d 323 (Tex. 2011)..............................................................................20

*James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*,
    198 S.W.3d 434 (Tex. App.–Dallas 2006, no pet.)...........................................10

*Jenkins v. City of San Antonio Fire Dep't*,
    12 F. Supp. 3d 925 (W.D. Tex. 2014), *aff'd*, 784 F.3d 263 (5th Cir. 2015)............................3

*JPMorgan Chase Bank, N.A. v. Orca Assets, G.P., LLC*,
    546 S.W.3d 648 (Tex. 2018).....................................................................18, 19, 20

*L. Off. of Andrew L. Jones, P.C. v. Schachar*,
    2020 WL 633677 (Tex. App. Feb. 11, 2020)......................................................9

*Miller v. CitiMortgage*,
    LLC, 970 F.Supp.2d 568 (N.D. Tex. 2013)........................................................22

*Nat'l Advert. Co. v. Brown*,
    894 S.W.2d 785 (Tex. App.–Tyler [12th Dist.] 1994).......................................5-6

*Nat'l Prop. Holdings, L.P. v. Westergren*,
    453 S.W.3d 419 (Tex. 2015)..........................................................................18-21

*Overseas Carriers, Inc. v. Team Ocean Servs.-Dallas, Inc.*,
    No. H-10-2842, 2013 WL 76300 (S.D. Tex. Jan. 4, 2013)..................................7

*Procter & Gamble Co. v. Amway Corp.*,
    242 F.3d 539 (5th Cir. 2001) ............................................................................15

*Ramaker v. Abbe*,
    No. 03-10-00713-CV, 2013 WL 3791491 (Tex. App.–Austin Jul. 18, 2013).........................4

*Roberts v. City of Shreveport*,
    397 F.3d 287 (5th Cir. 2005) .......................................................................3, 10

*Sw. Pipe Servs., Inc. v. Kinder Morgan, Inc.*,
    No. 14–09–00601–CV, 2010 WL 2649950 (Tex. App.-Houston [14th Dist.]
    July 6, 2010, no pet.)..........................................................................................9

*Tex. Cap. Bank, N.A. v. Ameriprise Fin. Servs., Inc.*,
    No. 3:08-CV-1186-N, 2011 WL 6189494 (N.D. Tex. May 20, 2011).................5

*Thomas Reg'l Directory Co., Inc. v. Dragon Prods., Ltd.*,
    196 S.W.3d 424 (Tex. App.–Beaumont 2006) ...................................................................8

*United Residential Props., L.P. v. Theis*,
    378 S.W.3d 552 (Tex. App.—Houston [14th Dist.] 2012)....................................................16

**Statutes**

PHS Act Section 361 ...........................................................................................................12

Texas Civil Practice and Remedies Code Section 38.001 ..................................................23

UCC ...........................................................................................................................4-5, 8-9

**Other Authorities**

21 CFR
    Part 1271 ...........................................................................................................................12
    § 1271.3(c) .......................................................................................................................12
    § 1271.10..........................................................................................................................12

Federal Rule of Evidence 801(c) ..........................................................................................3

Tex. R. Civ. P. 94..................................................................................................................4

## I.    INTRODUCTION

In this straightforward breach of contract case, Defendant Cristi Leeberg tries to obscure the core facts through meritless counterclaims and procedurally foreclosed defenses. The undisputed facts are simple: Legacy provided amniotic allografts to Defendant pursuant to five separate written Agreements; Defendant failed to pay for those products; and Legacy is now owed at least $7.3 million as a result.

Rather than contest these core facts, Defendant has erected an elaborate fiction. She claims that Rick Logwood—an independent sales representative, who she knew ran his own distributor business, communicated via his own company's email domain, and served multiple suppliers—somehow had the authority to guarantee her that she would never have to pay Legacy if Medicare denied reimbursement for the grafts she used on her patients. But Defendant never pleaded this contract modification defense in her answer, and even if she had, it fails as a matter of law. Logwood lacked actual authority to bind Legacy—a point the parties agree upon—and Defendant cannot manufacture apparent authority from the mere fact Legacy's invoices identified Logwood as a "Sales Rep" or that Legacy copied him on various emails.

Defendant's counterclaims are equally unavailing. Her breach of contract claims rest on the baseless assertion that Legacy's products were "non-conforming"—yet the IFUs and FDA approvals confirm the products performed exactly as intended, and she concedes the products "worked" for her patients. Her fraud claims flounder on the essential elements of scienter and justifiable reliance. Defendant has produced no evidence that Logwood knew his alleged "guarantee" was false when he made it, and Legacy itself was unaware of any such representation until this litigation began. Moreover, Defendant cannot establish justifiable reliance on oral

assurances that directly contradict the Agreements' unambiguous payment terms—terms she admits she read before signing five times over two years.

The contemporaneous evidence confirms what the law requires: Defendant understood her payment obligations. In emails Defendant withheld and that Legacy subpoenaed, Defendant acknowledged owing Legacy money, disputed only amounts, and offered to "eat the cost" on certain items—hardly the conduct of someone who believed she had an ironclad guarantee against collection.

For these reasons, Legacy is entitled to summary judgment on its breach of contract claim, dismissal of Defendant's counterclaims, and an award of attorneys' fees.

## II.    ADDITIONAL SUMMARY JUDGMENT EVIDENCE

In further support of this Motion, Plaintiff attaches the following additional evidence as outlined below, which is contained within the Appendix and which Plaintiff incorporates by reference as if fully set forth herein:

**Additional Summary Judgment Evidence**

**Exhibit 17:** Email dated January 12, 2023 (APEX_LEEBERG_00000009) (*See* **Ex. A**).

## III.    ARGUMENT

### A.    LEEBERG'S RELIANCE UPON EXHIBIT J IN SUPPORT OF "DISPUTED FACTS" 12–17 IS PROCEDURALLY IMPROPER AND LEGALLY INSUFFICIENT TO DEFEAT SUMMARY JUDGMENT

Defendant's reliance upon Exhibit J—a New York Times article dated April 10, 2025, entitled "Medicare Bleeds Billions on Pricey Bandages, and Doctors Get a Cut"—in support of "disputed facts" 12–17 is procedurally improper and legally insufficient to defeat summary judgment. Def. Resp. (Doc. 51), ¶¶12–17.

It is well settled that a party may not rely on inadmissible hearsay in opposing a motion for summary judgment. *Jenkins v. City of San Antonio Fire Dep't*, 12 F. Supp. 3d 925, 943 (W.D. Tex. 2014), *aff'd*, 784 F.3d 263 (5th Cir. 2015). Further, Newspaper articles are "classic, inadmissible hearsay." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005).

Exhibit J is a newspaper article authored by a third-party journalist meeting the definition of an out-of-court statement offered for the truth of the matters asserted. This is classic hearsay under Federal Rule of Evidence 801(c). Exhibit J even compounds the problem with layers of hearsay: statements from unnamed "experts," purported data "analyses" by third-party firms, and unsubstantiated allegations concerning industry practices generally. Accordingly, Exhibit J should be stricken.

> **B.    LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM (COUNT I) BECAUSE VALID CONTRACTS EXISTED, LEGACY PERFORMED, DEFENDANT BREACHED, LEGACY SUSTAINED DAMAGES, DEFENDANT NEVER PLEAD CONTRACT MODIFICATION AS AN AFFIRMATIVE DEFENSE, AND—EVEN IF SHE HAD—NO MATERIAL ISSUES OF FACT REMAIN AND SUCH DEFENSE FAILS AS A MATTER OF LAW**

While Defendant prevaricates in her Response, the reality is the following elements of Legacy's breach of contract claim are not in dispute: the Agreements were valid and executed by Leeberg; Legacy tendered performance by providing Defendant the grafts she ordered; Defendant breached by not paying Legacy for many of those grafts; and Legacy sustained damages to the tune of at least $7.3 million as a result. *See* Def. Resp. (Doc. 51), pp.7–17 (disputing only those facts which go to Defendant's claim of oral modification by Rick Logwood). The narrow issues before the Court on Legacy's breach of contract claim are: (1) whether Defendant is legally precluded from asserting contract modification when she never plead it as an Affirmative Defense; (2) if she is not precluded from asserting this defense, whether material issues of fact remain

regarding Rick Logwood's authority to orally modify Legacy's existing Agreements with Defendant; and (3) whether an extra-contractual promise can modify the clear payment terms.

### 1. Defendant Cannot Defeat Summary Judgment by Asserting an Affirmative Defense She Never Plead

In her Response, Defendant argues she may avoid payment to Legacy because Rick Logwood "guaranteed" her she would "not be obligated to pay Legacy under an invoice unless she received compensation from Medicare." Def. Resp. (Doc. 51), p.10. She further claims in her Response that the "guarantee" *preceded* the Agreements. *Id.* ("Logwood [] tendered [] pre-contractual 'no payment' guarantees to Leeberg."). Regardless of when or how often Logwood tendered these oral promises, they constitute an affirmative defense that Defendant never plead.

"Contract modification is an affirmative defense, and the parties must affirmatively plead any matter constituting an avoidance[.]" *Ramaker v. Abbe*, No. 03-10-00713-CV, 2013 WL 3791491, *6 n.3 (Tex. App.–Austin Jul. 18, 2013) (citing Tex. R. Civ. P. 94). Defendant plead eight affirmative defenses, none of which alleged that Defendant could avoid payment because of Rick Logwood's alleged verbal guarantee. *See* Def. Amend. Ans. (Doc. 20), pp.7–11. While Defendant *has* raised Logwood's "guarantee" in support of her counterclaims against Legacy, she has never asserted the promise as a reason Legacy's breach of contract claim fails. Because she has failed to plead this affirmative defense, it is forfeited, and Defendant should be precluded from relying upon it to defeat Legacy's motion for summary judgment as to its breach of contract claim (Count I). *Ramaker*, at *6 n.3; *see also Endurance Am. Ins. Co. v. Lloyd's Syndicate 3624*, No. 3:23-CV-0133-B, 2024 WL 3625671, *7 (N.D. Tex. Jul. 31, 2024) ("An affirmative defense not raised in the pleadings is ordinarily deemed waived.").

2. **Even if She is Not Precluded from Asserting This Defense, it Fails as a Matter of Law Because Logwood Lacked the Authority to Bind Legacy, No Material Issues of Fact Remain, and the Defense is Barred by the Statute of Frauds, the UCC, or Both**

(i)    Logwood had no authority

The parties agree that Logwood lacked <u>actual</u> authority to bind Legacy—this is not in dispute—but Defendant argues in her Response that "Logwood possessed <u>apparent</u> authority to bind Legacy." Def. Resp. (Doc. 51), p.10. Not so. In Texas, apparent authority is created by the words or conduct *by the principal* to the third party. *See Coffey v. Fort Wayne Pools, Inc.*, 24 F.Supp.2d 671, 681–82 (N.D. Tex. 1998); *Nat'l Advert. Co. v. Brown*, 894 S.W.2d 785, 787 (Tex. App.–Tyler [12th Dist.] 1994). Defendant argues Legacy took the following actions to create Logwood's apparent authority: (1) Legacy identified him as its "Sales Rep" on each of its invoices; (2) Legacy copied Logwood within email communications it sent to Defendant; and (3) he was referenced as a "Distributor" on the Customer Onboarding Forms. *See* Def. Resp. (Doc. 51), p.13. Defendant argues this creates a material issue of fact as to whether Logwood possessed apparent authority and cites *Ameriprise* in support—**Defendant is wrong.**

First, Defendant's use of *Ameriprise* is misleading because *Ameriprise* does <u>not</u> stand for the proposition that apparent authority is always a jury question, as she implies. Instead, the contours of an alleged agent only belong to the trier of fact "so long as facts remain in dispute." *Tex. Cap. Bank, N.A. v. Ameriprise Fin. Servs., Inc.*, No. 3:08-CV-1186-N, 2011 WL 6189494, *2 (N.D. Tex. May 20, 2011). **The facts here are not in dispute**. So, as *Ameriprise* states in the <u>very next sentence</u>, "If the facts are uncontroverted or otherwise established, the existence of an agency relationship is a pure question of law." *Id.* (quotations and citations omitted). It was, and still is, *Defendant's* burden to prove, by a preponderance of the evidence, as the party asserting agency, Logwood's apparent authority. *See Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d

671, 691 (Tex. 2017). The uncontroverted facts Defendant asserts above are legally insufficient to establish apparent authority to bind Legacy to a pre-contractual oral promise. *See Coffey*, at 681–82 ("A manufacturer is not liable under apparent agency merely because their dealer exhibited signs, advertisements, and pamphlets with the manufacturer's logo."). Especially where, as here, Defendant knew (based on her own admissions) that:

- Legacy never represented that Logwood had any authority to negotiate terms or to modify payment provisions in the Agreements (Plf. MSJ Appx., Ex. 1 (Leeberg Tr.), 79:6–10, App_0017).
- Logwood ran his own distributor business, called Apex (*id.* at 58:24–25, 147:24–148:1);
- Logwood's email domain was that of his own business, not Legacy (*id.* at 105:22–23); and
- Logwood was a distributor for multiple suppliers, not just Legacy (*id.* at 58:24–59:4).

A prerequisite to finding apparent authority is "evidence of conduct by the principal [] which would lead a reasonably prudent person to believe an agent had authority." *Nat'l Advert. Co.*, 894 S.W.2d at 787. Without doubt, knowing that Logwood was an independent distributor, as Defendant acknowledges—*see* Def. Resp. (Doc. 51), pp.2–3—Legacy's designation of Logwood as a "Sales Rep" and copying him on some emails would not lead a reasonably prudent person to believe Logwood could bind Legacy, alter its standard agreements, or create new ones (especially **unwritten** ones) on its behalf. Even more, Defendant had an affirmative obligation to exercise diligence to learn both the facts and scope of the alleged agent's authority. *Id.* She did nothing. Otherwise, dealing with the agent without doing so is at the party's own risk. *Id.*

Leeberg's reliance on *Gaines* for the proposition that Legacy clothed Logwood with indica of apparent authority is misplaced. Here, like in *Gaines,* "the summary-judgment evidence in this case consists almost entirely of acts or statements attributed to the alleged agent," not on the conduct of the principal. *Gaines v. Kelly*, 235 S.W.3d 179, 183 (Tex. 2007). In *Gaines*, the court held that there was no proof that the intermediary who delivered documents and facilitated the

transaction had authority to negotiate and commit the lender to a deal. *Id.* at 183. The record must establish the principal's full knowledge of all the material facts to prove a claim of apparent authority based on the principal's conduct. *Id.* at 182. Leeberg cites invoices and emails showing Logwood's APEX email address as evidence of his apparent authority, but presents no additional proof that simply listing his email authorized him to modify fully integrated agreements requiring written changes, nor does Leeberg provide any other conduct from Legacy indicating that Logwood was given such power. Leeberg attempts to argue that Legacy's "silence justified Leeberg's reliance upon [Logwood's] representations." Def. Resp. (Doc. 51), p.3. But at no point does Leeberg offer any evidence that Legacy was aware of Logwood's alleged "guarantee" to write off denied claims. If Leeberg was meeting with Logwood, receiving information unbeknownst to Legacy, as is the case, then Legacy's "silence" means nothing.

Leeberg further argues that she acted as a reasonably prudent person when she did not inquire about the scope of Logwood's authority because there were no circumstances that should raise questions in the mind of a reasonable party. Not so. An extraordinary transaction should raise questions in the mind of a reasonable party to inquire into the scope of an agent's authority. *Overseas Carriers, Inc. v. Team Ocean Servs.-Dallas, Inc.*, No. H-10-2842, 2013 WL 76300, *14 (S.D. Tex. Jan. 4, 2013). Agreements that appear to not benefit the principal fit squarely within the "extraordinary transaction" category. *Id.* An agreement that deprives Legacy of its contractual right to payment does not benefit Legacy and does not otherwise appear to have a benefit for Legacy. Logwood's alleged "no payment unless reimbursed" promise should have caused Leeberg to investigate the scope of his authority, especially since she signed five separate agreements and received denials as far back as November 2023. *See* Def. Resp. (Doc. 51), p.27. She made no such investigation. Leeberg did not reach out to anyone at Legacy at any time to investigate the scope

of Logwood's authority. While there is no separate element of proving due diligence, "failure to inquire under some circumstances may be evidence that the reliance was unreasonable because diligence and discretion were not exercised." *Thomas Reg'l Directory Co., Inc. v. Dragon Prods., Ltd.*, 196 S.W.3d 424, 428 (Tex. App.–Beaumont 2006). This is one of those circumstances. Accordingly, Leeberg lacked a reasonable belief in Logwood's authority to bind Legacy, because she did not investigate his authority in circumstances that require such investigation.

### (ii)    Defendant's integration clause arguments are immaterial

Defendant's integration clause **arguments are immaterial**. *See* Def. Resp. (Doc. 51), pp.7–10. Legacy need not prove it has fully integrated contracts with Defendant to prevail at summary judgment on its breach of contract claim; Defendant's arguments miss the point. The relevance of the integration clause is two-fold: (1) its presence makes it less likely that Defendant reasonably relied on any oral promise, since it is disclaimed in the written agreements she read and signed, and (2) it says that changes to the agreement must be in writing, which reduces the likelihood that a reasonably prudent person would think Logwood had the authority to modify the agreement orally. But it is not the case that Legacy needs to prove that the contract is fully integrated to succeed in its claim, as Defendant suggests.

### (iii)    Logwood's alleged guarantee is not a new agreement for a limitation of liability

She also tries to recast Logwood's so-called guarantee as a "new" agreement for "a limitation of liability," separate and distinct from the Agreements she signed, to avoid the Statute of Fraud (SOF)/UCC bar on oral modifications to contracts for the sale of goods. *Id.* at p.16. But Defendant uses a variation on the word "modification" nearly twenty times in her brief in recognition of the fact that her entire argument is that Logwood had the authority to modify her existing Agreements by reading into them this verbal guarantee of write-offs for non-

reimbursement. This alleged "modification" guarantee cannot be a "new" agreement for "a limitation of liability" that can avoid the SOF/UCC's bar on oral modifications on contracts for the sale of goods. *See Haase v. Glazner*, 62 S.W.3d 795 (Tex. 2001).

(iv)    If true, Logwood's alleged oral promise would materially change Defendant's written agreements, which would make the oral promise subject to the Statute of Frauds

Defendant tries to avoid the Statute of Frauds by arguing that Logwood's alleged oral modification "does not materially alter the underly written contract." *Id.* at pp.16–18. That is absurd. The Agreements **explicitly** say that Defendant owes Legacy the balance of each invoice within a certain number of days following product shipment—no exceptions. *See* Plf. MSJ Appx. (Doc. 48), Ex. 2 (Agreements), ¶6. Any term, oral or written, later saying that payment is no longer due if Medicare denies reimbursement is the same as adding an exception to or condition precedent an otherwise clear contractual payment term. That is the definition of material change. Indeed, the character or value of the underlying agreement must remain unaltered for the oral modification to be enforceable. *Grp. Hosp. Servs., Inc. v. One & Two Brookriver Ctr.*, 704 S.W.2d 886, 890 (Tex. App.–Dallas 1986, no writ). Here, a promise to forgo payment upon a condition precedent (non-reimbursement by insurance) would change both the character of the Agreements and the value that Legacy receives from the Agreements. In other words, an agreement where Legacy provides the products and Leeberg pays on a contingent basis is an agreement of a different character than the one she signed. *See L. Off. of Andrew L. Jones, P.C. v. Schachar*, 2020 WL 633677, at *4 (Tex. App. Feb. 11, 2020).

Further, her alleged course of conduct evidence is insufficient to alter the terms of an unambiguous agreement. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 313 n. 3 (Tex.2005) (per curiam); *Sw. Pipe Servs., Inc. v. Kinder Morgan, Inc.*, No. 14–09–00601–CV,

9

2010 WL 2649950, at *5 (Tex. App.-Houston [14th Dist.] July 6, 2010, no pet.); *James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 437 (Tex. App.–Dallas 2006, no pet.); *Atl. Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777, 783–84 (Tex. App.–Houston [14th Dist.] 1989, no writ). While Legacy's corporate designee acknowledged that Legacy sometimes afforded customers flexibility on the timing of payments, this did not change the payment provisions of the Agreements. Plf. Supp. MSJ Appx., Ex. 18 (Bini Tr.) 126:7–18.

Bini confirmed that there was no written amendment extending the contractual deadlines. Bini Tr. 140:17–20. She also confirmed that while Legacy continued shipping product to Leeberg despite a "large balance due and owing," Legacy did so to avoid interrupting patient care, and ultimately stopped selling because of the balance and she was no longer treating patients with Legacy's products. Bini Tr. 128:11–25, 129:1–10. Those accommodations did not change the fundamental payment term in the Agreements. The law enforces these payment terms as written and precludes parol evidence to add, vary, or contradict them. *See Givens v. Dougherty*, 671 S.W.2d 877, 878 ("To allow the very existence of a contract to be negated by parol evidence would be to render the Statute of Frauds a nullity.").

### C.    LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S BREACH OF CONTRACT CLAIMS BECAUSE LEGACY DID NOT BREACH ANY OF THE AGREEMENTS AND DEFENDANT CANNOT DEMONSTRATE CAUSATION AS A MATTER OF LAW

#### 1.    Legacy Did Not Breach Any of the Agreements

Defendant asserts she is entitled to damages for breach of contract because the amniotic allografts she received "were non-conforming to their intended use," that is, "as described in the IFU[1] furnished by Legacy[.]" *See* Def. Countercl. (Doc. 21), ¶¶ 56, 63, 70. Specifically, she argues

---

[1] IFU stands for "Instructions for Use." IFUs are manufacturer-created regulatory documents required for medical products that provide safety and procedural guidance for healthcare providers, patients, and caregivers. Plf. MSJ Appx.

"Legacy's [amniotic allografts] did not conform to their intended use because they were sold to [Defendant] for the purpose of wound treatment [but] were not approved [] for wound treatment [,] and that they qualified for reimbursement by Medicare." Def. Resp. (Doc. 51), pp.18–19. She also claims Legacy "indicat[ed] [the grafts] were suitable for [] applying [] without sutures" when they "needed to be applied with sutures or staples." *See* Def. Amed. Ans. (Doc. 20), First Affirmative Defense. Legacy is entitled to summary judgment on these claims because this is not so.

*First*, the parties' contracts do not mention product use beyond saying clearly that "Customer and Legacy Medical Consultants acknowledge that **use of any Product is at the sole discretion of the treating provider**, pursuant to his or her professional medical judgment." Plf. MSJ Appx. (Doc. 48) Ex. 2 (Agreements), APP_0082, 0086, 0090, 0094, 0098 (emphasis added). The contracts do not mention any "IFU," reimbursement by Medicare, or sutures or staples. *Id.* The contracts also never use the words "wound treatment." *Id.* Rather, what Defendant agreed to purchase, and Legacy agreed to sell, were "human cell and tissue products" to be used "at the sole discretion of the treating provider." *Id.* Everything else, like the "IFU," is separate from the signed contracts. Such evidence cannot be incorporated into the contract terms and constitutes inadmissible parol evidence.

*Second*, even if considered, the amniotic allografts **did** conform to their intended use as described in their IFUs. There remain no genuine issues of material fact regarding whether they did. To illustrate, Defendant first claims the IFUs said the grafts were intended to be used for "wound treatment." Def. Resp. (Doc. 51), pp.18–20. On the contrary, that is **not** what the IFUs

---

(Doc. 48), Ex. 3 (Kohler Report), ¶27, APP_0110. They are not created by Legacy but do accompany the product when shipped.

say. The Impax IFU specifically says under "Product Use" that the Impax Membrane grafts are "intended for use as a Human Cell, Tissue, and Cellular and Tissue-Based Product (HCT/P) for repair, reconstruction, replacement, and/or supplementation by providing tissue in the form of scaffolding in partial and full-thickness acute and chronic wounds." Def. Resp. Appx. (Doc. 51), Ex. F (Impax IFU). That is exactly what the FDA approved IMPAX Membrane for:

> **IMPAX Membrane** is a human allograft tissue that is regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P) as defined by 21 CFR 1721. **IMPAX Membrane** received written notification by the FDA's Tissue Reference Group confirming **IMPAX Membrane** meets the criteria for regulation solely under Section 361 of the PHS Act as defined in 21 CFR Part 1271.

*Id*. The IFU and the FDA approval match, directly refuting Defendant's characterization of the IFU as saying the product is approved solely for "wound treatment." It is the same for the Zenith IFU. Indeed, the Zenith IFU says: "**Zenith Amniotic Membrane** is intended for use <u>as a protective wound covering</u> in partial-and full-thickness acute and chronic wounds." *Id.* at Ex. M (Zenith IFU) (underline added). And like the Impax IFU, the Zenith IFU confirms:

> **Zenith Amniotic Membrane** received written notification by the FDA's Tissue Reference Group confirming Zenith Amniotic Membrane meets the criteria for regulation solely under Section 361 of the PHS Act as defined in 21 CFR Part 1271.

*Id.* In short, Legacy's amniotic allografts are HCT/P products, regulated under section 361 of the Public Health Service (PHS) Act, intended for homologous use. 21 CFR § 1271.10. Indeed, Defendant's applicable Local Coverage Determination (LCD)—L36377—titled, "Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities" confirms that these products *are reimbursable* for certain wound care applications. Plf. MSJ Appx. (Doc. 48), Ex. 10 (LCD L36377). The products Legacy sold to Defendant are fit for these intended purposes and would be reimbursable had Defendant used the product in accordance with her applicable LCD and properly documented medical necessity. *See id.* at APP_0221–0222; *see also* Ex. 13 (*Gateway*

Opinion), APP_0260 ("I am persuaded that the foregoing supports coverage. Impax was approved by the FDA as an HCT/P under the 361 process.").

To the extent Defendant is claiming Rick Logwood—an individual who is not a Legacy employee or agent—told her the products could or should be used differently[2], such a representation cannot alter the unambiguous terms of the agreements *or* the IFUs, that is, that Leeberg alone determines the medically appropriate use.

Defendant next claims that the products were non-conforming because the IFUs said the grafts did **not** need to be sutured or stapled to the patient, while Medicare (or CMS or the FDA) said they **did**. This is likewise not true, and there are no remaining issues of fact regarding whether it is. The Zenith IFU makes no mention of sutures or staples, and the Impax IFU very clearly says: "The graft is anchored based on the physician's choice of fixation *including* staples or sutures [] *when medically necessary*." Def. Resp. Appx. (Doc. 52), Ex. F (Impax IFU). The IFU does not say staples or sutures are, or are not, required. This language leaves the manner of application up to the treating provider. Likewise, Medicare does not mandate their use. Indeed, Defendant's applicable LCD confirms: "The graft is anchored using the individual's choice of fixation." Plf. MSJ Appx. (Doc. 48), Ex. 10 (LCD L36377), APP_0219.

Defendant's reliance on Legacy's "updated" IFUs is misplaced. *See* Def. Resp. (Doc. 51), pp.20–21. First, Defendant misleadingly exaggerates the differences between the IFUs, arguing that the "updated" IFU "contains a drastically different application method [] which aligns with the instructions Leeberg was originally provided by Logwood." *Id.* at 21. It does not: both IFUs say that product application is up to the provider. But second, as a matter of pure logic, updating

---

[2] Defendant states in her Response that "she used Legacy's products precisely in the manner Logwood [] prescribed[.]" Def. Resp. (Doc. 51), p.20.

an IFU does not prove that previous versions of a product's instructions were "wrong" or that the products are non-conforming with approved FDA uses. There are many reasons why the language within an IFU may change, including product evolution or regulatory changes, and Defendant has offered no evidence beyond conjecture that *Legacy's* IFU was changed because its products were non-conforming. This argument, entirely based in speculation, cannot defeat summary judgment. Moreover, any IFU updates *after* the date of relevant service cannot retroactively establish non-conformity.

In short, Defendant conflates "fit for its intended purpose" with "Medicare will reimburse me." *See* Def. Resp. (Doc. 51), pp.18–22. Defendant acknowledged the product "worked" for her patients (Plf. MSJ Appx. (Doc. 48), Ex. 1 (Leeberg Tr.) 113:20–114:1; *see also* Plf. MSJ (Doc. 47), p.5), but coverage depends upon her compliance with the LCD's coverage criteria and proper billing and documentation of her claims. Simply put, Defendant's definition is not what fitness for use means. *See* Plf. MSJ (Doc. 47), pp.32–34.

### 2.    Defendant Cannot Demonstrate Causation as a Matter of Law

To succeed in her counterclaim, Defendant needs to prove that Legacy caused her alleged damages, which according to her are Medicare's denial of her claims for reimbursement. In her Response, Defendant argues that Medicare's denials are "non-final decisions," thus creating "genuine issues of material fact" surrounding whether Legacy caused her denials by tendering "non-conforming" goods. *See* Def. Resp. (Doc. 51), pp.22–23. Apart from the fact that the Legacy products ***are*** "fit" for their intended use, this proves—rather than disproves—Legacy's point. Legacy cannot, as a matter of law, be said to have caused Defendant's alleged damages (i.e., Medicare's denials) since these denials turn on her documentation of the product's use and billing, and Defendant concedes she is still appealing these decisions. It may very well turn out to be the

case that Defendant caused her own denials because of her lack of medical documentation, as Legacy's expert opines. *See* Plf. MSJ Appx. (Doc. 48), Ex. 3 (Kohler Report), APP_0113, 0114. Indeed, given that Defendant is responsible for documenting medical necessity, and Medicare is responsible for deciding whether such documentation fits the coverage criteria, it begs the question to say Legacy caused anything. Simply put, "there are too many intervening factors for proximate causation to be proven here." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001). The Court should grant summary judgment on Defendant's breach of contract claims.

### D.    LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S FRAUDULENT MISREPRESENTATION COUNTERCLAIM AT COUNT IV, BECAUSE DEFENDANT CANNOT ESTABLISH THE REQUISITE SCIENTER ELEMENT AS A MATTER OF LAW AND NO GENUINE ISSUES OF FACT REMAIN

Defendant's fraudulent misrepresentation counterclaim (Count IV) is premised solely on an alleged oral representation by Rick Logwood (and only Rick Logwood[3])—that beginning in March of 2022 and continuing until June 2024, Rick Logwood "guaranteed" Defendant Legacy would not collect payment for any grafts not reimbursed by Medicare. Def. Countercl. (Doc. 21), ¶75. There are no genuine issues of material fact left to resolve regarding what the representation allegedly was or when and how often it was made. To be clear, Legacy contests that the representation was ever made, but even accepting Defendant's version of events for summary judgment purposes, she cannot establish the scienter element of fraud as a matter of law because she has offered no evidence that Logwood—the person who allegedly made the representations

---

[3] In Count IV of her counterclaims, Defendant initially alleged that both Rick Logwood *and* Brian Rowan made the alleged oral representation. *See* Def. Countercl. (Doc. 21), ¶75 ("by and through its agents Rick Longwood [sic] *and* Brian Rowan") (emphasis added). Later, at her deposition, Defendant admitted this allegation to only involve Rick Logwood. Plf. MSJ Appx. (Doc. 48), Ex. 1 (Leeberg Tr.) 86:12–87:5.

which she imputes to Legacy—never intended that the promise to write off invoices on denied claims would be performed.

Under Texas law, fraud based on a promise of future performance requires proof that "the person making the promise had no intention of performing at the time he made the promise." *AHBP LLC v. Lynd Co.*, 649 F.Supp.3d 371, 385 (W.D. Tex. 2023) (citing *Fluorine on Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004)). Even assuming *arguendo* that Logwood was Legacy's agent, Defendant still must prove that Logwood—as the speaker—had scienter. Under Texas law, a principal is generally not vicariously liable for the torts of an independent contractor, and vicarious liability requires proof that the agent committed the tort. *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998); *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 563–64 (Tex. App.—Houston [14th Dist.] 2012). To establish Logwood's fraud, Defendant must prove that "when the representation was made, the <u>speaker</u> knew it was false or made it recklessly without any knowledge of the truth as a positive assertion." *Id.* at 389 (emphasis added). The relevant inquiry, therefore, is whether the *speaker*—here, Logwood—possessed the requisite scienter at the time of the alleged misrepresentation.

Defendant's counterclaims allege that "Legacy, by and through its agents Rick [Logwood] and Brian Rowan[4], knew or should have known at the time such representations were made to Leeberg that they were false as Legacy never intended to forego collection." Def. Countercl. (Doc. 21), ¶76. But this conclusory allegation conflates Legacy's intent with Logwood's individual scienter—and Defendant offers no evidence whatsoever that *Logwood himself* knew his alleged "guarantee" was false and would never be performed by Legacy.

---

[4] Defendant has since clarified that Brian Rowan has nothing to do with this alleged representation. *See supra* n.4.

The distinction is critical. Logwood was not a Legacy employee; he was an independent sales representative operating through his own company, Apex MDCL. Kimberly Bini, Legacy's corporate representative, testified that Legacy was not even aware of the alleged "no-collection" representation until Defendant filed her counterclaim. Plf. Supp. Appx., Ex. 18 (Bini Tr.) 142:25–143:4. Legacy further confirmed that Logwood "had no authority to make that representation to Ms. Leeberg." *Id.* If Legacy itself was unaware of Logwood's alleged statements, then there is no basis to impute Legacy's knowledge or intent to Logwood at the time of his alleged representations.

In sum, Defendant has produced no evidence that Logwood knew, believed, or intended, at the times he allegedly made his "guarantee," the representation to be false. There is no email, text message, internal memorandum, or testimony suggesting Logwood possessed any such intent that his promise to write off denied claims would not be performed. Defendant's own testimony confirms she never communicated directly with anyone at Legacy until "issues down the road"— well after the alleged representations were supposedly made. Plf. MSJ Appx. (Doc. 48), Ex. 1 (Leeberg Tr.) 78:12–16. If Defendant's only communications were with Logwood, and Legacy was unaware of Logwood's alleged statements, then to impute Logwood allegedly false statements to Legacy, Defendant must establish that Logwood knew his statements were false when he made them. Simply put, the record is devoid of any evidence that Logwood possessed contemporaneous knowledge that his alleged promise/guarantee would never be performed. Defendant's speculation and hindsight is insufficient to create a genuine issue of material fact on the scienter element of her fraud claims.

**E.    LEGACY IS ENTITLED TO SUMMARY JUDGMENT ON BOTH OF DEFENDANT'S FRAUDULENT MISREPRESENTATION CLAIMS (COUNTS IV AND V), BECAUSE DEFENDANT CANNOT ESTABLISH JUSTIFIABLE RELIANCE AS A MATTER OF LAW AND NO GENUINE ISSUES OF MATERIAL FACT REMAIN**

Both of Defendant's fraud counterclaims (Counts IV and V) fail as a matter of law because Leeberg cannot establish justifiable reliance, an essential element of any fraud claim under Texas law.

Justifiable reliance "can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *JPMorgan Chase Bank, N.A. v. Orca Assets, G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018). One such circumstance is when the alleged oral misrepresentations conflict with the parties' actual contract: "[R]eliance upon an oral representation that is directly contradicted by the express unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.* at 658 (citation omitted); *see also Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 498 (Tex. 2019); *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424–25 (Tex. 2015). "A contract sufficiently contradicts a representation if the meaning of the contract conflicts with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation." *Barrow-Shaver*, 590 S.W.3d at 498 (internal quotations omitted).

Here, Defendant alleges that Logwood told her she would not have to pay for grafts if Medicare denied reimbursement. Those alleged assurances cannot be reconciled with the Agreements' express payment clauses, which require payment "within forty-five (45) days of the date of the Invoice" or within "forty-five (45) [or] sixty (60) days after product shipment," with no exception for reimbursement outcomes. *See* Plf. MSJ Appx. (Doc. 48), Ex. 2 (Agreements), ¶6. An alleged oral promise that Defendant would *never* have to pay for products if Medicare denies

reimbursement is flatly contradicted by these written terms in the Agreements requiring payment in 45 or 60 days *regardless of reimbursement* as a matter of basic logic.

Defendant argues that Legacy's justifiable reliance argument "fails as a matter of law and fact as it rests on a distorted reading of the Agreements, ignores Legacy's own course of conduct, and improperly asks this Court to resolve disputed factual issues on summary judgment." Def. Resp. (Doc. 50), p.25. Not so. Courts will decide the issue of contract ambiguity, and the plain language of the text controls. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 475. Payment was due on defined timelines without any contingency tied to Medicare reimbursement, and there is no signed writing altering that obligation. Texas law does not permit a party to reasonably rely on an alleged oral assurance that squarely contradicts a written, unambiguous, integrated agreement the party read and signed. *JP Morgan*, 546 S.W.3d at 658; *Nat'l Prop.*, 453 S.W.3d at 424–25.

Defendant concedes she read the Agreements before signing them. Plf. MSJ Appx. (Doc. 48), Ex. 1 (Leeberg Tr.) 110:21–22 ("Q. Prior to executing those agreements, this agreement, in particular. Did you read these documents? A. I did."). She further admitted the Agreements state that: (1) she would pay within 45 days (*id.* at 127:21–23); (2) she, as the treating provider, would determine medical necessity (*id.* at 128:3–5); and (3) the Agreements are integrated, that is, they contain the entire agreement between the parties (*id.* at 128:25–129:2). Indeed, the Agreements contain clear and unambiguous integration and no-oral-modification provisions requiring a signed writing for any change: "This Agreement contains the entire agreement between the Parties concerning the subject matter hereof [and] may be amended or modified only by a written agreement signed by both parties." Plf. MSJ Appx. (Doc. 48), Ex. 2 (Agreements), ¶7.

Defendant's argument that the Agreements' integration clauses do not "expressly disclaim" reliance on prior representations misses the point. Legacy does not contend the integration clause

19

alone bars Defendant's fraud claims. Rather, justifiable reliance fails for an independent reason: Texas law holds that a party cannot justifiably rely on oral statements that contradict a contract's unambiguous written terms, *regardless* of whether the merger clause contains specific disclaimer language. *See JP Morgan*, 546 S.W.3d at 658; *Nat'l Prop.*, 453 S.W.3d at 424–25. Nor does course-of-dealing leniency on payment timing create a new different obligation to forgive the payment obligations; the Agreements themselves foreclose oral modification. *See* Agreements, ¶7; *see also* Plf. Supp. Appx., Ex. 18 (Bini Tr.) 125:17–126:18, 140:10–141:7 (explaining departures from 45/60-day window were accommodations, not contractual changes).

Defendant's merger-clause citations do not change this justifiable-reliance analysis. For example, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, holds that a generic merger clause, standing alone, does not bar all fraudulent inducement claims absent a clear reliance disclaimer. 341 S.W.3d 323, 332–33 (Tex. 2011). But *Italian Cowboy*[5] does not permit reliance on an oral representation that directly conflicts with the contract's express terms. *See Nat'l Prop.*, 453 S.W.3d at 424–25; *JP Morgan*, 546 S.W.3d at 658. Rather, the well-established principle remains that "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him"—such as when the meaning of the parties' contract "conflicts with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation." *Roxo*, 713 S.W.3d at 409 (quoting *Barrow-Shaver*, 590 S.W.3d at 498) (alterations and quotation marks

---

[5] Italian Cowboy involved alleged misrepresentations about latent physical defects—specifically, a persistent sewer gas odor—that were not directly contradicted by any express lease provision. This case is fundamentally different. Here, the alleged "oral guarantee" directly contradicts the Agreements' express, unambiguous payment obligations. Defendant does not allege fraud concerning some latent condition or collateral fact, but instead claims she was promised she would not have to pay—precisely the opposite of what the Agreements require. When the alleged oral representation directly conflicts with an express, unambiguous contract term the plaintiff read and signed, reliance is unjustified as a matter of law even absent a specific disclaimer. *See* Nat'l Prop., 453 S.W.3d at 424–25.

omitted). Indeed, "as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Nat'l Prop.*, 453 S.W.3d at 424.

Moreover, as a sophisticated, "board certified" medical provider with over twenty-five years' experience, Def. Countercl. (Doc. 21) ¶5, it is unfathomable Leeberg would rely on the alleged representations by Logwood when she has an independent professional understanding of Medicare's complex billing regulations governing denials, reimbursement, and the appeals process, which place the obligation to comply with these rules solely on her. *See* Plf. MSJ Appx. (Doc. 48), Ex. 1 (Leeberg Tr.) 119:7–120:3, 204:11–17, 217:18–25.

The record establishes that Defendant understood her obligation to pay irrespective of reimbursement, and that Defendant's own email communications belie her fraud theory. In an email to Logwood dated March 23, 2023—which Defendant never produced and which Plaintiff obtained by way of subpoena[6]—Defendant disputed certain invoice amounts, but acknowledged her payment obligations for products received, writing that she would "eat the cost" on certain items. Supp. Appx., Ex. 17, APEX-LEEBERG_00000013. A party who believes she has an ironclad "guarantee" against collection does not volunteer to "eat the cost" of disputed invoices. In another email exchange from the same period, in March 2023, when Legacy sent a statement of account seeking remittance of unpaid amounts, Defendant disputed some entries as already paid and insisted Legacy "give me an accurate invoice," reflecting an understanding that she owed the invoiced balance once accurately stated. Doc. 52-8 at Appx_0036–0039. This contemporaneous

---

[6] On December 23, 2025, prior to the close of discovery and the parties' dispositive motions deadline, Plaintiff filed a Notice of Issuance of Subpoena for Production of Documents directed to non-party APEX MDCL LLC. Counsel for APEX MDCL LLC did not supply responsive documents until *after* Plaintiff's Motion for Summary Judgement was filed, on February 19, 2026. The return yielded 26 documents, all of which were produced to Defendant prior to the filing of this Reply.

conduct directly contradicts Defendant's claim that she had a reasonable belief she would never have to pay for products that Medicare did not reimburse. For these reasons, Defendant cannot establish justifiable reliance as a matter of law.

### F.    THE ECONOMIC LOSS DOCTRINE PREVENTS DEFENDANT FROM BRINGING COUNTERCLAIM V

Defendant argues that the economic loss rule does not bar Count V because the IFUs are not incorporated into any of the Agreements. Def. Resp. (Doc. 51), p.29. Legacy agrees that the IFUs are not incorporated, which is why Defendant's breach of contract claims fail. However, whether the IFU is a contract term is a different question from whether Count V arises out of the parties' contractual relationship. *See Miller v. CitiMortgage*, LLC, 970 F.Supp.2d 568, 583 (N.D. Tex. 2013) ("Under Texas law, if a tort claim arises solely from the parties' contractual relationship, the tort claim is not allowed."). It plainly does, and Count V is an attempt to recover for purely economic losses arising out of the same contractual transaction.

Texas courts consider whether a tort claim is "for breach of duty created by contract, as opposed to a duty imposed by law" and whether "the injury is only the economic loss to the subject of the contract itself." *Id.* at 584. Both factors favor Legacy. Count V alleges no independent duty. To the contrary, Defendant's own counterclaim ties the alleged misrepresentations directly to Legacy's sale of products "in connection with" the Agreements—the same products and the same transaction at issue in Counts I–III. *See* Def. Countercl. (Doc. 21), ¶ 20. Count V also seeks the exact same damages as Counts I–III: economic losses from Medicare denials. *Id.* at ¶¶87–88. Defendant alleges no physical harm, injury, or property damage separate from her alleged economic losses under the Agreements.

Additionally, Defendant's reliance on *Formosa Plastics* is misplaced. In *Formosa*, the defendant made misrepresentations in a bid package prior to contract signing. These

misrepresentations induced the plaintiff to submit a low bid and enter into the contract. The Court held that the "legal duty to not fraudulently procure a contract is separate and independent from the duties established by the contract itself*." Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, Inc., 960 S.W.2d 41, 46 (Tex. 1998).

Count V does not allege that Legacy made misrepresentations to induce Defendant to enter the Agreements. Rather, it alleges misrepresentations over a two-year period during contract performance—that Legacy furnished an inaccurate IFUs during the course of performance and instructed Leeberg to disregard it while performing under the Agreements. Def. Countercl. (Doc. 21), ¶¶ 81–88. The substance of Count V is indistinguishable from Counts I–III. Defendant has simply repackaged her breach of contract theory as fraud. For these reasons, the economic loss rule bars Count V as a matter of law.

## G.    LEGACY IS ENTITLED TO ATTORNEYS' FEES

Defendant's argument in her Response that Legacy cannot recover attorneys' fees rests on a recitation of the American Rule, but fails to acknowledge that Legacy fits squarely into the rule's statutory exception, as Legacy brings this action as a sworn account.

The general rule on attorneys' fees provides that fee awards are generally prohibited, unless specifically authorized by statute or contract. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). Section 38.001 of the Texas Civil Practice and Remedies Code authorizes the recovery of attorneys' fees for claims based on, among other things, a sworn account or an oral or written contract. *See* Tex. Civ. Prac. & Rem. § 38.001.

Here, Legacy brings its claims as a sworn account, supported by David M. Cornell's affidavit affirming Defendants' outstanding balance. Doc. 6, Ex. F. Because Legacy's claim falls within this statutory exception, the American Rule does not bar recovery of attorneys' fees. For

that reason, Legacy is entitled to recover its reasonable and necessary attorneys' fees incurred in prosecuting this action.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant summary judgment in its favor on its breach of contract claim (Count I). Legacy further requests that the Court grant summary judgment dismissing Defendant's counterclaims. Finally, Legacy is entitled to recover its reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 38.001.

Dated: March 9, 2026                             Respectfully submitted,

                                                 **BLANK ROME LLP**

                                                 /s/ *Megan A. Altobeli*
                                                 Gregory J. Moore
                                                 Texas Bar No. 24055999
                                                 Audrey F. Momanaee
                                                 Texas Bar No. 24055993
                                                 Fed Bar No. 724132
                                                 717 Texas Avenue, Suite 1400
                                                 Houston, Texas 77002
                                                 (713) 632-8613
                                                 Gregory.Moore@BlankRome.com
                                                 Audrey.Momanaee@BlankRome.com

                                                 -and-

                                                 Megan A. Altobelli (local counsel)
                                                 Texas Bar No. 24107116
                                                 200 Crescent Court, Suite 1000
                                                 Dallas, Texas 75201
                                                 (972) 850-1467 M. Altobelli Direct
                                                 Megan.Altobelli@BlankRome.com

                                                 **ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a true and correct copy of the foregoing document has been served on all parties and counsel of record through the Court's CM/ECF filing system on this 9th day of March 2026, in accordance with the Fed. R. Civ. P. 5(b)(2).

                                  */s/ Megan A. Altobelli*
                                    Megan A. Altobelli

25